IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS; NY DIVISION

-------------------------------------------------------------------X

IN THE MATTER OF                               CHAPTER 13
Richard Holt, **DEBTOR**                        CASE NO. 16-23653-rdd

-------------------------------------------------------------------X

16-23653-rdd, **DEBTOR**

Plaintiff

v.

WAMU ASSET ACCEPTANCE CORP,
NOT IN ITS INDIVIDUAL CAPACITY,
                              **COMPLAINT**

Defendant

-------------------------------------------------------------------X

**COMPLAINT OF THE PLAINTIFF PURSUANT TO 11 U.S.C. SECTION 506(A)
AND BANKRUPTCY RULE 3012 TO DETERMINE THE VALUE OF
SECURITY AND CREDITOR'S ALLOWED SECURED CLAIM AND
COMPLAINT FOR DAMAGES, SANCTIONS AND INJUNCTIVE RELIEF**

## I. INTRODUCTION

1.1 This is an action for actual and punitive damages filed by the Plaintiff Richard Holt, (hereinafter "Plaintiff") pursuant to Sections 105, 362, 501, 502, 503 and 506 of the Bankruptcy Code, and Rules 2016(a), 3001, 7001(1), 7001(2), 7001(7), 7001(8) and 7001(9) of the Federal Rules of Bankruptcy Procedure to determine the interest of the Defendants in the residential real estate of the Plaintiff and determine the amount of the allowed secured claim, if any, of the Defendants.

1.2 This Complaint focuses on the improper accounting of escrow, fees, charges and misapplication of payments by various entities including the Defendant WAMU ASSET ACCEPTANCE CORP, "WMAA", Washington Mutual Bank, "WaMu", JPMorgan Chase Bank NA, "JPMCB", Washington Mutual FA, "WaMuFA" in the proof of claim filed against the Plaintiff's estate for improper amounts owed as certified by employees, agents and related parties of the Defendants and its attorneys, acting as agents, and in pleadings filed by the Defendant.

1.3 This Complaint focuses on the fraud perpetrated on the Court and the Plaintiff by the Defendant filing an earlier and false proof of claim together with fraudulent documents in support thereof and the Defendants' fraudulent misrepresentation of the owner of the Plaintiff's claimed Mortgage Loan and the identity of the real party in interest.

1.4 This Complaint focuses on the fraud perpetrated by the Defendant by way of its fabrication of documents.

1.5 This Complaint seeks declaratory judgment as to the precise nature and extent of any lien and debt claimed by the Defendant and its predecessors and successors.

## II. PARTIES

2.1 The Plaintiff in this case is a Debtor under Chapter 13 of Title 11 of the United States Code in case 16-23653-rdd which case was filed on December 1, 2016 and is presently pending before this Court.

2.2 Defendant WMAA is an investor and owner of mortgage loans.

WAMU ASSET ACCEPTANCE CORP is a Delaware Corporation, a chartered national bank, is headquartered in New York, NY and may be served by mailing a copy of the Summons and Complaint, via first class U.S. Mail, c/o THE CORPORATION TRUST COMPANY,, CORPORATION TRUST CENTER 1209 ORANGE ST DE 10017. The President of which is John Doe I or Jane Doe I, who is an officer suitable for purposes of service of process.

## III. COMPLAINT

### A. JURISDICTION

3.1 Jurisdiction is conferred on this Court pursuant to the provisions of Section 1334 of Title 28 of the United States Code in that this proceeding arises in and is related to the above- captioned Chapter 13 case under Title 11 and concerns property claimed to that of the Debtor in that case.

3.2 This Court has both personal and subject matter jurisdiction to hear this case pursuant to Section 1334 of Title 28 of the United States Code, Section 157(b)(2) of Title 28 of the United States Code.

3.3 This Court has supplemental jurisdiction to hear all state law claims, if any, pursuant to Section 1367 of Title 28 of the United States Code. 3.4 The Plaintiff is informed and believes that this matter is primarily a core proceeding and therefore the Bankruptcy Court has jurisdiction to enter a final order. However, in the event this case is determined to be a non-core proceding then and in that event the Plaintiff consents to the

entry of a final order by the presiding United States Bankruptcy Judge.

## B. VENUE

3.5     Venue lies in this District pursuant to Section 1391(b) of Title 28 of the United States Code.

## RELEVANT FACTS

3.6     On or about March 22, 2000 non-party Washington Mutual Bank FA (hereinafter "WaMuFA" or "Originating Lender") allegedly made a mortgage loan to Plaintiff pertaining to 23 Ridgewood Road, CT 06830, (the "Property"), referred to in this Complaint as the "First Mortgage Loan" or "Mortgage Loan".

3.7     In connection with the First Mortgage Loan the Plaintiff, based on information and belief, is alleged to have executed a promissory note (the "First Mortgage Note") in the original principal amount of $308,000 payable to WaMuFA.

3.8     The First Mortgage Note was allegedly secured by a Mortgage on the Property dated March 22, 2000, and based upon information and belief, is recorded with the Town Clerk for Norwalk, CT, (the "First Mortgage"), which names MaMuFA. as the Lender.

3.9     On or about December 1, 2016, the Plaintiff filed a petition for Chapter 13 Bankruptcy for the Southern District of New York, White Plains, NY Division and was assigned case number 16-23653-rdd, (hereinafter the Plaintiff's Bankruptcy Case).

3.10     On March 8, 2017, case history item #29, the Defendant through loan servicer JPMCB filed an objection to the Plaintiff's Chapter 13 filing. Attached to exhibit "C" thereof is a note indorsed on page 6 of 6 by Cynthia Riley, stating that she is a Vice President of Washington Mutual Bank, F.A. The Plaintiff is attaching this note, the "Cynthia Riley-note", as exhibit "A" hereto.

3.20     However, in a previous bankruptcy filing by the Plaintiff, 15-22704-rdd, on May 19, 2015, in the instant Court, the United States Bankruptcy Court for the Southern District of New York at White Plains, NY, the Defendant through its servicer filed a proof of claim, no 3, on September 17, 2015.

3.30     In Part 3-1 thereof, the Defendant through its servicer attached a copy of the note supporting the claim. This note is distinctively different than the Cynthia-Riley note proffered by the Defendant through its servicer on March 8, 2017 in case history item #29. On page 1 of 1, a bull's eye appears in upper right hand corner. The Plaintiff has learned that this bull's eye represents that the note has passed through a rigorous authentication procedure by the Defendant. On page 6 of 6, there is no indorsement by a

Cynthia Riley, but instead two indorsements by a Mykisha Rush, representing herself as a Vice President. On the first indorsement Rush states JP Morgan Chase Bank NA as successor in interest by purchase from the FDIC, as Receiver for Washington Mutual Bank, FA. On the second indorsement, Rush indorses the note in blank, also as Vice President of JP Morgan Chase Bank NA. The Plaintiff is attaching this note, the "Mykisha Rush-note", as exhibit "B" hereto.

3.40    Previously, in a case CV-02-0192482 dated October 29, 2002, Washington Mutual FA vs Richard L Holt et al, in the State of Connecticut Superior Court for the Judicial District of Stamford-Norwalk at Bridgeport, CT, WaMuFA, the "Original case", submitted an affidavit by a Kellie Rohling, "Rohling" a proclaimed Vice President of WAMUFA, a to which was attached yet another note, see Exhibit "C" attached hereto with the affidavit of Rohling as the PNOTE"-note. On page 1 of 1 of said note, appears a bar code "PNOTE", not present on the Cynthia Riley note or the Mykisha Rush-note. The "PNOTE"-note is also marked "BEST AVAILABLE DOCUMENT". In item 2 of Rohling's affidavit, she states "A true and accurate copy of the Note is attached as Exhibit "C".

3.50    In the Original case, i e 2002-case, see the Attached complaint therein, Exhibit "E", in item 3 of the wherefore clause, the Plaintiff, WaMuFA, is suing for money damages against the makers of, or obligors on, the Note described herein (unless same has been precluded by virtue of a Bankruptcy filing);

3.55 In the body of the complaint in the original case, on the first page, item 3 the Plaintiff, WaMuFA states: On or about March 22, 2000, the Defendants, Richard L. Holt individually and on behalf of Dorsum Nemus Limited Liability Company, executed and delivered to Washington Mutual Bank FA, a Note (the "Note") for a loan in original principal amount of $308,000.00.

3.60    In item 4 of the first page, the Plaintiff, WaMuFA, states: On said date to secure said Note the Defendants, Richard L. Holt individually and on behalf of Dorsum Nemus Limited Liability Company , did execute and deliver to Washington Mutual Bank, FA, a mortgage o the Property, a copy of which is attached hereto as Exhibit "A. Said mortgage was dated March 22, 2000 and recorded March 27, 2000, in Volume 3876 at Page 250 of the Norwalk Land Record. The Plaintiff, Washington Mutual Bank, FA is the owner and holder of said Note and Mortgage.", Furthermore in item 5, "Said Note is in default and the Plaintiff, Washington Mutual as the owner and holder of said Mortgage and Note has elected to accelerate the balance due on said Note to be due in full and to foreclose the Mortgage securing said Note., then item 6 "The Plaintiff has elected to accelerate the balance due on said Note, to declare said Note to be due in full and to foreclose the Mortgage securing said Note".

3.70    Except. the allegations in the complaint were not true. As exhibit "E" attached here to shows, WaMuFA had returned the Defendant's payments to create a default that did not exist WaMuFA got caught by the Texas Attorney General, see

Exhibit "F", in systemically sending back and misplacing payment to cause foreclosure as practice and pattern. WaMuFA admitted this in a letter to the Plaintiff herein, Richard Holt's attorney in Germany, Jens Reissig, and that it would withdraw the foreclosure, see Exhibit "G".

3.80    Thereby, WaMuFA also admitted that the affidavit by Rohling, was perjurious, sworn under oath, to infer unclean hands upon WaMFA and any auccessor, Nemo dat quod non habet, from ever foreclosing again in equity, see U.S. Supreme Court. *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240 (1933). *Keystone Driller Co. v. General Excavator Co.* Nos. 34 and 35

"...1. He who comes into equity must come with clean hands. P. 290 U. S. 244.

2. This maxim applies only when some unconscionable act of the plaintiff has immediate and necessary relation to the equity he seeks in the litigation..."

"It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court.' *Story's Equity Jurisprudence* (14th Ed.) 98. The governing principle is 'that [290 U.S. 240, 245] whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' *Pomeroy, Equity Jurisprudence* (4th Ed.) 397. -

.

3.90    By suing for money damages under item 3 under the Wherefore-clause in its complaint, WaMuFA opted to enforce the note,, the money damages clause. It cannot do both. By suing under note, it effectively accepted cash, *see PK MOTORS, INC. v. Page,* Dist. Court, MD Florida 2007, a landmark case on notes and underlying transactions, attached as exhibit "H",

3.100   Furthermore, WaMuFA accepted yet another payment that it did account for and misplace, see exhibit "I". Hence, WaMu took cash and thereby released any claims to the perceived collateral, again see *PK Motors,* supra.

3.110 In addition, WaMuFA was never a PETE, A Person entitled to enforce. Contrary to its allegation in the original complaint, the note was only signed by one person, the Plaintiff herein Richard Holt, and not in a corporate capacity for Dorsum Nemus Limited Liability Company.

3.120   The mortgage, see exhibit "J", was only signed by Richard Holt, again not in a corporate capacity. The mortgage defines a Dorsum Lemus Limited Liabilty Company as the borrower and the wording thereof refers to a security instrument by the defined borrower, Dorsum Lemus Limited Liability Company. The complaint in the original case was false, Richard Holt, could not sign anything, He was not the owner of the property and could not mortgage it.

3.130   That the borrower was intended to be the company, Dorsum Nemus Limitied Liability Company, is substantiated by the HUD-statement, see exhibit "K", clearly indicating it as the borrower.

3.140   The confusion is solely to blame WaMuFA for, or rather the attorney for the mortgage broker Northeast Mortgage LLC, Corporation in the closing. The quality assurance representative for WaMuFA had sent a list of corrections for the closing, see exhibit "L", however the errors were not corrected.

3.150 The mortgage broker could not correct the documentation, as it would have exposed that the Plaintiff, Richard Holt's signature, had been fored on the loan application, see exhibit "M".

3.160   Thus, WaMuFA ended up with half a note, i e missing a note signed by the supposed proper party, the company, as required by the mortgage. Then it ended up with a mortgage signed by a non-party, the Plaintiff herein, Richard Holt, not an owner of the property.

3.170   By not correcting the closing documents per the instruction of WaMuFA, the loan broker, Northeast Mortgage LLC, confused the closing attorney, who instructed Richard Holt to only sign as an individual.

3.180   Instead of contacting the parties, Richard Holt, and the company to correct the documents, WaMuFA took the drastic measure of trying to feign a foreclosure instead.

3.190   A negotiable instrument was not created because the Plaintiff did not intend to sign the note in a personal capacity and the Plaintiff received no consideration to create the negotiable instrument under UCC 3-310 b(2). There is no mortgage because a mortgage is an incident to the note and it cannot stand alone. The mortgage is not securing any note to which Dorsum Nemus Limited Liability Company is a part. see *NATIONAL CITY BANK v. SYATT REALTY GROUP, INC et al*, case No. 11-1777 UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT , attached as exhibit "Q". See also *PK Motors* supra transaction reduced to the note.

3.200  The subsequent attempt by a claimed successor to foreclose, filed in Connecticut as case no. FST-CV08-5009720-S, JPMORGAN CHASE BANK v. HOLT,RICHARD Et Al, before the State of Connecticut Superior Court at Stamford, CT, see exhibit "N" in 2008, with the Cynthia Riley-note failed, by opting in 2002 to enforce the note, the collateral had already been released for six years, leaving the current claimed Creditor and the Plaintiff in the 2008-foreclosure without a remedy, even if the loan had been consummated and completed which it was not - because of the erroneous note and mortgage failing to form a negotiable instrument under UCC 3-310 b(2).

3.210  By introducing the PNOTE-note in 2002, admitting that it was was the true note in the Rohling-affidavit, WaMuFA waived any other note than the PNOTE-note in any proceeding. Hence, in 2008 WMAAC did not have an original note in its possession when commencing the foreclosure-action in the name of its servicer, JPMCB, , failing Connecticut case law *DEUTSCHE BANK NATIONAL TRUST COMPANY, Trustee v. Rodney THOMPSON et al.* No. 37362. Decided: March 22, 2016 -- the Plaintiff must be in possession of the note when filing the complaint, see attached exhibit "R", rendering the Connecticut 2008-proceeding invalid ab initio, and the asinine comments about the Plaintiff herein, Richard Holt's conduct therein a 380-page waste of paper, the Defendant objection to the Plaintiff's filing a Chapter 13, case history item #29.

3.220  By filing yet another version of the note in its proof-of-claim in the first White Plains-bankruptcy, case no. 15-22704-rdd, again attempting to enforce the debt, the Defendant herein, WMAAC through its servicer JPMCB, admitted that prior two notes, the PNOTE-NOTE and the Cynthia Riley-notes were false, retroactively waiving the prior note,

3.230  By this exercise, the Defendant through its servicer, JPMCB, has effectively created an implied res judicata in the 2002-case. WaMuFA is said case admitted wrongdoing and abandoned the case without a final judgment. By having the Plaintiff as the successor of WaMuFA via the FDIC, presenting the Mykisha Rush-note, it implies that is the ruling note, and that FDIC despite knowledge of the prior frauds, including the returned payments and the perjurious sworn affidavit by Rohling, is alleged have sold it the Plaintiff despite knowledge of the unlawful acts associated with it, which would effectively making the FDIC, a Government-owned entity complicit in forgery.

3.240  Now, the servicer JPMCB has come forward and nationated to that WMAAC is the true party in interest. The Plaintiff is including a stipulation to this effect from JPMCB and also the investor screens from WaMu's Mortgage Servicing Platform, "MSP" in the same exhibit, identifying the investor A01" as the true party in interest and the claimed owner of the instant loan, see Exhibit "P". Hence the foreclosure filed by the Defendant's servicer, JPMCB in 2008 was false and fraudulent and so were the proofs of claim filed by the Defendant's servicer JPMCB in the instant Court is 2015 and 2017.

3.250   At the time of the false foreclosure in 2002, WaMuFA alleged a debt of about $368,000. In its proof of claim in 2015, the Defendant' servicer  JPMCB, claimed a debt of around $450,000 it is also claiming legal fees in excess of $100,000. In 2002 the property, based on neighboring sales would be in the price range of $800,000. In 2008, when the false foreclose in December of 2008 occurred of over $1 million based on neighboring sales. Based on neighboring sales today, of $1.2 million.

3.260   The claimed loan was not the standard loan at more than the value of the property. As the erroneous returned payments averred herein shows, the Plaintiff nor the property owner had any intentions of ceasing to pay. If it had not been for the false foreclosure in 2002, the instant property could easily have refinanced, considering the high equity, or sold at a considerable profit. This was no less true in 2008. The clock stopped, all interest was told from the breach of contract of WaMuFA, returning payment and manufacturing a foreclosure. Hence, not more would have been due WaMuFA then in 2002, minus the lost payment of about $100,000. Selling the property in 2008 would therefore have brought $700,000 in excess of any amount WaMu could have claimed, $900,000 today, yet in its objection of March 8, 2017 in the instant court, case history item #29, the Defendant seems to suggest that the Plaintiff should walk away from the litigation since the Plaintiff has no personal equity in it, and "gift" the property to the Defendant.

3.270   However, the Plaintiff has considerable tort claims. The parties with an interest in the property, not only from the lost payment of about $100,000 has sued for damages in the Swedish courts against the Federal Deposit Insurance Corporation, "FDIC", and Hunt-Leibert Jacobson, the attorneys for WaMuFA in the first foreclosure to whom the payment was remitted, and also the holding company of WaMu -- the latter upon advice of the FDIC. The amount claimed because of consequential damages is over $10 million. The acceleration notice from WaMuFA in 2008 tallying the itemized items indicates that $79978.64 is past due, which would have been amply covered by the lost payment of nearly $100,000, i e there was no default in 2008, regardless of all other facts prohibiting the foreclosure action. The authenticity and validity of this computer generated default notice is questionable -- what kind of computer system would make a $42,218.49 computation error. See exhibit "T".

3.280   The FDIC after the Plaintiff bringing a lawsuit for the involvement of the FDIC in in the instant matter in the United States Federal District Court for the Southern District of New York at Manhattan, contacted the Plaintiff that it had stated a dispute resolution case, to which the Plaintiff submitted his claim reflecting the consequential damages in Sweden -- to which also the Plaintiff would be liable if he "walked away" from the litigation over the property. The Plaintiff was informed that after the FDIC has processed the claim, the dispute resolution -- the Plaintiff may start his independent law

suit against the FDIC over the claimed torts -- this reflects the standard Federal torts
claim-procedure.

3.290   While the FDIC dispute resolution is ongoing, the Plaintiff asked the
Connecticut Court to stay the proceeding, which it did not, and the Defendant through its
servicer refused, the Defendant through its servicer aiming to "run away" with the
property before the Plaintiff has a possibility to commence his Federal law suit
against the FDIC following the dispute resolution, which the Plaintiff later
did in June of 2017.

3.300   In its objection of March 8, 2017, before the instant bankruptcy Court, the
Defendant through its servicer, JPMCB, seems to suggest that the Plaintiff has been
conducting a frivolous defense in the State court. This does not reflect the truth at, here is
a brief timeline:

After commencing the lawsuit in 2008, the Defendant and its servicer did nothing
until 2010, when it filed for a summary judgment based on a affidavit by an Ediba
Trivuncic, who turned out to be a robo-signer. The summary judgment failed, but the
Defendant brought a witness to the Court in 2011, a Jeremy Summerford, "Summerford",
who swore before the Court that he had found the instant loan in the list referred to in the
Purchase and Assumption Agreement between the FDIC as Receiver for WaMu and the
Defendant of September 25, 2008. To this day, Summerford is the only one who has seen
that list. FDIC has since affirmed, even on its web site that the list is a scrivener's error, it
does not exist.

3.310   The Plaintiff's counsel, Larry Ginsberg asked after hearing the witness that
the case be dismissed. The presiding Judge, Douglas Mintz, denied the requuest but at the
same time allowed for the Plaintiff's discovery including the list. The Defendant's
servicer's attorney at the hearing, stated that it was too big, millions of records if the
Plaintiff recalls correctly and was an electronics file. Judge Mintz ordered it to be
produced anyway, and later affirmed the Plaintiff's extensive production request.

3.320   What followed was s six year battle to get all the discovery from the
Defendant' servicer. What the Defendant's servicer claims is dilatory on part of the
Plaintiff is actually just a reflection of the Defendant's "cavalier"-attitude towards
discovery. As an example, the Plaintiff is including a letter to the Plaintiff and his counsel
from Brian Rich, the attorney for the Defendant's servicer dated December 12, 2013, see
attached exhibit "O" where he claims that his client, the Defendant, has no knowledge of
neither Cynthia Riley, the indorser of the Cynthia Riley-note, "Florida Munoz", actually
Florina Munoz, who notarized the summary judgment affidavit in 2010, nor Margaret
Dalton, "Dalton", who seems to have been the leader of Munoz's group, and perhaps the
most notorious robosigner of all. Dalton is one of the few individuals, together with
Summerford, the witness the Defendant brought in 2011,that claims to have seen the list
of loans that the Defendant claims to have received from the FDIC.

3.330   The Plaintiff did get some discovery, fatal discovery for the Defendant and it servicer's case. The Plaintiff filed numerous motions to dismiss based on this discovery. Connecticut procedures mandates that the Motions to dismiss for lack of subject matter jurisdiction stops all other actions and must be heard first. The Connecticut court however has dodged this and decided these will be heard last.

3.340   The Plaintiff has also filed numerous motions to have the Defendant's servicer attorney sanctioned for failure to produce, to no avail.

3.350   The result has been 25 trial days so far, where the Plaintiff new "muck" in almost every sessions, brought no decision adverse to the Plaintiff, other than evasive decisions allowing the Defendant and it servicer to avoid discovery.

3.360   After the Defendant's failed attempt to achieve a summary judgment based on a false robosigned affidavit in 2010, the Defendant spend almost a year to the Plaintiff's best recollection, breaking up the Plaintiff's Special Defenses, on requests to revise, breaking up the defenses from about a more dozen, to about fifty. It then used that against the Plaintiff stating that the many defenses are indicative of the Plaintiff's dilatory practices.

3.370   The Connecticut court made a mistake in letting the Defendant's servicer's attorney see the Plaintiff's objection to the Defendant's subsequent motion to strike. When realizing that the a motion to strike would raise issues that would have brought the case to an end in the Plaintiff's favor in the pre-trial phase, the Defendant's servicer attorney elected not to go through with its motion to strike.

3.380   How can the Defendant through its servicer in good faith can claim that the Plaintiff's special defenses are dilatory, even bringing these to the instant bankruptcy Court, as an exhibit in its objection on March 8, 2017, case history item #29, when it waived any objections thereto?

3.390   Among the fatal discovery produced, was the investor screen in the Plaintiffs Master Servicing Platform, MSP, see attached exibit "P"= . It indicates Investor "A01" which according to a witness from the Defendant in another case, is not an investor code of a WaMu-portfolio loan, but a loan owned by WMAAC, contrary to what the Defendant has claimed through its servicer, that the instant loan is owned by JPMCB, defeating the assertion by the Defendant's servicer that the instant loan is one that JPMCB acquired from the FDIC, and evidencing extrinsic fraud on the courts,when the 2008-foreclosure was filed.

3.400   The Plaintiff is also including the depositions, see attached exhibit "S", in another case of Cynthia Riley, "Riley", the indorser on the Cynthia Riley-note from 2011 and 2013, the part where she testifies that she never personally indorsed any notes. A later witness statement from the corporate representative, Wilkins Rodriguez, that the Defendant brought to the Connecticut trial also affirmed that the Cynthia Riley-note was

never even in her office in Jacksonville, Florida for her to indorse, which Riley herself also confirmed in her depositions.

3.410   Solely the investor screen and Cynthia Rileys-depositions would be sufficient to have ended the Connecticut trial, and the Defendant through its servicer has been back-pedalling ever since.

3.420   After becoming aware of the odd assignment, proffered as an exhibit herein exhibit "T", from October 7, 2014, November 7, 2014, the Plaintiff has attempted to move the foreclosure case to a Federal court, where it is not so easy to avoid discovery as in the Connecticut state Court. Along with the exhibit, the Plaintiff is including the contract between the FDIC and Nationwide Title Clearing, "Nationwide", which is the party that has concocted the false assignment. JPMCB and Nationwide are currently embroiled in a RICO-suit, (Racketeer-Influenced and Corrupt Organization), *15 CV 293-LTS-JCF,  MORTGAGE RESOLUTION SERVICES, LLC, 1ST FIDELITY LOAN SERVICING, LLC, and S & A CAPITAL PARTNERS, INC., v. JPMORGAN CHASE BANK, N.A., CHASE HOME FINANCE LLC, and JPMORGAN CHASE & CO* before the United States District Court for the Southern District of New York. The Plaintiff cites from said case:

""The following is a partial list of wrongdoers, other than the named Defendants, whose actsintentinally facilitated the racketeering activity that Defendants perpetrated:
• Joseph A. Smith, Jr., Monitor under the NMS and RMBS Settlements;
• Professionals hired by the Monitor, including his own law firm, Poyner Spruill, LLP, Smith
Moore Leatherwood LLP, BDO USA, Grant Thornton LLP, and others (the "Professionals");
• Other Servicers participating in the NMS and/or RMBS Settlements;
• Nationwide Title Clearing (NTC); and
• Third Party Collection Agencies.."

and:

"Other knowing participants in the conspiracy include third party title clearing agencies,
such as Nationwide Title Clearing Company (NTC), Pierson Patterson, and LCS Financial
Services, who were directed by Defendants to prepare and then file fraudulent lien releases and
other documents affecting interests in property."

3.430   The Defendant through its servicer's attorney can hardly claim that this is dilatory -- it knew of the existence of the Mykisha Rush-note when the assignment was filed, yet withheld this knowledge from the Plaintiff until the proof of claim introduced in the instant bankruptcy Court in 2015.

3.440 Yet it let the Plaintiff go through two bankruptcy filings in 2015 and 2016, ruining his credit rating forever, that would not have been necessary had it informed the Connecticut court and the Plaintiff of the Mykisha Rush-note used for the 2014 assignment.

3.450   The Defendant simply has no sense of shame. In the Plaintiff's attempts to remove the case to Federal Court, and his lawsuits in the Federal courts, the Plaintiff has present the "contradictory" notes, also in the State of Connecticut appellate Court. Yet no one seems particularly concerned over the obvious falsifications. Has the justice systems become so jaded over the forgery of notes, which does not seem be isolated incidents, that it simply does not care anymore?

3.460   The Defendant trough its servicer however has introduced a forged note in the instant bankruptcy Court in its proof of claim from September 2016.

3.470   That proof of claim was an attempt to prove a debt by the Plaintiff personally, seeking to enforce a false note.

3.480   That proof of claim is the exclusive domain of the instant bankruptcy Court, not linked in any way to any foreclosure in Connecticut.

3.490   The Defendant through its servicer cannot prove a debt with a forged noted.

3.500   The Defendant through it servicer is now betting that it can avoid this confrontation before the instant bankruptcy Court by having the court find that the Plaintiff does not have a right to file in the instant bankruptcy Court, that the court lacks jurisdiction.

3.510   The Plaintiff asserts that the instant Court has jurisdiction. The Plaintiff has substantial connections to the district to having a business in the district and also had so in 2015. The Defendant through its servicer seeks to gain from its own maneuverings in the matter. Simultaneous with the occurrence of the assignment and the Mykisha Rush-note, the Plaintiff's business was in line to take over the newspaper it had been servicing for the past 25-year or so, in Manhattan, as its editor has died in the Fall of 2014. This had to be abandoned as the assignment emerged while the Plaintiff had been in Finland at the editor's funeral and where the future of the newspaper in New York was being decided.

3.520   The Plaintiff business in construction compliance was also part in a substantial project in Northern Sweden to manufacture unique rail roads sleepers in a infrastructure project that was intended for the Metropolitan Transit Authority, the "MTA". The Plaintiff can back this up with the approved proposals for the project by Swedish Government institutions and his attendance at a major international railroad technology conference in Berlin, Germany at the time. Because of the extreme

temperature shifts, between relatively harsh winters and tropical humidity summers, the MTA cannot use the concrete sleepers used by railroads elsewhere in the world. However, the wooden sleepers used today are impregnated with creosote, a toxic substance that must be phased out under environmental regulations.

3.540   The Plaintiff's project uses a unique material that resolves that problem. The project estimated in Sweden to account for considerable profits came to a screeching halt when the Plaintiff had to return to the US because of the litigation over the assignment.

3.550   The property in Connecticut is essential for the New York infrastructure projects. It is a unique construction shipped to the US from Sweden representing a design not common in the US with considerably ability to withstand fires and storms.

The design is inherent in among others a parking system the same Swedish group is also proposing to the MTA for automated mechanical parking along its network of suburban railway stations to optimize parking spaces, but that also have to housed in safe construction.

3.550   The Plaintiff's intended to return to Sweden to live and before taking his retirement coordinate the infrastructure projects there. Federal residency rules dictate that it is where a person intend and resides forever, which in the Plaintiff's case would not be in a property he does not own in Connecticut but where he is forced to stay while concluding the ongoing litigation.

3.560   The Defendant's attempt through its service to use a problem it has caused itself with it fraudulent concealments and fraudulent proof of claims and false foreclosures, the interruption in the Plaintiff's business in New York against the Plaintiff from access to the instant bankruptcy Court where the Defendant through its servicer has filed false documents is "gamesmanship" and vexatious litigation.

3.570   The Plaintiff ask that the bankruptcy Court as a sanction for the false note filed in the bankruptcy Court, and its role in dispute resolutions, declares that the Mykisha Rush-note is the genuine and ruling note under the ancient principle of the Montefiori-case. This would wipe out the foreclosures in 2002 and 2008, and have the effect nullify any liens. It would also force the FDIC to declare whether it actually gave power of attorney to the Defendant's servicer  to make the assignment in 2014 and participated and aided in the forgery of notes or it is also was defrauded. The Plaintiff presumes that the FDIC and the Government does not willingly and knowingly participate in forging activities and will do the right thing, and its was the making of its errant contractor, Nationwide that provided the forged documents.

See:

*Apex Binding Corp. v. Relkin,* 198 Misc. 381 - NY: Supreme Court 1950:

" As was said by SETTLE, J., in *Royster v. Heck* (29 Ky. L. Rep. 634, 638): "One cannot blow hot and cold; this is a trite expression of the maxim allegans contraria non est audiendus; he is not to be heard who alleges things contrary to each other. This fundamental principle is of wide application in the law of equitable estoppel. He can not treat a contract as subsisting, and afterwards avoid it. (Herman on Estoppel, 1039-1049."

Indeed, the question posed by Chancellor KENT, in 1817, applies to this case when he said: "Can he be entitled to credit, when he comes now and declares that he acted the hypocrite in all those transactions? It is one of the maxims of the common law (4 *Co. Inst.* 299) that *allegans suam turpitudinem non est audiendus.*" (*Underhill v. Van Cortlandt,* 2 Johns. Ch. 339, 350.)"

Even citing one of the oldest known case on estoppel:

"As long ago as 1762, Lord MANSFIELD, in *Montefiori v. Montefiori* (1 Black. W. 363, 364) denied relief in an action where a brother sued another brother to compel the return of a promissory note which the plaintiff had given him for the purpose of creating an impression of defendant's wealth and thus hasten the consummation of a marriage, saying: "The law is, that where, upon proposals of marriage, third persons represent anything material, in a light different from the truth, even though it be by collusion with the husband, they shall be bound to make good the thing in the manner in which they represented it. It shall be, as represented to be."

## COUNT 1
## FRAUD.

4.1    The allegations of paragraphs 1.1 through 3.570 of this Complaint are hereby re-alleged and incorporated by reference.

4.2    The Defendant by its misrepresentations through it servicer of any entitlement herein rise rising to actual fraud, attempted to defraud the Plaintiff of his money and other parties affected of their property. The Defendant and its servicer  knew that the Cynthia Riley-note and the Mykisha Rush-note were fraudulent and that the Defendant had no claim against the property herein.

4.3    Yet, The Defendant through its servicer proceeded anyway. The Defendant failed to speak out when it first had knowledge thereof.

4.4     The Defendant's  and it servicer's actions has led to the Plaintiff being assessed unsubstantiated fees and charges, designed to extract additional and substantial profits from the servicing of the mortgage loan the Defendant claimed herein, to the detriment of Plaintiff and other creditors.

4.5     The Defendant and the predecessor to the loan herein, lack standing and capacity.

## B. Lack Of Standing / Failure to Bring Claim in the Name of the Real Party In Interest

4.3 The allegations in paragraphs 1.1 through 3.570 of this complaint are realleged and incorporated herein by this reference.

4.4 No documentation has been brought by the Defendant that a complete chain of title from the claimed originating lender, WaMuFA, to the the Defendant herein.

4.5 The Defendant must prove that it is the real party in interest as the rightful owner and holder of both the Note and the Mortgage and that it has the legal right to enforce the same; the Defendant failed to meet this burden.

4.6 No valid writing demonstrates that the Creditor named by the Defendant, WaMuFA, and its claimed successor, the Defendant, has an interest in the instant property, Securing such claim is in violation of F.R.B.P. 3001(c)(1) and(2) and is therefore sanctionable in the manner prescribed by F.R.B.P. 3001(c) (2) (D)(i) and (ii)

4.7 There is no apparent chain of transfers to explain how or when the purported the named Creditor by the Defendant, the Defendant itself, and its pre-decessor, WaMuFA, came to allegedly own the Plaintiff's alleged loan.

4.8 A Federal Court cannot have jurisdiction unless a party has constitutional standing. The Defendant fails to provide any credible evidence as to if and when a negotiation of the Note to the named Creditor, WaMuFA or its successor, the Defendant, ever occurred.

4.9 The Creditor named by the Defendant, WaMuFA, nor its successor, the Defendant, is therefore neither a creditor nor the real party in interest and lacks standing make any claims to the instant property.

4.10 Defendants nor the creditor named by it, WaMuFA, or the claimed successor, the Defendant, have constitutional standing to make any claims in the Plaintiff's Chapter 13 case.

4.11 In the bankruptcy courts, procedure is governed by the Federal Rules of Bankruptcy and Civil Procedure. Procedure has an undeniable impact on the issue of who can assert a claim as a holder, because pleading and standing issues which arise in the context of our federal court system. According F.R.Civ. Pro. 17, "[a]n action must be prosecuted in the name of the real party in interest." (Emphasis added).

4.12 A Proof of Claim are subject to Fed.Rules Bankr. Pro. 7017 which is a restatement of F. R. Civ. P. 17. 4.13 The Plaintiff avers that the real party in interest in a federal action to enforce a note, whether in bankruptcy court or federal district court, is the owner of a note. Because the actual name of the actual note owner is not stated and there is no connection between the creditor named by the Defendant, WaMuFA or its claimed successor, the Defendant, and the copy of the Note provided by the Defendant through its servicer, the Creditor named by the Defendant, WaMuFA, and its alleged successor, the Defendant's very claim is defective.

4.14 The Creditor named by the Defendant, WaMuFA, nor its alleged successor, the Defendant, establishes only that it is neither the holder nor the owner of the note. The named Creditor nor its successor, the Defendant, fails to establish that it has a beneficial interest in the copy of the Note, or that it ever had a beneficial interest in the copy of the Note that was attached to the Defendant's proof of claim in 2015.

4.15 The United States Constitution Article III §2 specifically limits the jurisdiction of the federal courts to "Cases or Controversies." Justice Powell delivered the Opinion of the Supreme Court in the case of Warth v. Seldin addressing the question of standing in a federal court as follows:

In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of the particular issues. This query involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. In its constitutional dimension, standing imports justiciability: whether the Plaintiff has made out a —case or controversyǀ between himself and the Defendants within the meaning of Art.III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the Plaintiff has —alleged such a personal stake in the outcome of the controversyǀ as to warrant his invocation of federal –court jurisdiction and to justify exercise of the court's remedial powers on his behalf. Baker v. Carr 369 U.S.186,204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663(1962). The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party...A Federal court's jurisdiction therefore can be invoked only when the Plaintiff himself has suffered —some threat or actual injury resulting from the putatively illegal action...ǀ Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146,1148, 35 L.Ed.2d 536 (1973).ǀ Warth v. Seldin 422U.S.490, 498 (1975).

Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers. ... even when the Plaintiff has alleged injury sufficient to meet the —case or

controversyl requirement, this Court has held that the Plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties. E.g., Tilestion v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943).l Warth v. Seldin 422U.S.490, 499 (1975) (emphasis added).

4.16 The Plaintiff in the instant case reiterates that a party seeking relief in any Federal Court "bears the burden of demonstrating standing and must plead its components with specificity." Coyne v American Tobacco Company, 183 F.3d 488, 494 (6th Cir. 1999), further *SPOKEO, INC. v. ROBINS* CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT No. 13–1339. Argued November 2, 2015—Decided May 16, 2016. Again, the minimum constitutional requirements for standing are: proof of injury in fact, causation, and redressability. Valley Forge Christian College v Americans United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982). Furthermore, in order to satisfy the requirements of Article III of the United States Constitution, any claimant asserting rights in a Federal Court must show he has personally suffered some actual injury as a result of the conduct of the adverse party. Coyne, 183 F.3d at 494; Valley Forge, 454 U.S. at 472.

4.17 As set forth hereinabove, the Creditor named by Defendant, WaMuFA, nor its claimed successor, the Defendant, can make no assertions as to its own interest in the outcome of the instant claim it is making. The named Creditor and it claimed successor further fails to establish any clear, documented, perceived injury to itself.

4.18 The Defendant have not shown that the Creditor named by the Defendant WaMuFA, nor its successor, the Defendant, has any stake in the ownership of the Note and Mortgage as either a holder or owner. Any attempt to indicate the named Creditor or its alleged Successor, as an owner of the Plaintiff's loan has been by way of fraudulent and misleading documents fabricated by employees of the Defendant or WaMuFA and by persons who lack any personal knowledge as to the Plaintiff's mortgage loan.

4.19 Defendants must demonstrate how, when and from whom it derived their alleged rights.

4.20 There is a complete lack of any credible explanation describing how, when and from whom the Creditor named by the Defendant, WaMuFA or its claimed successor, the Defendant derived any rights. There is a clear question of fact as to the issue of Defendants' standing to file a Proof of Claim through its servicer in the Plaintiff's bankruptcy case.

4.21 In the instant case, the court is left to decipher the legitimacy of any Assignments of Mortgage presented under oath by the Defendant or as the claimed the successor of WaMuFA.

4.22 To the extent the Defendant caused the actions taken by the alleged successor, WaMuFA, it constitutes a gross and willful violation of the Automatic Stay pursuant to 11 U.S.C. section 362(a)(3) by the Defendants.

4.23 As a result of the violation of the automatic stay by its inaction after filing false and fraudulent documents as described herein, the Defendant is liable to the Plaintiff for actual damages, punitive damages and legal fees under 362(k)(1) of the Bankruptcy Code.

## COUNT II V. CLAIM FOR RELIEF: DECLARATORY JUDGMENT

5.1 The allegations in paragraphs 1.1 through 3.570 of this complaint are realleged and incorporated herein by this reference.

5.2 At no time relevant to the allegations herein was the Creditor named by the Defendant, WaMuFA, nor its successor, the Defendant, identified as the actual holder and the lawful owner of the mortgage note it claims to be originally signed by the Plaintiff.

5.3 Therefore, the the creditor named by Defendant, WaMuFA, nor its alleged successor, the Defendant, has no constitutional standing to file a claim or otherwise participate in this Chapter 13 proceeding.

5.4 Because the named Creditor, WaMuFA, nor the alleged successor, the Defendant, is not the actual holder and lawful owner or assignee of the mortgage, it has no security interest, and thusly no right to seek to collect money from Plaintiff's or their bankruptcy estate.

5.5 As a result thereof, the Defendant should be ordered to pay back to the Chapter 13 Trustee all funds received on the arrearage claim and all funds received from the Plaintiff in the form of direct mortgage payments, pre and post-petition.

5.6 Plaintiff seeks a declaratory judgment holding that the Defendant that neither it, or the creditor named by it, WaMuFA, or its alleged successor, the Defendant, has no enforceable secured or unsecured claim against the property of the estate in bankruptcy;

5.7 the bankruptcy Court declares that the note referred to as the Mykisha Rush-note is genuine and the only ruling note in regard to the instant loan and mortgage.

and 5.8 Plaintiff also seeks a judgment declaring laimed security interest by WaMuFA and the Defendant void pursuant to 11 U.S.C. § 506(d).

## COUNT III
## VI. CLAIM FOR RELIEF: FRAUD ON THE COURT INCLUDING FALSE AND FRAUDULENT PROOF OF CLAIM

6.1 The allegations in paragraphs 1.1 through 3.570 of this complaint are re-alleged and incorporated herein by this reference.

6.2 The proof of claim filed by Defendant through its servicer in 2016 is a false and fraudulent claim constituting fraud on the Court, the Chapter 13 Trustee, the Plaintiff and other named creditors for the following reasons:

a. Defendant through its servicer filed the Proof of Claim Number in 2016 which included a copy of a Note the Defendants at all times knew was not payable to the named Creditor, WaMuFA, and which bears no endorsement to the named Creditor, , a fact the Defendant through its servicer knowingly omitted to disclose to the court, the Plaintiff, the Chapter 13 Trustee and the other creditors.

b. Defendant through its servicer filed a Proof of Claim in 2016 which included a copy of a Note, the defective condition of which the Defendants omitted disclose. Specifically, the original note is defective and fails to support the Proof of Claim because in reality, it is not payable to the named Creditor, and it does not bear a bona fide endorsement in blank or a specific endorsement to the named Creditor. The Defendant through its servicer purposefully and knowingly omitted to disclose the material fact of the lack of proper endorsement to the court, the Plaintiff, the Chapter 13 Trustee and the other creditors.

c. Defendant through its servicer filed a Proof of Claim in 2016 which included documents the Defendant through its servicer held out to be assignments of mortgage which at all times the defendant knew to be false fabricated documents manufactured by and signed by agents or parties relating to WaMuFA and the Defendant.

d. Defendant through its servicer filed a Proof of Claim in 2016 which included unsubstantiated fees and charges which the Defendant and it servicer at all times knew to be false and knowingly asserted a claim to collect such false amounts for their own unjust enrichment and monetary gain.

6.3 The Defendant through it servicer knowingly made a false misrepresentation to the court; To Wit, the Defendant agents or parties relating to WaMuFA and the Defendant, which knowingly fabricated assignments of mortgage to present to the court and such act of presenting a false fabricated document was committed for the purpose of enticing the reliance of the Court the Chapter 13 Trustee, the Plaintiff and the other creditors in the bankruptcy case;

.      6.4 The Creditor named by the Defendant, WaMuFA, or its claimed Successor, the Defendant, knowingly made false misrepresentations to the court; To Wit, the Defendant knowingly claimed unsubstantiated monies alleged to be owed by the Plaintiff

and presented the same to the court. Such act was committed for the purpose of enticing the reliance of the Court, the Chapter 13 Trustee, the Plaintiff and the other creditors in the bankruptcy case and for the financial gain of the Defendants;

. 6.5 The Defendant omitted material, crucial information and facts from the court regarding the Note and Assignment of Mortgage at issue;

To Wit, the Defendant through its servicer knowingly submitted a Note to the Court which is neither indorsed to the Claim and the creditor named by the Defendant, WaMuFA, or its alleged successor, the Defendant, nor is it validly assigned to these parties.

6.6 The Plaintiff has been damaged by the actions and omissions of the named Creditor, WaMuFA, its alleged successor, the Defendant;

To Wit, in that he has been and continues to be forced to expend his time and expenses toward the defense of this contested matter to protect his rights.

6.7 All parties of interest in the Plaintiff bankruptcy case are harmed by the actions and omissions of the named Creditor, WaMuFA, its alleged successor, the Defendant;

To Wit, in that the integrity of the judicial process relied upon has been compromised by the fraudulent acts, fraudulent documents and omissions of the Defendant.

6.8 This Court has authority under 11 U.S.C. § 105(a) to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 6.9 The Court should impose sanctions on the Defendant for fraud as the defendant have filed false documents to support an improper claim regarding the Debtor herein. Plaintiff therefore request that Court invoke the powers granted to it by 11 U.S.C. § 105(1) and issue such order, process or judgment necessary to address the fraud of the Defendants and to prevent any future fraud or abuse of process. In the alternative, the Plaintiff requests this Court to waive the pre-notice time requirements of Rule 9011 of the Bankruptcy Rules and to impose sanctions under that Rule.

WHEREFORE, Plaintiff prays:

A. That the Court disallow, expunge and strike any claim by the Creditor named by the Defendant, WaMuFA, and its alleged successor, the Defendant.

B. That the Court direct the Chapter 13 Trustee to any claim or proof of claim advanced by the aforementioned parties.

C. That WaMuFA and the alleged successor, the Defendant, be precluded from filing any amended, modified, or substitute claim in this case;

D. That the alleged arrearages contained in the Proof of Claim be cancelled and forever discharged;

E. That Claimant be required to pay legal fees and expenses to any attorney for Plaintiff;

F. That the Claimant provide a complete accounting of the Plaintiff's mortgage loan account, forthwith;

G. That the Defendant's claimed security interest be declared void pursuant to 11 U.S.C. § 506(d); H. That the Defendant be sanctioned pursuant to 11 U.S.C. 362(k) for allowing the alleged successor, the Defendant, to violate the automatic stay;

I. That the Defendant be precluded from presenting any omitted information, in any form, consistent with the sanctions provided by F.R.B.P. 3001(c)(2)(D)(i);

J. That the Plaintiff be awarded other appropriate relief , including reasonable expenses and attorney's fees consistent with the sanctions provided by F.R.B.P. 3001(c)(2)(D)(ii);

K. That Plaintiff have such other and further relief as the Court may deem just and proper.

WHEREFORE, Plaintiff prays that the Court grant the relief requested herein.

This the 11th Day of July, 2017

RESPECTFULLY SUBMITTED, /S/ Richard Holt, acting pro se

Mailing address:
244 Fifth Avenue, #2031
New York NY 10001

Phone: 203-434-1455

# EXHIBIT "A"

**Washington Mutual**

**ADJUSTABLE RATE NOTE**
**(FHLB Index - Payment and Rate Caps)**

:059-0

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST
RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE
THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __385,000.00__ ).
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR
ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__NEWTOWN__                              __Connecticut__
            (City)                                  (State)

__March 22, 2000__

__23 RIDGEWOOD DRIVE, NORWALK, CT 06853__
(Property Address)

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ __308,000.00__ plus
any amounts added in accordance with Section 4 (G) below, (this amount is called "principal"), plus
interest,    to    the    order    of    the    Lender.    The    Lender    is
__Washington Mutual Bank, FA__ . I understand that the Lender may transfer
this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive
payments under this Note is called the "Note Holder".

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount has been paid. I will pay
interest at a yearly rate of __4.950__ %. The interest rate I will pay will change in accordance with
Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay
both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making payments every month. In this Note, "payments"
refer to principal and interest payments only, although other charges such as taxes, insurance
and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on
__May, 2000__ . I will make these payments every month until I have paid all of
the principal and interest and any other charges described below that I may owe under this Note.
My    monthly    payments    will    be    applied    to    interest    before    principal.    If,    on
__April 1, 2030__ . I still owe amounts under this Note, I will pay those amounts in full
on that date, which is called the "maturity date".

I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__
_____ , or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of
U.S. $ __1,644.01__ , unless adjusted at an earlier time under section 4(H) of this Note.

)59-0

**(C)  Payment Changes**
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the principal balance and interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A)  Interest Rate Change Dates**
The  interest  rate  I  will  pay  may  further  change  on  the  ___1st___  day  of ___May, 2000_____, and on that day every month thereafter.  Each date on which my interest rate could change is called a "Change Date".

**(B)  The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index").  The most recent Index figure available on each interest rate Change Date is called the "Current Index".

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new Index as if it were the Index. The new Index will be the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields").  The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent available twelve months and dividing by 12. This information may be available in you library, or you may write to the Board of Governors, Publication Services Washington D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate Index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

**(C)  Interest Rate Change Calculation**
Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Three & One-Tenth___ percentage points ___3.100___% ("Margin") to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%).  Subject to the limits stated in Section 4(D) below,  this rounded amount will be my new interest rate until the next Change Date.  In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined.  If a new Index is selected, the new Margin will be the difference between the average of the Index for the most recent three year period which ends on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available).  In either case, this difference will be rounded to the next higher 1/8 of 1%.

**(D)  Interest Rate Limit**
My interest rate will never be greater than ___Eleven & Ninety-Five-Hundredths___ percentage points ___11.950___% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

32743 (02-89)                              Page 2 of 6

059-0

**(E) Payment Change Dates**
Effective every year commencing _____ May 1, 2001 _____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**
Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid principal would otherwise exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**
On the fifth anniversary of the due date of the first monthly payment, and on that same day every fifth year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**
If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without payment of any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after

,----J59-0

the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

6.    **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $10.00. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of __Fifteen__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__% of my overdue payment of principal and interest. I will pay this late charge promptly but only once of each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.    **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.    **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32743 (02-89)                    Page 4 of 5

59-0

### 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed ( the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Security Instrument, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

### 12.   MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

59-0

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X_____
RICHARD HOLT

Pay to the order of

Without Recourse
WASHINGTON MUTUAL BANK, FA

By_____
CYNTHIA RILEY
VICE PRESIDENT

32743 (02-95)                              Page 6 of 6

**Washington Mutual**

**NOTE ADDENDUM**
**Borrower's Payments Before They are Due**
**(Prepayment Fee Clause)**

5059-0

This Note Addendum is made this __22nd__ day of __March, 2000__ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of __Washington Mutual Bank, FA__ _____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due. Any payment of principal only is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a full prepayment at any time during the first __Three__ years of the loan, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the first payment due date of the Note, the Prepayment Fee shall be equal to __Three__ percent (__3.000__ %) of the original loan amount. If Noteholder receives prepayment after the first anniversary but on or before the __Second__ anniversary of the first payment due date of the Note, the prepayment fee shall be __Two__ percent (__2.000__ %) of the original loan amount. If Noteholder receives prepayment after the second anniversary but on or before the __Third__ anniversary of the first payment due date of the Note, the prepayment fee shall be __One__ percent (__1.000__ %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at anytime without penalty accrued but unpaid interest that has been added to Principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no affect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

By signing below, borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

X_____
RICHARD HOLT

(ASB/A410)
32890 (09-97)

**EXHIBIT "B"**

 **Washington Mutual**  



## ADJUSTABLE RATE NOTE
### (FHLB Index - Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ ____385,000.00____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__NEWTOWN__ _____   __Connecticut__
(City)                          (State)

__March 22, 2000__

__23 RIDGEWOOD DRIVE, NORWALK, CT 06853__
(Property Address)

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ __308,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "principal"), plus interest,    to    the    order    of    the    Lender.    The    Lender    is __Washington Mutual Bank, FA__. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount has been paid. I will pay interest at a yearly rate of __4.950 %__. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**

(A)  Time and Place of Payments

I will pay principal and interest by making payments every month. In this Note, "payments" refer to principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I   will   make   my   monthly   payments   on   __1st__   day   of   each   month   beginning   on __May, 2000__, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My   monthly   payments   will   be   applied   to   interest   before   principal.   If,   on __April 1, 2030__, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date".

I will make my monthly payments at __9451 CORBIN AVE. NORTHRIDGE, CA 91324__ _____, or at a different place if required by the Note Holder.

(B)  Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,644.01__, unless adjusted at an earlier time under section 4(H) of this Note.

Page 1 of 6

**(C) Payment Changes**
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Interest Rate Change Dates**
The interest rate I will pay may further change on the ___1st___ day of ___May, 2000___, and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date".

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the monthly weighted average cost of funds for savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on each interest rate Change Date is called the "Current Index".

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new Index as if it were the Index. The new Index will be the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent available twelve months and dividing by 12. This information may be available in you library, or you may write to the Board of Governors, Publication Services Washington D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate Index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

**(C) Interest Rate Change Calculation**
Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Three & One-Tenth___ percentage points ___3.100___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. If a new Index is selected, the new Margin will be the difference between the average of the Index for the most recent three year period which ends on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**
My interest rate will never be greater than ___Eleven & Ninety-Five-Hundredths___ percentage points ___11.950___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E)  Payment Change Dates**
Effective  every  year  commencing _____ **May 1, 2001** _____ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine  the  amount  of  the  monthly  payment  that  would  be  sufficient  to  repay  the  projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F)  Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

**(G)   Changes  in  My  Unpaid  Principal  Due  to  Negative  Amortization  or  Accelerated Amortization**
Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H)   Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid principal can never exceed a maximum amount equal to __125%__ of the principal amount original borrowed. In the event my unpaid principal would otherwise exceed that __125%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I)   Required Full Monthly Payment**
On the fifth anniversary of the due date of the first monthly payment, and on that same day every fifth year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J)  Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K)  Failure to Make Adjustments**
If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.      BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without payment of any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after

the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $10.00. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _Fifteen_ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_% of my overdue payment of principal and interest. I will pay this late charge promptly but only once of each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.



**10.   WAIVERS**

I and any other person who ~~~ obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed ( the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Security Instrument, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the  Note or other loan   document is acceptable to  Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.   MISCELLANEOUS PROVISIONS**

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _____

RICHARD HOLT

Pay to the Order of:   JPMorgan Chase Bank N A
Without Recourse
JPMORGAN CHASE BANK, N.A. successor in interest
by purchase from the FDIC, as receiver for
Washington Mutual Bank formerly Washington Mutual Bank, FA

By: _____

Pay to the Order of:
Without Recourse
JPMorgan Chase Bank, NA
By: _____
Mykisha D. Rush/Vice President

Page 6 of 6

**Washington Mutual**

**NOTE ADDENDUM**
**Borrower's Payments Before They are Due**
**(Prepayment Fee Clause)**

This Note Addendum is made this __22nd__ day of __March, 2000__ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of __Washington Mutual Bank, FA__

__ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due. Any payment of principal only is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a full prepayment at any time during the first __Three__ years of the loan, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the first payment due date of the Note, the Prepayment Fee shall be equal to __Three__ percent ( __3.000__ %) of the original loan amount. If Noteholder receives prepayment after the first anniversary but on or before the __Second__ anniversary of the first payment due date of the Note, the prepayment fee shall be __Two__ percent ( __2.000__ %) of the original loan amount. If Noteholder receives prepayment after the second anniversary but on or before the __Third__ anniversary of the first payment due date of the Note, the prepayment fee shall be __One__ percent ( __1.000__ %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at anytime without penalty accrued but unpaid interest that has been added to Principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

By signing below, borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

X _____
RICHARD HOLT

**EXHIBIT "C"**

| | | |
|---|---|---|
| **DOCKET NO: CV 02 0192482  S** | : | **SUPERIOR COURT** |
| **WASHINGTON MUTUAL BANK, FA** | : | **JUDICIAL DISTRICT OF STAMFORD/NORWALK** |
| **VS.** | : | **AT STAMFORD** |
| **RICHARD L. HOLT, ET AL** | : | **JULY 11, 2003** |

### AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF  Florida :
                                          :        ss.           July 11, 2003
COUNTY OF  Duval          :

The undersigned, being duly sworn, hereby deposes and says as follows:

1.    I am over the age of 18 years and understand the meaning and obligation of an oath. I am employed as a/an Vice President with the Plaintiff, Washington Mutual Bank, FA.  In my capacity as a Vice President I am personally familiar with and have personal knowledge of the books and records of the Plaintiff, as they apply to the account of the Defendants, Richard L. Holt and Dorsum Nemus, LLC, including but not limited to payment histories, loan histories, servicing records, and default notices. The books and records of the Plaintiff are kept in the ordinary course of business and said books and records were made at or about the time described.

2.    On March 22, 2000, the Defendants, Richard L. Holt individually and on behalf of Dorsum Nemus, LLC, executed and delivered to Washington Mutual Bank, FA a Note in the original principal amount of $308,000.00, and agreed to make payments

1

pursuant to the terms of said Note. A true and accurate copy of the Note is attached as Exhibit A.

3. On March 22, 2000, the Defendants, Richard L. Holt individually and on behalf of Dorsum Nemus, LLC, conveyed by Mortgage Deed their interest in that certain piece or parcel of real property known as 23 Ridgewood Drive, Norwalk, Connecticut, to Washington Mutual Bank, FA. The Mortgage was recorded on March 27, 2000 in Volume 3876 at Page 250 of the Norwalk Land Records. A true and accurate copy of the Mortgage is attached hereto as Exhibit B.

4. Pursuant to the terms of the Note and Mortgage the Defendant were to make principal and interest payments on the 1st day of each month beginning on May 1, 2000, and each and every month thereafter until April 1, 2030.

5. The Defendants have failed, refused and neglected to make monthly mortgage payments as required by the loan documents since the payment due for April1, 2002, and for each and every month thereafter.

6. The Defendants are in default under the loan documents for failure to make payments as required by the terms of the Note and Mortgage.

7. The Defendants were duly notified in writing on at least five occasions, by the Plaintiff in accordance with the terms of the Note and Mortgage of the default and that the failure to cure the default may result in acceleration of the debt. The Defendants have failed, refused and neglected to cure the default. A true and accurate copy of the default letters is attached hereto as composite Exhibit C.

2

8.    Thereafter the Note was accelerated and the remaining unpaid principal balance, plus interest, attorney's fees and costs are due and owing to the Plaintiff.

9.    Based upon my review of the books and records of this account, the following sums are due and owing from the Defendants to the Plaintiff:

| | | |
|---|---|---|
| Principal Balance | $ | 315,654.00 |
| Interest from 3/1/02 to 6/30/03 @ 5.41% APR | $ | 23,900.48 |
| Pre-Acceleration Late Charges | $ | 94.99 |
| Escrow Advances | $ | 28,794.08 |
| Other Misc. | $ | 68.40 |
| TOTAL: | $ | 368,511.95 |

10.    The Per Diem rate of interest after 6/30/03 is $ 45.92.

11.    Plaintiff is not seeking payments due for May, 2001, July, 2001 or February, 2002 as they have already been posted.

12.    Plaintiff afforded the Defendants the opportunity to bring their April, 2002 payment current, however the Defendants failed neglected and refused to tender funds for the April, 2002 payment until a tender in November, 2002, which was properly rejected in accordance with the Note and Mortgage, as further and additional amounts were required since April, 2002 to bring the loan current.

13.    In accordance with the Note and Mortgage, the Plaintiff is not required to accept insufficient funds or partial payments from the Defendants where such tendered amounts fail to bring the loan current and the Defendants have defaulted.

3

I hereby swear and state that the foregoing facts are true and accurate to the best of my knowledge and belief.

Subscribed and sworn to me this ___11th___ day of July, 2003.

WASHINGTON MUTUAL BANK, FA.

By: _____
Its: Vice President

STATE OF Florida          )
COUNTY OF Duval           )  SS: _____

Subscribed and sworn to before me on this 11 day of July, 2003, before me, the undersigned officer, personally appeared, Nellie Kohling who acknowledged himself/herself to be the Vice President of the Plaintiff, Washington Mutual Bank, FA, and that s/he, as such officer, being authorized to do, executed the foregoing instrument for the purposes therein contained and acknowledged the same to be his/her free act and deed individually and as such officer, and the free act and deed of the corporation.

WITNESS THEREOF, hereunto set my hand.

_____
Notary Public
My Commission Expires: _____

Loan #0035960990

5

14.    The Defendants have failed, neglected and refused to tender sufficient funds to bring the loan current since their default in April, 2002.

15.    The Plaintiff has never entered into any forbearance agreement with the Defendants.

16.    Plaintiff is the owner and holder of the Note and Mortgage.

17.    Plaintiff has been forced to incur attorney's fees and costs to collect this indebtedness.

18.    Plaintiff has satisfied any and all conditions precedent to enforcing this instrument.

19.    There are no setoffs or counterclaims to the indebtedness due and owing in this matter.

20.    I submit this Affidavit in support of the Plaintiff's Motion for Summary Judgment.

4

 

**Washington Mutual**

PNOTE

**ADJUSTABLE RATE NOTE**
(FHLB Index - Payment and Rate ...)

BEST AVAILABLE DOCUMENT

...053-0

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __385,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

NORWALK _____    Connect (mut
(City)                              (State)

March 22, 2000

23 RIDGEWOOD DRIVE, NORWALK, CT 06853
(Property Address)

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ __385,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "principal"), plus interest,   to   the   order   of   the   Lender.   The   Lender's name is __Washington Mutual Bank, FA__ . I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount has been paid. I will pay interest at a yearly rate of __4.250__ %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

(A) - Time and Place of Payments

I will pay principal and interest by making payments every month. In this Note, "payments" refer to principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on __May, 2000__ , I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My   monthly   payments   will   be   applied   to   interest   before   principal.   If,   on __April 1, 2030__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date".

I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__ , or at a different place if required by the Note Holder.

(B)   Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,844.01__ , unless adjusted at an earlier time under section 4(H) of this Note.

32743-00-00                                    Page 1 of 6

# EXHIBIT A

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(C)(F)(G)(H) and (I) of this Note, to reflect changes in the principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Interest Rate Change Dates**

The interest rate I will pay may may further change on the 1st day of May, 2000, and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date".

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on each Interest rate Change Date is called the "Current Index."

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new Index as if it were the Index. The new Index will be the Twelve-Month-Average as set forth below, or the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields"). The Twelve-Month-Average is determined by adding together the Monthly Yields for the most recent available twelve months and dividing by 12. This information may be available in your library, or you may write to the Board of Governors, Publication Services Washington D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate Index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

**(C) Interest Rate Change Calculation**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Three & One-Tenth percentage points 3.100 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. If a new Index is selected, the new Margin will be the difference between the average of the Index for the most recent three year period which ends on the last date date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than Eleven & Ninety-Five-Hundredths percentage points 11.950 % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

D-650

6059-0

**(E) Payment Change Dates**

Effective every year commencing _____ May 1, 2001 _____ and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to _125%_ of the principal amount original borrowed. In the event my unpaid principal would otherwise exceed that _125%_ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the fifth anniversary of the due date of the first monthly payment, and on that same day every fifth year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without payment of any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after

the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (I) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $10.00. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of _Fifteen_ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_ % of my overdue payment of principal and interest. I will pay this late charge promptly but only once of each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that If I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed ( the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Security Instrument, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12.   MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

32743 (02-99)

Page 5 of 6

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

X_____

RICHARD HOLT

**Washington Mutual** ●

NOTE ADDENDUM
Borrower's Payments Before They are Due
(Prepayment Fee Clause)

6059-0

This Note Addendum is made this __22nd__ day of __March, 2000__ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of _____ Washington Mutual Bank, FA _____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

## BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due. Any payment of principal only is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a full prepayment at any time during the first __Three__ years of the loan, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the first payment due date of the Note, the Prepayment Fee shall be equal to __Three__ percent ( _3.000_ %) of the original loan amount. If Noteholder receives prepayment after the first anniversary but on or before the __Second__ anniversary of the first payment due date of the Note, the prepayment fee shall be __Two__ percent ( _2.000_ %) of the original loan amount. If Noteholder receives prepayment after the second anniversary but on or before the __Third__ anniversary of the first payment due date of the Note, the prepayment fee shall be __One__ percent ( _1.000_ %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at anytime without penalty accrued but unpaid interest that has been added to Principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

By signing below, borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

X _____
RICHARD HOLT

(AS2/A410)
32690 (03-97)

# EXHIBIT "D"

**SUMMONS - CIVIL**
(Except Family Actions)
JD-CV-1 Rev. 6-97
C.G.S. §§1-346, 51-347, 51-349, 51-350, 52-45a
52-48, 52-259, P.B. Sec. 49, 63, 66

**STATE OF CONNECTICUT**
**SUPERIOR COURT**

SE…
…
…

**"X" ONE OF THE FOLLOWING**
*Amount, legal interest or property in demand, exclusive of interest and costs is:*

☐ less than $2,500
☐ $2,500 through $14,999.99
☒ $15,000 or more
*("X" if applicable)*
☐ Claiming other relief in
☒ addition to or in lieu of money or damages.

**INSTRUCTIONS**
1. Type or print legibly; sign original summons and conform all copies of the summons.
2. Prepare or photocopy conformed summons for each defendant.
3. Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.
4. After service has been made by officer, file original papers and officer's return with the clerk of court.
5. The party recognized to pay costs must appear personally before the authority taking the recognizance.
6. Do not use this form for actions in which an attachment, garnishment or replevy is being sought. See Practice Book Section 49 for other exceptions.

**RETURN DATE** (mo., day, yr.)
November 19, 2002

**TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.**

| | | | |
|---|---|---|---|
| ☒ JUDICIAL DISTRICT | **AT** (Town in which writ is returnable)(C.G.S. 51-346, 51-349) | **CASE TYPE** (From case type list-see back) | |
| ☐ HOUSING SESSION ☐ GA NO. | Stamford-Norwalk at Stamford | Major  P   Minor  00 | |

**ADDRESS OF COURT CLERK WHERE WRIT AND OTHER PAPERS SHALL BE FILED** (No., street, town and zip code)(C.G.S. 51-347, 51-350)
123 Hoyt Street, P. O. Box 3245, Ridgeway Station, Stamford, CT  06905

**TELEPHONE NUMBER**
(203) 965-5307

| PARTIES | NAME AND ADDRESS OF EACH PARTY   NOTE: *Individual's Names* (No., street, town and zip code)   Last, First, Middle Initial | | PTY NO |
|---|---|---|---|
| FIRST NAMED PLAINTIFF | Washington Mutual Bank, FA, 9451 Corbin Avenue, N010204, Northridge, CA  91324 | | 01 |
| Additional Plaintiff | | | 02 |
| FIRST NAMED DEFENDANT | Holt, Richard L., 23 Ridgewood Road, Norwalk, CT  06853 | | 50 |
| Additional Defendant | Dorsum Nemus Limited Liability Company, c/o Richard L. Holt, 23 Ridgewood Drive, Norwalk, CT  06854 | | 51 |
| Additional Defendant | | | 52 |
| Additional Defendant | | | 53 |

☐ Form JD-CV-2 attached

### NOTICE TO EACH DEFENDANT

1. You are being sued.
2. This paper is a Summons in a lawsuit.
3. The Complaint attached to these papers states the claims that each Plaintiff is making against you in this lawsuit.
4. To respond to this Summons, or to be informed of further proceedings, you or your attorney must file a form called an "Appearance" with the Clerk of the above-named Court at the above Court address on or before the second day after the above Return Date.
5. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default.

6. The "Appearance" form may be obtained at the above Court address.
7. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately take the Summons and Complaint to your insurance representative.
8. If you have questions about the Summons and Complaint you should consult an attorney promptly. The Clerk of Court is not permitted to give advice on legal questions.

| DATE | SIGNED (Sign and "X" proper box) | | TYPE NAME OF PERSON SIGNING AT LEFT. |
|---|---|---|---|
| October 29, 2002 | | ☒ Comm. of Superior Court ☐ Assistant Clerk | Geoffrey K. Milne |

**FOR THE PLAINTIFF(S) PLEASE ENTER THE APPEARANCE OF:**

| NAME AND ADDRESS OF ATTORNEY, LAW FIRM OR PLAINTIFF IF PRO SE (No., street, town and zip code) | TELEPHONE NO. | JURIS NO. (If atty or law firm) |
|---|---|---|
| Hunt Leibert Chester & Jacobson, PC, 94 Hungerford St., Hartford, CT 06106 | (860) 246-5889 | 101589 |

| NAME AND RESIDENCE OF PERSON RECOGNIZED TO PROSECUTE IN THE AMOUNT OF $350 (No, street, town and zip) | | SIGNATURE OF PLAINTIFF IF PRO SE |
|---|---|---|
| Patricia Krupa of 94 Hungerford Street, Hartford, CT 06106 | | |

| # PLFS. | # DEFS. | # CNTS. | SIGNED (Official taking recognizance; "X" proper box) | | For Court Use Only |
|---|---|---|---|---|---|
| 1 | 2 | 1 | | ☒ Comm. of Superior Court ☐ Assistant Clerk | FILE DATE |

**ATTEST:**
**A TRUE COPY**
**ALBERT W. CALIENDO**
**STATE MARSHAL, FAIRFIELD COUNTY**

**IF THIS SUMMONS IS SIGNED BY A CLERK:**
a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.
c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service thereof.

| I hereby certify I have read and understand the above: | SIGNED (Pro Se Plaintiff) | DATE SIGNED | DOCKET NO. |
|---|---|---|---|
| | | | |

| JD-CV-1.DOC | ORIGINAL |
|---|---|
| File No. | |

| | | |
|---|---|---|
| **RETURN DATE: November 19, 2002** | : | **SUPERIOR COURT** |
| **WASHINGTON MUTUAL BANK, FA** | : | **JUDICIAL DISTRICT OF STAMFORD-NORWALK** |
| **VS:** | : | **AT STAMFORD** |
| **RICHARD L. HOLT AND DORSUM NEMUS LIMITED LIABILITY COMPANY** | : | **October 29, 2002** |

## COMPLAINT

1.   Plaintiff, Washington Mutual Bank, FA (hereinafter referred to as "Washington Mutual") is a corporation organized and existing under the laws of California with an address of 9451 Corbin Avenue N010204, Northridge, California 91324.

2.   At all times complained of herein, the Defendant, Dorsum Nemus Limited Liability Company, owned real property situated in the Town of Norwalk, County of Fairfield and State of Connecticut known as 23 Ridgewood Drive, (hereinafter the "Property") being more particularly described in Schedule A attached hereto and made a part hereof.

3.   On or about March 22, 2000, the Defendants, Richard L. Holt individually and on behalf of Dorsum Nemus Limited Liability Company, executed and delivered to Washington Mutual Bank, FA, a Note (the "Note") for a loan in the original principal amount of $308,000.00.

4.   On said date to secure said Note the Defendants, Richard L. Holt individually and on behalf of Dorsum Nemus Limited Liability Company, did execute and deliver to Washington Mutual Bank, FA, a Mortgage on the Property, a copy of which is attached hereto as Exhibit A. Said Mortgage was dated March 22, 2000 and recorded March 27, 2000 in Volume 3876 at Page 250 of the Norwalk Land

Records. The Plaintiff, Washington Mutual Bank, FA, is the owner and holder of said Note and Mortgage.

5.    Said Note is in default and the Plaintiff, Washington Mutual as the owner and holder of said Mortgage and Note has elected to accelerate the balance due on said Note, to declare said Note to be due in full and to foreclose the Mortgage securing said Note.

6.    The Plaintiff has provided written notice in accordance with the Note and Mortgage to the Defendants of the default under the Note and Mortgage, but said Defendants have failed and neglected to cure the default. The Plaintiff has elected to accelerate the balance due on said Note, to declare said Note to be due in full and to foreclose the Mortgage securing said Note.

7.    The following liens or encumbrances claim to have an interest in the Property which liens or encumbrances are prior in right to the Mortgage herein:

      a.    The Town of Norwalk may claim an interest in the Property by virtue of inchoate liens for real estate taxes on the Grand Lists of October 1, 2001 and October 1, 2002.

8.    There are no liens or encumbrances which claim to have an interest in the Property which liens or encumbrances are subsequent in right to the Mortgage herein.

9.    The Defendant Dorsum Nemus Limited Liability Company, is the owner of the equity of redemption of the Property and, on information and belief, is in possession of the Property.

10.    The Plaintiff, Washington Mutual, has further caused a Lis Pendens to be filed on the Land Records of the Town of Norwalk and has further caused a copy of said Lis Pendens to be served on the Defendants, Richard L. Holt and Dorsum Nemus Limited Liability Company. A copy of said Lis Pendens is attached hereto as Exhibit B.

11.    The Plaintiff, Washington Mutual, has further caused a notice to be given to the Defendants, Richard L. Holt and Dorsum Nemus Limited Liability Company, of their rights pursuant to the Statutes pertaining to unemployment and underemployment by annexing to this Writ, Summons and Complaint a copy of the notice provided for in said Statute.

Compl.doc (Rev. 03/02)
File No. 03304-00011

HUNT LEIBERT CHESTER & JACOBSON, P.C. ● ATTORNEYS AT LAW
94 HUNGERFORD STREET ● HARTFORD, CONNECTICUT 06106 ● (860) 246-5889 ● JURIS NO. 101589

WHEREFORE, the plaintiff claims:

1.    Foreclosure of the Mortgage;

2.    Possession of the Property;

3.    Money damages against the makers of, or obligors on, the Note described herein and/or their Estates, if deceased, (unless same has been precluded by virtue of a Bankruptcy filing);

4.    A reasonable attorney's fee (unless same has been precluded by virtue of a Bankruptcy filing);

5.    Interest (unless same has been precluded by virtue of a Bankruptcy filing);

6.    Costs of suit (unless same has been precluded by virtue of a Bankruptcy filing);

7.    Deficiency Judgment against the makers of, or obligors on, the Note described herein, and/or their Estate, if deceased (unless same has been precluded by virtue of a Bankruptcy filing); and

8.    Such other and further relief as the Court may deem just and equitable.

Notice is hereby given to the Defendant that the Plaintiff intends to seek satisfaction of any judgment rendered in its favor in this action out of any debt accruing to said defendant by reason of her personal services, (unless same has been precluded by virtue of a Bankruptcy filing).

Dated at Hartford, Connecticut on October 29, 2002.

PLAINTIFF
Washington Mutual Bank, FA

By
Geoffrey K. Milne, Esq.
Hunt Leibert Chester & Jacobson, P.C.
Its Attorneys

Compl.doc (Rev. 03/02)
File No. 03304-00011
HUNT LEIBERT CHESTER & JACOBSON, P.C. ● ATTORNEYS AT LAW
94 HUNGERFORD STREET ● HARTFORD, CONNECTICUT 06106 ● (860) 246-5889 ● JURIS NO. 101589

| | | |
|---|---|---|
| **RETURN DATE: November 19, 2002** | : | **SUPERIOR COURT** |
| **WASHINGTON MUTUAL BANK, FA** | : | **JUDICIAL DISTRICT OF STAMFORD-NORWALK** |
| **VS:** | | |
| | : | **AT STAMFORD** |
| **RICHARD L. HOLT AND DORSUM NEMUS LIMITED LIABILITY COMPANY** | : | **October 29, 2002** |

STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest, or property in demand is not less than $15,000.00, exclusive of interest and costs.

PLAINTIFF
Washington Mutual Bank, FA

By
Geoffrey K. Milne, Esq.
Hunt Leibert Chester & Jacobson, P.C.
Its Attorneys

Compl.doc (Rev. 03/02)
File No. 03304-00011

# EXHIBIT "E"

P.O. Box 1993
Northridge, CA 91328-1993

Washington Mutual

March 29, 2002

Mr. Richard Holt
23 Ridgewood Road
Norwalk, CT 06855

Re: Loan Number:        380
        Property: 23 Ridgewood Road
                  Norwalk, CT 06855

Dear Mr. Holt:

This letter is to confirm that we have corrected the credit for January 2002 on the above referenced loan.

Please accept our apology for any inconvenience this may have caused you. This level of service is not representative of the service level that Washington Mutual strives to provide. Thank you for allowing us the opportunity to be of service to you.

Sincerely,

Office
Collection Support Department
(800) 398-4940

116



**FedEx.** *USA Airbill*    835358998677

04/27/2003

R HOLT                        203,853-1715

CDC

PO BOX 247

REMAYON          CT. 06853

PAYMENT PROCESSING        800,282-4890

WASHINGTON MUTUAL

9451 CORBIN AVENUE    NO101105

NORTHRIDGE          CA. 91324

44p

115

Washington Mutual

04/30/02

CENTRA DATA COMMUNICATION LLC
P.O BOX 456 GRAND CENTAL STATION
NEW YORK,NY 10163

Re: Loan No.:      9590

Dear Customer(s)

We are returning your check number 305 in the amount of 354.00 for the following reason(s)

SHORT PAYMENT

If you any question in regards to your mortgage loan, please do not hesitate to give us a call or you can contact our Customer Service Hotline at (800) 282-4840 to assist you with your needs.

Sincerely,

Cash Management

11 ?



118





FedEx. USA Airbill    830721356902

08/01/2002

2/2 340-1272

CDC

PO BOX 456    GCS

NEW YORK    NY    10163

CRU CHK 314

CASH MANAGEMENT    800,2824848

WASHINGTON MUTUAL BANK

9451 CORBIN AVENUE

NORTHRIDGE    CA    91324

Washington Mutual

August 07, 2002

Richard Mult
23 Ridgewood Rd
Norwalk, CT 06853

RE:    Loan No:        190
Property Address: 23 ridgewood Dr
                  Norwalk CT 06853

Dear Customer(s):

We value your business and want to thank you for your recent payment
on the above referenced loan.

We are unable to accept your payment at this time because the amount
does not represent the total amount due on your loan, and partial
payments are not acceptable.  As a result, we are returning check
number 314 in the amount of $1899.85, dated 071502.

In order to process your monthly payment and properly credit your
account, we encourage you to call this office at the number listed
below prior to remitting your payment.

Thank you for the opportunity to serve you, and for your prompt
attention to this matter.


Washington Mutual
Collection Department
(800)232-6840


CM014-010


152



**Washington Mutual**

August 26, 2002

Richard Bolt
23 Ridgewood Rd
Norwalk, CT 06883

RE:    Loan No:       7500
Property Address: 23 Ridgewood Dr
                  Norwalk CT 06883

Dear Customer(s):

We value your business and want to thank you for your recent payment on the above referenced loan.

We are unable to accept your payment at this time because the amount does not represent the total amount due on your loan, and partial payments are not acceptable. As a result, we are returning check number 127 in the amount of $1699.88, dated 081502.

In order to process your monthly payment and properly credit your account, we encourage you to call this office at the number listed below prior to remitting your payment.

Thank you for the opportunity to serve you, and for your prompt attention to this matter.


Washington Mutual
Collection Department
(800)383-4048



CRA16-010


125





■ Washington Mutual

September 14, 2002

*ATT:*
*ANDREW*
*SAMUEL*

Richard Holt
23 Ridgewood Rd
Norwalk, CT 06853

RE:    Loan No:         3890
Property Address: 23 Ridgewood Dr
                   Norwalk CT 06853

Dear Customer(s):

We value your business and want to thank you for your recent payment on the above referenced loan.

We are unable to accept your payment at this time because the amount does not represent the total amount due on your loan, and partial payments are not acceptable. As a result, we are returning check number 320 in the amount of $1899.65, dated 09-12-02.

In order to process your monthly payment and properly credit your account, we encourage you to call this office at the number listed below prior to remitting your payment.

Thank you for the opportunity to serve you, and for your prompt attention to this matter.

Washington Mutual
Collection Department
(800) 282-4840

CM816-010

129

P.O. Box 1002
Northridge, CA 91328-1002

Washington Mutual

September 19, 2002

Richard Holt
23 Ridgewood Road
Norwalk CT 06853

Re: Loan Number:           0690
      Property: 23 Ridgewood Drive
                Norwalk CT 06853

Dear Mr. Holt:

This letter is to confirm that we have received your correspondence dated 9/13/02. Please be advised that we have reviewed your loan and have verified that funds in the amount of $353.47 have posted to your loan toward late charges on 11/16/01.

We currently show that your loan is due for the April 2002 payment.

In reviewing your loan, we can reverse the following funds of $751.12 from Late Charges and $801.58 from Suspense to be applied as the April 2002 payment once the difference of $214.61 has been received.

If you should have any questions concerning this matter please feel free to contact us at the number listed below. Thank you for allowing us the opportunity to be of service to you.

Sincerely,

*Sarah Lauterio*
Collection Support Department
(800) 252-4540

128







126

⊕ Washington Mutual

November 01, 2002

Richard Holt
23 Ridgewood Rd
Norwalk, CT 06853

RE:    Loan No:                    .590
       Property Address:    .3 Ridgewood Dr
                            Norwalk CT 06853

Dear Borrower(s):

We are returning your check number 332 in the amount of
$1,899.95, dated 10/25/02 as the amount does not represent
the total amount due on your loan, and partial payments are
not acceptable.

Your loan is in foreclosure.  You must contact the following
attorney to determine the amount now due:

       Attorney Name:
       Law Firm:            Hunt, Leibert & Chester
       Telephone Number:    860-246-5889

All foreclosure reinstatements must be paid in Certified Funds.

Washington Mutual
Foreclosure Department
(800)282-4840

FC335-013

132



FedEx. USA Airbill  837674783779

11/04/2002

RICHARD HOLT    203,866-3420

ASSET TR

PO BOX 247

ROWAYTON    CT    06853

JRC OF CM

DEBBIE CORONA    818,773-6238

WASHINGTON MUTUAL

9200 OAKDALE    OSM

NORTHRIDGE    CA    91328

135

◪ Washington Mutual

November 07, 2002

Richard Holt
13 Ridgewood Rd
Norwalk, CT 06853

RE:   Loan No:                    490
      Property Address:   13 Ridgewood Dr
                          Norwalk CT 06853

Dear Borrower(s):

We are returning your check number 0391201071 in the amount of
$314.61, dated 11/04/02 as the amount does not represent
the total amount due on your loan, and partial payments are
not acceptable.

Your loan is in foreclosure.  You must contact the following
attorney to determine the amount now due:

      Attorney Name:
      Law Firm:           Hunt, Leibert & Chester
      Telephone Number:   860-346-5889

All foreclosure reinstatements must be paid in Certified Funds.

Washington Mutual
Foreclosure Department
(800) 582-4540

FC135-013

136





Washington Mutual

04/30/02

CENTRA DATA COMMUNICATION LLC
P.O BOX 456 GRAND CENTAL STATION
NEW YORK,NY 10163

Re: Loan No.:        9590

Dear Customer(s)

We are returning your check number 305 in the amount of 354.00 for the following
reason(s)

SHORT PAYMENT

If you any question in regards to your mortgage loan, please do not hesitate to give us a
call or you can contact our Customer Service Hotline at (800) 282-4840 to assist you with
your needs.

Sincerely,

Cash Management

113

**EXHIBIT "F"**

# News **Analysis** & **Commentary**



**HOME LOAN BLUES**
Colby says that
WaMu lost her
mortgage money

operatively with the Attorney General's office," she says.

The dustups with customers come as WaMu execs work to turn a once little-known regional thrift into a kind of Wal-Mart of consumer banking. Since 1991, WaMu has been on a massive expansion tear as it seeks to acquire millions of new retail and home loan customers. Acquiring its way into such big markets as Texas, California, and New York, WaMu now ranks as the nation's top thrift and mortgage lender, serving 12.3 million households, with $283 billion in assets and 2,650 offices coast to coast.

### ILLEGAL FEES?

YET AS THE BANK HAS GROWN, so has its stable of unhappy customers around the country. Last month, Minnesota District Court Judge Steven Z. Lange granted national class action status to a January, 2003, suit that alleged WaMu charged "illegal prepayment penalty fees" to borrowers paying off their mortgage loans. WaMu concedes it has overcharged some customers in Minnesota. In August, the bank settled a Seattle lawsuit alleging that WaMu had lost mortgage payments, posted payments late or improperly, charged erroneous fees, and filed inaccurate reports to credit agencies. As part of the settlement, the bank agreed to review complaints from more than 1,000 customers. In July, a separate Seattle suit was certified as a class action covering some 150,000 customers in five Western states. It alleged WaMu "improperly collected" reconveyance, statement, and other fees when customers paid off their home loans. WaMu disputes those charges and says it will "defend these claims vigorously."

## BANKING
# IS THIS ANY WAY TO RUN A BANK?

## WaMu's alleged blunders have it fending off lawsuits and complaints

**W**HEN SHERRY COLby decided to pay off the mortgage on her Houston house with some of the money she had collected from her insurance company for mold damage, she thought her troubles were over. Instead, she merely traded one nightmare for another. In February, she forwarded two insurance company checks for nearly $35,000 to her mortgage company, Washington Mutual. The money went into an escrow account, and she continued to make monthly payments through July. And although she sent in the balance of the mortgage in August, by Labor Day, Colby received threatening calls from debt collectors saying she had fallen behind on her payments.

What happened? In August, Colby claims, the funds somehow vanished as they moved from the escrow account to the payoff department. Says the 44-year-old CPA: "They've lost the money."

WaMu says privacy issues prevent it from discussing the case. But Colby is just one of scores of disgruntled customers from around the country. The fast-growing, Seattle-based Washington Mutual Inc. has been fending off lawsuits and complaints in states ranging from Minnesota to Washington and California.

As the problems in Texas pile up—since mid-2002, some 200 individual consumer complaints have been filed against WaMu—*BusinessWeek* has learned that Texas' Attorney General's Office has launched an investigation into WaMu's mortgage business practices. The AG's office is looking into allegations of everything from lost mortgage payments to improper foreclosures. Fay L. Chapman, WaMu general counsel, acknowledges the bank may have made some mistakes and is reviewing each complaint individually. "We have been working co-

### LOSING GLITTER

WaMu has racked up a variety of customer complaints, including:

**LOST** mortgage payments

**EXCESSIVE** and erroneous fees

**MISHANDLED** property tax payments

**INACCURATELY** filed credit reports

The problems have left WaMu scrambling to improve its customer service and processing systems. As a result, direct complaints to WaMu have declined 35% in the first six months of 2003, and misapplied mortgage payments from April to August fell 33%, according to John Rostas, WaMu's senior vice-president of operational excellence. Still, if Sherry Colby is any indication, WaMu has a ways to go. ■

*–By Stephanie Anderson Forest in Dallas*



RANK QUATTRONE
SIDE HIS MONEY
ACHINE (P.104)

VANISHING JOBS
IS IT RIGHT TO
BLAME CHINA? (P.32)

NOKIA TAKING ON
NINTENDO AND
SONY IN GAMES (P.50)

The McGraw·Hill Companies

# BusinessWeek

TOBER 13, 2003

www.businessweek.com

# THE
# WEB
# MOGUL

**BARRY DILLER**
never had a secret
plan to take over
Vivendi. But he does
have a not-so-secret
plan to rule the Web.
**Page 62**





# REPORT OF 2004 PROGRESS & INITIATIVES

## TEXAS ATTORNEY GENERAL
## GREG ABBOTT

## HIGHLIGHTS

**COLLECTED A RECORD $1.67 BILLION IN CHILD SUPPORT PAYMENTS** in 2004. The collections benefitted 685,000 children.

**ARRESTED 32 ONLINE CHILD SEXUAL PREDATORS,** with a perfect conviction record in cases brought to trial.

**SUED A UT STUDENT RUNNING ONE OF THE WORLD'S LARGEST EMAIL SPAM OPERATIONS.** The business used more than 250 assumed names to deceive consumers.

**TRAVELED ACROSS THE STATE EDUCATING TEXAS SENIORS ABOUT PHONY SWEEPSTAKES, FOREIGN LOTTERIES, AND OTHER SCAMS.** Urged consumers statewide to "Just Hang Up" on unsolicited telemarketing calls and identity theft scams.

**RECEIVED THE MEDICAID FRAUD CONTROL UNIT OF THE YEAR AWARD** from the U.S. Department of Health & Human Services.

**TRACKED DOWN 124 CHILD SEXUAL PREDATORS WANTED FOR PAROLE VIOLATIONS,** including two fugitives on the run for 13 years.

**WON GUILTY PLEAS OR VERDICTS IN 25 CRIMINAL CASES** involving capital murder, intoxication manslaughter, gambling, sexual assault of a minor, and other crimes.

**ISSUED 10,974 OPEN RECORDS LETTER RULINGS.** Approximately 27% of these were issued in ten business days or less, and 49% in twenty days or less. Answered over 11,000 calls to the Open Government Hotline.

**COLLECTED $50.7 MILLION IN TAXES AND DEBTS OWED TO THE STATE,** including nearly $5 million from bankrupt MCI/WorldCom.

## SUPPORTING CHILDREN & FAMILIES

**ARRESTED NINE PEOPLE ON THE 2004 TOP TEN CHILD SUPPORT EVADER LIST** and sent more than 2,800 parents to jail for failing to pay support.

**ESTABLISHED PATERNITY FOR 59,000 CHILDREN AND CHILD SUPPORT ORDERS IN NEARLY 57,000 CASES.** The State earned more than $36 million in federal child support performance incentives. Obtained signed paternity acknowledgments for nearly 70% of the children born out of wedlock in Texas.

# FIGHTING MEDICAID FRAUD

**RECOVERED $36 MILLION IN OVERPAYMENTS AND CIVIL PENALTIES** from the makers of Paxil, Flonase, Cipro, Claritin and other drugs. The companies were caught inflating prices and mislabeling their products.

**WON A GUILTY PLEA FROM AN EAGLE PASS DOCTOR IN A $304,000 MEDICAID FRAUD CASE.** The doctor was charged with overbilling for sonograms and using unapproved drugs imported from Mexico.

**WON RECORD PRISON SENTENCES FOR A HUSBAND AND WIFE TEAM WHO STOLE $646,000 FROM MEDICAID.** The woman, a licensed counselor, got 63 years in prison; her husband received a 35-year sentence.

**WON A 10-YEAR SENTENCE, PLUS $8.4 MILLION IN RESTITUTION** against a Midland doctor who overbilled Medicaid for services at a walk-in clinic.

# PROTECTING VICTIMS OF CRIME

**AWARDED MORE THAN $72 MILLION IN CRIME VICTIMS COMPENSATION – A NEW RECORD.** Received a record 38,800 applications, and certified 95 sexual assault nurse examiners.

**AWARDED $33.7 MILLION IN GRANTS** to more than 300 public and non-profit victim assistance organizations, and trained more than 4,200 victim service professionals.

**CONTINUED BUILDING THE TEXAS VINE NETWORK,** which gives crime victims information about offender status and court developments. At year end, VINE was available in 93 county jails and 62 court systems across the state.

# PROTECTING TEXAS CONSUMERS

**WON MORE THAN $1 MILLION IN RESTITUTION** from 14 Houston-area car dealerships that forced car buyers to purchase maintenance coupons. More than 4,000 consumers received restitution.

**WON INJUNCTIONS AGAINST ELEVEN TELEMARKETING FIRMS** for violating the Texas No-Call law.

**SHUT DOWN THE TEXAS POLICE OFFICERS ALLIANCE (TPOA),** a fraudulent charity that raised almost $300,000 from donors, but paid only $500 in benefits to the families of slain peace officers.

**WON A $23 MILLION JUDGMENT** against the officers and directors of a charity that gave scholarships to needy students. The directors and officers were held liable for paying themselves grossly excessive compensation and benefits.

**SUED DELAWARE-BASED CROSS COUNTRY BANK FOR PREYING ON LOW-INCOME CONSUMERS.** The bank offered credit of up to $2,500, but for most consumers the limit was as low as $200 and in many cases, finance charges and fees used up most of the issued credit.

**WON REFUNDS TOTALING $4.2 MILLION FOR MORE THAN 18,000 TEXAS POLICYHOLDERS** who overpaid on car repair claims that should have been covered by insurance.

**SUED BANKRUPT TELECOM RESELLER NORVERGENCE** for scheming to defraud hundreds of small Texas businesses.

**FORCED WASHINGTON MUTUAL TO STOP MISHANDLING MORTGAGE AND ESCROW ACCOUNTS.**
Reformed business practices will help ensure that company errors do not result in wrongful foreclosures or unfair consumer credit reports.

**SHUT DOWN THREE FRAUDULENT MORTGAGE BROKERS IN EL PASO** for operating without proper licenses, charging illegal fees on home equity loans, and falsifying documents.

# FIGHTING FOR AFFORDABLE HEALTHCARE

**SECURED $30 MILLION FOR CHARITY HEALTHCARE AT A LAREDO HOSPITAL** and helped a charity hospital in Dallas recover $23 million wrongfully taken during the sale of the facility.

**SUED A FLORIDA DISTRIBUTOR** for charging exorbitant prices for flu vaccine.

**WON $1.1 MILLION IN CONSUMER REFUNDS FROM BANKRUPT MARK NUTRITIONALS INC.** The company claimed its product let people lose weight while sleeping, without exercise or dieting.

**OBTAINED A $38 MILLION MULTISTATE SETTLEMENT FROM DRUG MAKER WARNER-LAMBERT,** which improperly promoted the epilepsy drug Neurontin as a treatment for back pain, psychiatric disorders (including bi-polar disorder), and attention deficit disorder.

# PROTECTING HISPANIC TEXANS

**SENT A DALLAS-AREA WOMAN TO PRISON FOR 97 MONTHS FOR POSING AS A FEDERAL IMMIGRA-TION OFFICER** and won a $1.4 million civil judgment against her for defrauding immigrant families in the Dallas area.

**WON $900,000 IN RESTITUTION FROM A HIDALGO COUNTY NOTARY PUBLIC,** in the first-ever trial under the Texas "notario" statute. The defendant claimed to be an attorney and charged fees to prepare immigration documents.

**SUED MIDLAND-BASED APLICACION DE ORO AND ITS OWNERS** for providing unauthorized legal services to almost 600 consumers.

**SENT A DALLAS WOMAN TO JAIL ON CIVIL CONTEMPT CHARGES.** She defrauded consumers by charging them over $1,000 each for immigration services she could not legally provide, then did little or no work on their cases.

**SUED OAK CLIFF-BASED GRUPO ECSA,** whose owner promoted her business through a website and radio advertisements, defrauded immigrants of at least $1.7 million, and was sent to jail for violating a court order to stop promoting her business.

**WON $3.3 MILLION IN CIVIL PENALTIES AND MORE THAN $200,000 IN RESTITUTION FROM CITY MORTGAGE SERVICES OF DALLAS.** Company owners pocketed mortgage payments instead of sending them to the lenders, leaving hundreds of homeowners in danger of losing their homes.

**SUED SEVERAL FLORIDA-BASED CREDIT CARD COMPANIES, INCLUDING PROLINE AND LATINCARD PLUS.** Defrauded consumers by charging them an up-front fee of nearly $300. The companies promised major credit cards with high credit limits to Hispanic consumers. In reality, the cards were only good for purchases from the companies' catalogs and Web sites. Texas was the first state to act to stop this nationwide scam.

# OTHER HIGHLIGHTS

**VIGOROUSLY DEFENDED TEXAS' RIGHT TO HAVE A TEN COMMANDMENTS MONUMENT** on the grounds of the State Capitol.

**SUED SECOND CHANCE BODY ARMOR, INC.,** one of the largest makers of bullet-proof vests, for failing to reveal serious flaws that could jeopardize the lives of law enforcement officers.

**SAVED THE STATE MORE THAN $2 BILLION IN REVENUE IN 2004,** most of it from a case involving USAA. This case determined that insurance companies owe sales and other general taxes to the State.

**COLLECTED MORE $18 MILLION FROM SIX MAJOR OIL COMPANIES** that underpaid crude oil production taxes owed to the State.

**SHUT DOWN A ROCK QUARRY THAT WAS POLLUTING THE BRAZOS RIVER,** and sued six other rock and sand quarries for similar violations.

**HELPED 56 TEXAS AGENCIES AND UNIVERSITIES GET REIMBURSEMENT FROM NATIONAL GYPSUM COMPANY** to cover the cost of removing asbestos from their buildings.

**FORCED ALCOA TO PAY MORE THAN $12.4 MILLION TOWARD CLEAN-UP OF HAZARDOUS WASTE POLLUTION IN LAVACA BAY.** The pollution came from an aluminum plant in Port Comfort.

# EXHIBIT "G"

11/27/2004    11:12 am
26/11/2004   15:11    63455361291    From    To    Page  1
PA'S RETIREMENT-HOME    S.    01

Washington Mutual

Legal Department
Mailstop: WMT 1708
1201 Third Avenue
Seattle, WA 98101

(206) 377-9184 direct
(206) 377-9845 fax

Received
Reibig & Hummel
26. Nov. 2004
EINGANG

November 23, 2004

**VIA FEDEX**

Jens Reibig, Esq.
Reibig & Hummel
Friedenstrasse 11 A
06114 Halle
Germany

Re:    Mortgagor:        Richard Holt
       WaMu Loan No.:    9590
       Property Address: 23 Ridgewood Drive
                         Norwalk, CT 06853

Dear Mr. Reibig,

Thank you for your letter dated September 10, 2004. We very much appreciate your patience in awaiting our reply.

We understand that your client may be frustrated with the lack of customer service he received from Washington Mutual Bank. We apologize for this and, by way of this letter, will hopefully be on our way to amicably resolving this matter.

Your comment of Washington Mutual having a "... duty to not lose payments ..." is agreed. However, Mr. Holt still has a duty to keep making his mortgage payments under any circumstances. The last payment we received was on July 1, 2002 in the amount of $965.74, which was applied on the April 2002 payment.

We do understand that there may have been confusion on the part of Washington Mutual representatives as to what Mr. Holt promised to send in and what was perhaps captured in system notes thereby the payments getting sent back. We apologize for this. As a customer service gesture to bring the total amount due down on this loan, we are willing to waive all late, property inspection, NSF and payoff statement fees accrued on this loan. This amount totals $3,194.47, of which $2,149.99 has been previously waived. Additionally, $1,108.54 of the total amount has been processed as paid, which we will credit to the loan's suspense (holding) account. In summary, the total amount of fees currently owed (and that we are willing to waive) on Mr. Holt's loan totals $1,870.94.

107

11/11/2001    11:22 NR
26/11/2004  15:11    03455281291

Free:                    To
                RA'E REISSIG&HUMMEL

Page   2
S.       82

Jens Reibig, Esq.
Re: Richard Holt
November 23, 2004
Page 2

Mr. Holt's loan is currently in default; however, the holds are in place through January 31, 2005. Foreclosure activities did start on this loan in October 2002. We will agree to waive the $6,887.67 in foreclosure fees assessed due to that it appears Mr. Holt did try and make payments before the foreclosure process started. We will also have removed any foreclosure information we reported to the consumer reporting agencies to which we report as well as reverse any derogatory reporting from the origination of this loan through July 2002 (the last month a payment was received).

In the loan's suspense account currently, there is $444.17. We can apply this amount with the $1,108.54 (this amount reflects fees already paid) to the total amount due on this loan which totals $1,552.71.

At present, Mr. Holt's escrow account is at a negative amount of ($38,087.70). The total amount currently due on this loan is $67,344.83, this amount represents only principle, interest, and all fees currently owed (not the escrow). However, with the above mentioned fees that we are willing to waive, i.e., $6,758.61, and the $1,552.71 to be applied to the loan from the suspense account, the total amount due at present would be $57,033.51, plus escrow. Enclosed please find for your information a breakdown of the above figures.

We will request our Homeowner's Assistance Department to send an application to Mr. Holt directly at his Connecticut address. If Mr. Holt is approved for a repayment schedule of the total amount due on this loan, it will be worked through the Homeowner's Assistance Department.

We understand, per your letter, that Mr. Holt is pursuing discussions with the appropriate taxing authority as to our tax disbursements from his escrow account, which we consider owed and due. Please keep us posted on these discussions. In most instances where there have been overpayments to a taxing authority, the homeowner is reimbursed directly, not the lender. If there has been a mistake by the taxing authority and a reimbursement check is sent to Mr. Holt, please have him forward these funds to us immediately for our deposit into his escrow account.

The foregoing is offered for Mr. Holt's consideration and is contingent on him signing a Release as to the circumstances surrounding these matters on this loan. Please let us know how you wish to proceed. Thank you.

Sincerely,

Shannon Moynihan
Paralegal

Jens Reibig, Esq.
Re: Richard Holt
November 23, 2004
Page 3

Enclosure
Cc: Fay Chapman, General Counsel
    Melissa Sirovina, Executive Response Center
    Quality Service Management
SMM/em

22/87/2884  16:28   83455281291              RA'E REISSIG&HUMMEL              S.    81

ATTN: Jens Reibig

Seite 1 von 1

## Volker Kadler

| | |
|---|---|
| **Von:** | Moynihan, Shannon [shannon.moynihan@wamu.net] |
| **Gesendet:** | Montag, 19. Juli 2004 23:30 |
| **An:** | info@hsi-anwalt.de |
| **Betreff:** | ATTN: Jens Reibig |
| **Wichtigkeit:** | Hoch |

<<Washington Mutual Legal1.tif>>

Attorney Reibig,

Please see attached letter regarding Richard Holt. Original to follow via U.S. First-Class Mail. Thank you.

--

*Shannon Moynihan*
*Consumer Group Paralegal*
*206.377.8194 - voice*
*206.377.2289 - fax*

*Washington Mutual*
*Legal Department*
*Mailstop: WAT 1706*
*1801 Third Avenue*
*Seattle, WA 98101*

*NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by replying to this email and immediately delete the message and any attachments without copying or displaying the contents whatsoever. Thank you.*

· 22.07.2004

FW: Message for Mr. Reibig

---

Von:        Moynihan, Shannon [shannon.moynihan@wamu.net]
Gesendet:   Montag, 31. Januar 2005 23:30
An:         info@hsi-anwalt.de
Cc:         Sirovina, Melissa
Betreff:    FW: Message for Mr. Reibig
Wichtigkeit: Hoch

The below message is regarding Richard Holt. Thank you.

--

Shannon Moynihan

Washington Mutual Bank, FA

Consumer Group Paralegal

206.377.0296 - voice

206.377.2008 - fax

-----Original Message-----
From: Moynihan, Shannon
Sent: Monday, January 31, 2005 2:19 PM
To: 'info@hsi-anwalt.de'
Cc: Sirovina, Melissa
Subject: Message for Mr. Reibig
Importance: High

ATTORNEY-CLIENT COMMUNICATION

AND/OR ATTORNEY WORK PRODUCT

--PRIVILEGED AND CONFIDENTIAL

Mr. Reibig,

I am following up as to Washington Mutual's last written communication to you of 23 November, 2004. Please be advised that the loan will continue normal servicing as of 18 February, 2005. Please respond as to our 'offer' of this past November. Thank you.

--

Shannon Moynihan

Consumer Group Paralegal

206.377.0296 - voice

206.377.2008 - fax

Washington Mutual Bank, FA

Legal Department

07.02.2005

**02/02/2005**   **19187 05**
**08/02/2005   11:37      9345520122L**

F-vel                              To:
**MA'E AETMMIGGHLMOEL**

Page  :
0.     03

**FW: Message for Mr. Raibig**

Seite 2 von 2

*Jurkmys 000 F 5300*

*000 Third Avenue*

*Seattle, 000 50000*

*NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by replying to this email and immediately delete the message and any attachments without copying or disclosing the contents whatsoever. Thank you.*

**07.02.2005**

22/07/2004  16:20  03495201291              RA'E REISSIGM4MNEL           6.    82

**Washington Mutual**
Legal Department
Mailstop: WMT 1706
1201 Third Avenue
Seattle, WA 98101

(206) 377-9154 direct
(206) 377-0256 fax

July 19, 2004



Jens Reibig, Esq.
Reibig & Hummel
Friedenstraße 11 A
06116 Halle
Germany

Re:    Mortgagor:        Richard Holt
       WaMu Loan No.:    2590
       Property Address: 23 Ridgewood Drive
                         Norwalk, CT 06853

Dear Mr. Reibig:

Your letter regarding the above-referenced Washington Mutual mortgage loan addressed to Fay Chapman regarding our response to you from the Executive Response Center has been received.

We are, unfortunately, at a loss as to what your further concerns are. Since the Legal Department does not have access to loan servicing records, we asked for the assistance of the Executive Response Center to assist you by providing information as to Mr. Holt's loan. So, in trying to decipher the information you previously sent to Ms. Chapman as well as reviewing our responses to you, I asked for further clarification of the loan servicing records, and we are still of the understanding that Mr. Holt feels he sent in the payments for April 2001 (however, the missing funds are actually for the May 2001 payment), and July, 2001. We do not have record of receiving these payments. We ask again that you please forward, as soon as possible, the cancelled payment instruments so we can adjust our records accordingly.

Currently a payment in the amount of $92,806.65 is needed to bring Mr. Holt's loan current. This amount was explained in detail in the loan history previously provided to you by the Executive Response Center, of which amount reflects principal; interest; late, NSF and property inspection fees; as well as the delinquent taxes Washington Mutual paid on Mr. Holt's behalf (the escrow account currently has a large negative balance of ($38,087.7x)). However, if you are able to provide the cancelled payment instruments along with payment of $69,093.29, the

|11

22/07/2004  16:20   03455201291          RA'E REISSIGHHUMMEL          S.   03

Jens Reibig, Esq.
Re: Richard Holt
July 19, 2004
Page 2

loan will be brought current, of which this amount reflects the current balance due less the amount of the two 'missing' payments and the late fees accrued on them.

This account is seriously delinquent and due for the April 2002 through present payments. Since Mr. Holt's bankruptcy has been discharged, the foreclosure and collection activities may again proceed. However, in an effort to assist Mr. Holt in bringing his mortgage loan current before further costs are incurred due to foreclosure, we have put a suspension on foreclosure and collection activities as well as further late fee accrual on this loan for 60-days from the date of this letter. Mr. Holt may also apply for a payment workout plan. Please let us know if Mr. Holt would like to receive an application package from our Homeowner's Assistance Department for its review as to him qualifying for a repayment plan. After September 17, 2004, the loan will resume with normal servicing causing it to begin foreclosure activities unless the full payment due is received or a payment workout plan has been approved by this date.

We feel that we have provided you with sufficient information as to Mr. Holt's loan and consider this matter closed. However, if you feel there are other issues surrounding this loan, please provide them to us in writing. Thank you.

Sincerely,

Shannon Moynihan
Paralegal

Cc: Fay Chapman, General Counsel
    Melissa Sirovins, Executive Response Center
SMM/sm

# EXHIBIT "H"

## PK MOTORS, INC. v. Page

Dist. Court, MD Florida, 2007 - Google Scholar

... On the other hand, if the creditor elects to reject the dishonored check as payment, then the creditor is **entitled to enforce** the unpaid underlying obligation. ... Id. [3] Of course, **PK Motors** may be able to look to the two Cadillacs in satisfaction of its personal money judgment. ...

Related articles    Cite    Save

(2007)

## PK MOTORS, INC., d/b/a PARKER CADILLAC NISSAN, a Florida corporation, Plaintiff,

### v.

## MELVIN E. PAGE, and SANDRA J. PAGE, Defendants.

Case No. 3:06-cv-693-J-33MMH.

### United States District Court, M.D. Florida, Jacksonville Division.

July 16, 2007.

# ORDER

This matter comes before the Court pursuant to the Motion for Default Judgment (Doc. # 12), filed by **PK Motors** on January 23, 2007. **PK Motors** filed a proposed form of final judgment on March 6, 2007. (Doc. # 13.) The record reflects that Defendants Melvin E. Page and Sandra J. Page were served with process on November 5, 2006. (Doc. # 6; Doc. # 8.) On December 21, 2006, the Clerk entered a default against each Defendant. (Doc. # 10; Doc. # 11.) On April 13, 2007, the Court took **PK Motors'** motion under advisement and directed **PK Motors** to file a memorandum providing legal argument that supports its requested damages. **PK Motors** filed its memorandum on April 23, 2007. (Doc. # 23.) For the following reasons, the Court grants **PK Motors'** motion for default judgment and enters a money judgment in favor of **PK Motors**.

**PK Motors'** complaint alleges that on January 10, 2006, the Pages entered into written contracts to purchase from **PK Motors** two Cadillacs for a total price of $127,885.38. (Doc. # 1, at 2.) This price reflected an $18,000 credit **PK Motors** gave the Pages for a used vehicle the Pages traded in. (Doc. # 1, at 8.) The Pages gave **PK Motors** a check for $127,885.38. (Doc. # 1, at 2.) **PK Motors** transferred to the Pages certificates of title to the two Cadillacs. (Doc. # 1, at 2.) However, the Pages' check was dishonored. (Doc. # 1, at 2.) **PK Motors** remains in possession of the two Cadillacs. (Doc. # 2, at 5.) The Court's jurisdiction is founded in diversity of citizenship. (Doc. # 1, at 1.)

In its motion, **PK Motors** seeks a default judgment awarding it three categories of relief. First, **PK Motors** seeks a money judgment of $127,885.35 plus prejudgment interest. Second, **PK Motors** seeks a declaratory judgment that it is **entitled** to certificates of title to the two Cadillacs during any time in which the money judgment remains unpaid. Third, **PK Motors** seeks costs and attorney's fees.

**PK Motors'** motion did not reveal the legal theory under which it seeks such relief. **PK Motors** could be **entitled** to the requested money judgment on either of two theories, but not on both. Under the Uniform Commercial Code as codified in Florida, **PK Motors** is **entitled** to **enforce** either the contract for sale of the two Cadillacs or the check the Pages gave in payment. See Fla. Stat. § 673.3101(2)(c) (2006); Rajsfus v. Fabri, 535 So. 2d 690, (Fla. 3d DCA 1988) ("Under the Uniform Commercial Code, an action on a dishonored instrument may be maintained on either the instrument or the underlying obligation."); U.C.C. § 3-310 cmt. 3 ("If the check . . . is dishonored, the seller may sue on either the dishonored instrument or the contract of sale

17-08245-rdd    Doc 1-1    Filed 07/12/17    Entered 07/12/17 15:31:23    Complaint

PK MOTORS, INC. v. Page, Dist. Court, MD Florida 2007 – Google Scholar    Pg 102 of 217                                                3/20/17 12:51 AM

. . . ."). Thus, the Court directed **PK Motors** to file a memorandum identifying whether it seeks to **enforce** the contract or the check. **PK Motors** explained in its memorandum that it seeks to **enforce** the check. (Doc. # 16, at 4.) **PK Motors** also argued that, in addition to enforcement of the check, it is **entitled** to a declaratory judgment that it holds title to the two Cadillacs.

The Court grants **PK Motors** its requested money judgment, but the Court cannot simultaneously declare that **PK Motors** holds title to the two Cadillacs. Section 673.3101(2), Florida Statutes, provides,

> if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:
>
> (a) In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.. . .
>
> (c) Except as provided in paragraph (d), if the check or note is dishonored and the obligee of the obligation for which the instrument was taken is the person **entitled** to **enforce** the instrument, the obligee may **enforce** either the instrument or the obligation.

Fla. Stat. § 673.3101(2) (2006).[1] Paragraph (c) grants a disappointed seller the choice of enforcing either the check, or the underlying obligation for which the check was given. If the seller chooses to **enforce** the check, the underlying obligation is discharged. In re Brigance, 234 B.R. 401, 405 n.3 (W.D. Tenn. 1999) (interpreting Tenn. Code § 47-3-310(b)(3), a provision identical to Fla. Stat. § 673.3101(2)(c)).[2] In other words, if a seller chooses to **enforce** the check, the underlying obligation is treated as if it had been paid when the check was given. See id. By choosing to **enforce** the Pages' check, **PK Motors** has chosen to accept that check as payment for the Cadillacs. As a result, the sale is complete, and the Pages hold title to the Cadillacs.[3]

**PK Motors** has also requested prejudgment interest. In a diversity case, the Court follows state law governing prejudgment interest. SEB, S.A. v. Sunbeam Corp., 476 F.3d 1317, 1320 (11th Cir. 2007). Under Florida law, a prevailing plaintiff is **entitled** to prejudgment interest, at the statutory rate, from the date of the loss to the date of judgment. Ins. Co. of N. Am. v. Lexow, 937 F.2d 569, 572 (11th Cir. 1991). In the absence of a contractually agreed rate, the statutory rate of prejudgment interest in Florida is set by the state's Chief Financial Officer. Compare Fla. Stat. § 687.01 (2006) with Fla. Stat. § 55.03 (2006). In its proposed form of final judgment, **PK Motors** proposed that prejudgment interest run from the date of the filing of this action, and accrue at the rate of 5% per annum. In its memorandum, **PK Motors** demonstrates that the statutory rate of prejudgment interest was 9% in 2006 and is 11% in 2007. (Doc. # 16, at 5.) However, **PK Motors** states that it is prepared to accept prejudgment interest computed at 5%. The Court finds that interest rate appropriate. Additionally, the Court finds it appropriate that prejudgment interest run from the date of the filing of this action. See Bodine v. Federal Kemper Life Assurance Co., No. 85-1814-Civ., U.S. Dist. LEXIS 4158, at *8 (M.D. Fla. Apr. 2, 1992). Accordingly, the Court grants **PK Motors** prejudgment interest of $6,096.45.[4]

In its motion for default judgment, **PK Motors** requested its reasonable attorney's fees only as to its claim for

declaratory relief. In its memorandum, **PK Motors** requests leave to amend its motion for default judgment to include a request for attorney's fees under section 68.065, Florida Statutes. That section specifically authorizes recovery of attorney's fees and costs incurred in collecting a dishonored check. Fla. Stat. § 68.065(5) (2006). The Court grants **PK Motors'** request to amend its motion for default judgment on this narrow issue. Accordingly, the Court grants **PK Motors** its attorney's fees and costs. **PK Motors** attached to its motion for default judgment an affidavit averring that it incurred $1,540 in attorney's fees and $710.18 in costs. The Court awards **PK Motors** this amount.

Accordingly, it is

ORDERED, ADJUDGED, and DECREED:

1. The Motion for Default Judgment (Doc. # 12), filed by **PK Motors** on January 23, 2007, is GRANTED to the extent stated below.

2. **PK Motors** shall have a personal money judgment against the Pages in the amount of $136,232.01. This amount includes the face amount of the check, $127,885.38; $6,096.45 in interest; $1,540 in attorney's fees; and $710.18 in costs.

3. The Clerk shall enter a judgment accordingly.

DONE and ORDERED.

[1] Paragraph (d), inapplicable in this case, provides a rule governing cases where the instrument is unavailable or where the obligee is not the person **entitled** to **enforce** the instrument.

[2] The bankruptcy court explained the logical import of the choice between enforcing a check and enforcing the underlying obligation for which the check was given:

It perhaps simplifies an understanding of this election if one keeps in mind that the check constitutes a payment of the underlying obligation. If the creditor elects to proceed on the check, the underlying obligation has been satisfied. On the other hand, if the creditor elects to reject the dishonored check as payment, then the creditor is **entitled** to **enforce** the unpaid underlying obligation. The creditor cannot both accept payment and reject payment.

Id.

[3] Of course, **PK Motors** may be able to look to the two Cadillacs in satisfaction of its personal money judgment. See Fla. Stat. § 56.061 (2006) ("Land and tenements, goods and chattels, equities of redemption in real and personal property, and stock in corporations, shall be subject to levy and sale under execution.")

[4] This amount represents 5% annual interest on $127,885.38 over 348 days.

Save trees - read court opinions online on Google Scholar.

# EXHIBIT "I"

THIS CHECK IS DELIVERED FOR PAYMENT
ON THE FOLLOWING ACCOUNTS

| DATE | AMOUNT |
|------|--------|
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |

4059

**LARRY F. GINSBERG**
706 BEDFORD ST.
STAMFORD, CT 06901

51-44/119

DATE 8/17/05

PAY TO THE
ORDER OF   Hurst Leibert as Trustee                $ 99,900.37

Ninty-nine thousand one hundred + 37/xx                DOLLARS

Fleet
21049    www.fleet.com
Bulls Head Office
Stamford, Connecticut 06905

Re: WAMU or MD4 et al
Loan # 0037960790 00
Prop: 23 Richmond Drive, Norwalk, CT 06850

77r- 261- 4769



BANK ONE.NA
⬛⬛⬛⬛624
86252005
⬛⬛⬛704576



BANK OF AMERICA,NB HRT
A11000130 .E3293.62 P94
08/04/05   P94 C      $ 654 CT
⬛⬛⬛1697

# EXHIBIT "J"

Exhibit D

**VOL 3876 PG 250**          **003822**

PREPARED BY AND AFTER
RECORDING MAIL TO:

Washington Mutual Bank, FA
C/O DATA PLEX
19001 PALA DRIVE - B221560PGA
GARDEN GROVE, CA 92841

—————SPACE ABOVE THIS LINE FOR RECORDING DATA———

▓ **Washington Mutual**                                       . 000000

## OPEN-END MORTGAGE

LOAN NO.:  ▓▓▓▓▓▓6859-0

THIS MORTGAGE ("Security Instrument") is given on __March 22, 2000__.
The mortgagor is __DORBUN LEXUS LIMITED LIABILITY COMPANY__

_____

("Borrower"). This Security Instrument is given to __Washington Mutual Bank, FA__
_____ which is organized and existing under the
laws of __USA__            , and whose address is __400 East Main Street Stockton, CA__
__95290__                                  ("Lender"). Borrower owes Lender the principal sum of
__Three Hundred Eight Thousand & 00/100__

Dollars (U.S. __308,000.00__    ). This debt is evidenced by Borrower's note dated the same
date as this Security Instrument ("Note"), which provides for monthly payments, with the full
debt, if not paid earlier, due and payable on __April 1, 2030__        . This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with
interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other
sums, with interest, advanced under Paragraph 7 to protect the security of this Security
Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does
hereby grant and convey to Lender and Lender's successors and assigns the following described
property located in __Fairfield__                County, Connecticut:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

which has the address of __23 RIDGEWOOD DRIVE__
__NORWALK__              Connecticut __06853__     ("Property Address");
CONNECTICUT-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3007   6/90
25211A (12-97)                          Page 1 of 8

## EXHIBIT D



TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2.  Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of Paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under Paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured

Page 2 of 6

VOL 3876 PG 252

by this Security Instrument.

3.  **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under Paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under Paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in Paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.  **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with Paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of the payments. If under Paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.  **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the

732116 (12-94)                                                          Page 3 of 8

VOL 3876 PG 253

LOAN NO.: 0█████4059-9

Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in Paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

9.   Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this Paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8.   Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9.   Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10.   Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by

3381180-04671                         Page 4 of 8

VOL3876PG254

LOAN NO.: ▓▓▓▓▓▓▓4059-0

the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of such payments.

11.  Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12.  Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13.  Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14.  Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15.  Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

7231NE (13.87)

Page 6 of 8

VOL 3876 PG 255

LOAN NO.: ████████4059-0

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with Paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payment should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this Paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

VOL 3876 PG 256

LOAN NO.: ██████████

**21.  Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**22.  Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**23.  Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**24.  Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable line(s)]

[x] Adjustable Rate Rider        [ ] Condominium Rider           [ ] 1-4 Family Rider
[ ] Graduated Payment Rider      [ ] Planned Unit Development Rider  [ ] Biweekly Payment Rider
[ ] Balloon Rider                [ ] Rate Improvement Rider       [ ] Second Home Rider
[ ] Other(s) (specify)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

792110 (12-97)                                           Page 7 of 8

VOL 3876 PG 257

LOAN NO.: ████████5099-0

X _____  WITNESS
   LARRY W. GINDER6

X _____  WITNESS
   WARREN S. WORLEY

X _____
   RICHARD HOLT

_____ (Space Below This Line For Acknowledgment) _____

STATE OF CONNECTICUT,   GARFIELD
County ss: STAMFORD

The foregoing instrument was acknowledged before me this   3/22/2000
                                                            (date)
by  RICHARD HOLT

                                        (person acknowledged)

                                        Commissioner of the Superior Court
(Official Seal)                         Notary Public  WARREN S WORLEY

My Commission expires:

7321H(12-97)                  Page 6 of 6

VOL 3876 PG 258

## SCHEDULE A

ALL that certain lot of land, with the buildings thereon, situated in the City of
Norwalk in the County of Fairfield and State of Connecticut, known and
designated as lot number fifteen (15) on a certain map entitled "Map of
DOBsherst at Rowayton, Norwalk, Ct." now on file in the office of the Town
Clerk of said Norwalk and numbered twenty-two hundred and ninety-one
(2291), reference thereto being had; said lot being bounded as follows:

| | |
|---|---|
| NORTHERLY: | 60 feet, more or less, by land now or formerly of Allen S. Curry and Arline R. Curry; |
| EASTERLY: | 175 feet, more or less, by land now or formerly of Allen D. Neuhall and Dorothy Margret; |
| SOUTHERLY: | 60 feet, more or less, by Ridgewood Avenue; and |
| WESTERLY: | 174 feet, more or less, by land now or formerly of Arnold D. Asphlon and Gladys E. Asphlon. |

VOL 3876 PG 259

**Washington Mutual**

ADJUSTABLE RATE RIDER
(FHLB Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this __22nd__ day of __March, 2000__, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to __Washington Mutual Bank, FA__ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

__23 REDGEWOOD DRIVE, NORWALK, CT 06053__
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __365,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid principal until the full amount has been paid. I will pay interest at a yearly rate of __4.950__ %. The interest rate I will pay will change in accordance with Section 4 of the Note. The interest rate required by Section 2 and Section 4 of the Note is the rate I will pay both before and after any default described in Section 7(B) of the Note.
The Note provides for changes in the interest rate and the monthly payments as follows:

Page 1 of 6

VOL 3876 PG 260

4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
    (A)  Change Dates
    The interest rate I will pay may further change on the first day of
May, 2000 _____ , and on that day every month thereafter. Each date
on which my interest rate could change is called a "Change Date".
    (B)  The Index
    Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the monthly weighted average cost of funds for Eleventh District savings
institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District
Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on
each interest rate Change Date is called the "Current Index".
    Information on the 11th District Monthly Weighted Average Cost of Funds Index may be
obtained by writing to the Federal Home Loan Bank at P.O. Box 7848, San Francisco,
California 94120, Attention: Public Information Department; or by calling the Federal Home
Loan Bank at 1-415-616-2600.
    If the Index is no longer available, the Note Holder will use the new Index as if it were
the Index. The new Index will be the Twelve-Month Average, determined as set forth below,
of the annual yields on actively traded United States Treasury Securities adjusted to a
constant maturity of one year as published by the Federal Reserve Board in the Federal
Reserve Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields").
The Twelve-Month Average is determined by adding together the Monthly Yields for the most
recent available twelve months and dividing by 12. This information may be available in you
library, or you may write to the Board of Governors, Publication Services Washington D.C.
20551. The most recent figure available 15 days prior to each Interest Rate Change Date will
be the Current Index. If the new Index is no longer available, the Note Holder will choose an
alternate Index which is based upon information comparable to the new Index. The Note
Holder will give me notice as to this choice.

    (C)  Interest Rate Change Calculation
    Before each Change Date, the Note Holder will calculate my new interest rate by adding
Three & One-Tenth _____                              percentage points
3.100 __ % ("Margin") to the Current Index. The Note Holder will then round the result of
this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the
limits stated in Section 4(D) below, this rounded amount will be my new interest rate until
the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a
new Margin will be determined. If a new Index is selected, the new Margin will be the
difference between the average of the Index for the most recent three year period which ends

Page 3 of 4

VOL 3876 PG 261

on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

(D)   Interest Rate Limit

My interest rate will never be greater than ___11.950___% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E)   Payment Change Dates

Effective every year commencing ___May 1, 2021___ and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

(F)   Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

(G)   Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the

Page 3 of 6

VOL 3876 PG 262

monthly payment is less than the interest portion, the Note
Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid principal would otherwise exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

(I)   Required Full Monthly Payment

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J)   Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

(K)   Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal."

B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
      Covenant 17 of the Security Instrument is amended to read as follows:

Page 4 of 6



VOL 3876 PG 263

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 6 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Page 5 of 5

VOL 3876 PG 264

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute an document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X _____
   RICHARD HOLT

Page 6 of 6

Received for Record    March 27,    A.D. 2000 at 9:31 A.    M, and recorded by
                                                              Town Clerk

# EXHIBIT "K"

DOC53 131125 reference 2 of 6.

**Settlement Statement**
**Optional Form for**
**Transactions without Sellers**

U.S. Department of Housing
and Urban Development

OMB Approved No. 2502-0491

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Dorsum Nemus Limited Liability Company | Washington Mutual Bank, F.A. |
| 23 Ridgewood Road | P. O. Box 25508 |
| Norwalk, CT 06853 | Santa Ana, CA 92799 |

HUD1

| Property Location: (if different from above) | Settlement Agent: |
|---|---|
| 23 Ridgewood Road, Norwalk, CT 06853   BEST AVAILABLE DOCUMENT | Natalia S. Kerler |
| | Place of Settlement: |
| | 1 Washington Ave, Sandy Hook, CT 06482 |

Loan Number: 2383-003596059          Settlement Date:  March 22, 2000

| L. Settlement Charges | | M. Disbursement to Others | |
|---|---|---|---|
| 800. Items Payable in Connection with Loan | | 1501. Payoff of first mtg loan Webster Bank | 78,069.46 |
| 801. Loan Origination Fee: 2.0 % to Northeast Mortgage | 6,160.00 | | |
| 802. Loan Discount: Washington Mutual Bank, F.A. | | 1502. Payoff of second mtg loan HSBC Mtg | 49,727.08 |
| 803. Appraisal fee to | | 1503. | |
| 804. Credit report to | | | |
| 805. Lender's inspection fee to | | | |
| 806. Mortgage insurance application fee to | | 1504. | |
| 807. Underwriting fee to Washington Mutual | 300.00 | | |
| 808. Tax registration to Lereta Corp | 75.00 | 1505. | |
| 809. Flood Determination to Lereta Corp | 16.00 | | |
| 810. Wire Transfer fee to Washington Mutual | 35.00 | 1506. | |
| 811. Lender Loan fee to Broker              $6,160.00 P.O.C. | | | |
| 900. Items Required by Lender to be Paid in Advance | | 1507. | |
| 901. Interest from 3/27/2000 to 4/1/2000  @ $41.66 / day | 208.30 | | |
| 902. Mortgage insurance premium for  mos. to | | 1508. | |
| 903. Hazard insurance premium for   yrs. to | | 1509. | |
| 904. Flood insurance premium for   yrs. to | | | |
| 905. | | | |
| 1000. Reserves Deposited with Lender | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. Flood insurance | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | 0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee to Natalia S. Kerler | 495.00 | 1515. | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to Law Office of Natalia Kerler | 152.00 | 1520. TOTAL DISBURSED | |
| 1104. Title insurance binder to | | (enter on Line 1603) | $127,796.54 |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
|  (includes above items Numbers: ) | | | |
| 1108. Title insurance to CATIC | 1,002.00 | | |
|  (includes above items Numbers: ) | | | |
| 1109. Lender's coverage  $1,002.00 ($308,000.00 coverage) | | | |
| 1110. Owner's coverage | | | |
| 1111. | | | |
| 1112. (Review title for insurability, clear underwriting objections, | | | |
| 1200. Government Recording and Transfer Charges | | M. NET SETTLEMENT | |
| 1201. Recording fees:  Deed $0.00  Mortgage $80.00  Release $20.00 | 100.00 | 1600. Loan Amount | 308,000.00 |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps: | | 1601. Plus Cash/Check from Borrower | 0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus Total Settlement Charges (Line 1400) | 8,568.30 |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey to | | 1603. Minus Total Disbursements to Others (Line 1520) | 127,796.54 |
| 1302. Pest inspection to | | | |
| 1303. Airborne Express for Payoff | 25.00 | 1604. Equals disbursements to | |
| 1304. | | Borrower (after expiration | |
| 1305. | | of any applicable rescission | |
| 1306. | | period required by law) | 171,635.16 |
| 1307. | | | |
| 1400. Total Settlement Charges     (enter on Line 1602) | $8,568.30 | | |

Borrower(s) Signature(s):

R. Grund Holt   Date: 3/22/2000    Settlement Agent:
Dorsum Nemus Limited Liability Company   MANAGER    Natalia S Kerler
                                         Date:

Footer Page 2 of 6.

# EXHIBIT "L"



# EXHIBIT "M"

## NORTHEAST MORTGAGE CORPORATION

### V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. income | $ 19000 | | $ 19000 | Rent | | |
| Overtime | | | | First Mortgage (P & I) | 1080 | $ 1926.77 |
| Bonuses | | | | Other Financing (P & I) | 1310 | |
| Commissions | | | | Hazard Insurance | 350 | 50 |
| Dividends/Interest | | | | Real Estate Taxes | 819 | 819 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 19000 | $ | $ 19000 | Total | $ 3359 | $ 2415.77 |

Describe Other Income   Notes: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) doesn't choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | |
| | | |
| | | |

### VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Description | | | | |
| Cash deposit toward purchase held by: | | Name and address of Company | $ Pymt./Mos. | $ |
| | | Ford | 388 | 15000 |
| List checking and savings accounts below | | Acct. no. RCLIBO8YO8 | | |
| Name and address of Bank, S & L, or Credit Union | | Name and address of Company | $ Pymt./Mos. | $ |
| CHASE | | Citibank | 389 | 7784 |
| Acct. no. 517-5001191-05 | $ 25109 | Acct. no. 5B3779858 20 | | |
| Name and address of Bank, S & L, or Credit Union | | Name and address of Company | $ Pymt./Mos. | $ |
| | | Citibank | 120 | 4437 |
| Acct. no. | $ | Acct. no. 5B83994ST 20 | | |
| Name and address of Bank, S & L, or Credit Union | | Name and address of Company | $ Pymt./Mos. | $ |
| | | Chase | 102 | 3401 |
| Acct. no. | $ | Acct. no. 0769900 | | |
| Name and address of Bank, S & L, or Credit Union | | Name and address of Company | $ Pymt./Mos. | $ |
| | | Citibank | 20 | 3381 |
| Acct. no. | $ | Acct. no. 5429180031017 | | |
| Stocks & Bonds (Company name/number & description) CAYMAN DATO SINDAL | 50,000 100,000 | Name and address of Company | $ Pymt./Mos. | $ |
| | | Bank of Amer. | 48 | 2468 |
| Life insurance net cash value Face amount $ | $ | Acct. no. 4336006S 7012 | | |
| Subtotal Liquid Assets | $ 175,109 | Name and address of Company | $ Pymt./Mos. | $ |
| Real estate owned (enter market value from schedule of real estate owned) | $ 570,000 | See Pg 4 | 2692 | 132,441 |
| Vested interest in retirement fund | $ | Acct. no. | | |
| Net worth of business(es) owned (attach financial statement) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | | |
| Automobiles owned (make and year) | $ | Job Related Expense (child care, union dues, etc.) | | |
| Other Assets (itemize) PONTIAC/CAD FURNITURE ANTIQUES | 100,000 75,000 100,000 | Total Monthly Payments | $ 3809 | |
| Total Assets a. | $ 940,599 | Net Worth (a minus b) | 590 0459? | Total Liabilities b. | $ 168,862 |

Page 2 of 3   INITIALS:

NORTHEAST MORTGAGE CORPORATION

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 23 Ridgewood | SFR | 570,000 | 126,717 | | 2,390 | 467 | |
| | | | | | | | |
| | | | | | | | |
| **Totals** | | 570,000 | 126,717 | | 2,380 | 469 | |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

_Alternate Name_   _Creditor Name_   _Account Number_

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 126,717 |
| e. Estimated prepaid items | 206,833 |
| f. Estimated closing costs | 8750.00 |
| g. PMI, MIP, Funding Fee paid in cash | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 117,375.87 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| | |
| | |
| | |
| m. Loan amount | 308,000 |
| (exclude PMI, MIP, Funding Fee financed) | |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 308,000 |
| p. Cash from / to Borrower | 170,664 |
| (subtract j, k, l & o from i) | |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

|  | Borrower Yes No | Co-Borrower Yes No |
|---|---|---|
| a. Are there any outstanding judgments against you? | | |
| b. Have you been declared bankrupt within the past 7 years? | | |
| c. Have you had property foreclosed upon or given deed in lieu thereof in the last 7 years? | | |
| d. Are you a party to a lawsuit? | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | |
| h. Is any part of the down payment borrowed? | | |
| i. Are you a co-maker or endorser on a note? | | |
| j. Are you a U.S. citizen? | | |
| k. Are you a permanent resident alien? | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | | |
| m. Have you had an ownership interest in a property in the last three years? | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that...

Borrower's Signature   X   Date 3/7/00

Co-Borrower's Signature   X   Date

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

**BORROWER**

☐ I do not wish to furnish this information

| Race/National Origin: | ☐ American Indian or Alaskan Native  ☐ Asian or Pacific Islander  ☐ Black, not of Hispanic origin  ☐ Hispanic  ☐ White, not of Hispanic origin  ☐ Other (specify) |
| Sex: | ☐ Female  ☑ Male |

**CO-BORROWER**

☐ I do not wish to furnish this information

| Race/National Origin: | ☐ American Indian or Alaskan Native  ☐ Asian or Pacific Islander  ☐ Black, not of Hispanic origin  ☐ Hispanic  ☐ White, not of Hispanic origin  ☐ Other (specify) |
| Sex: | ☐ Female  ☐ Male |

| To be Completed by Interviewer | | NORTHEAST MORTGAGE CORPORATION |
|---|---|---|
| This application was taken by: | Interviewer's Name (print or type) Ed Davies | |
| ☐ face to face interview | Interviewer's Signature   Date 3/7/00 | 800 MAIN STREET SOUTH |
| ☐ by mail | Interviewer's Phone Number (incl. area code) 203-262-6110 | SOUTHBURY, CT 06488 |
| ☐ by telephone | | |

Freddie Mac 65/Fannie Mae 1003



**Continuation Sheet/Residential Loan Application**

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower | Borrower: RICHARD LOT | | Agency Case Number: |
|---|---|---|---|
| | Co-Borrower: | | Lender Case Number: |

CITIBANK    412800268102        44    2114

CHASE    9258302190703675    29    1456

ALEX    2133300                    68    1357

BROOK BROS.    1011724019    136    688

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | | Date | Co-Borrower's Signature | | Date |
|---|---|---|---|---|---|
| X | | | X | | |

Freddie Mac Edition 10/92 (Amended)    Addendum to 1003    Printed by The Loan Handler from Calchar Software, Inc. (408) 370-1700    Fannie Mae Form 1003/Rev. 10/92 (Amended)

DOC7 131210 reference  6 of 37.        ORTHEAST MORTGAGE CORPORATION

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance.  Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable.  Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☐ Conventional  ☐ Other: | | Agency Case Number | Lender Case Number |
|---|---|---|---|---|
| | ☐ FHA  ☐ FmHA  4.95 | | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☐ Fixed Rate | ☐ Other (explain): |
|---|---|---|---|---|---|
| $ 308,000 | 6.5 % | 360 | | ☐ GPM  ☒ ARM (type): | COFI |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state & zip code)   No. of
23 RIDGEWOOD DR. NORWALK, CT. 06853

Legal Description of Subject Property (attach description if necessary)   Year Built

| Purpose of Loan | ☐ Purchase  ☐ Construction  ☐ Other (explain): | Property will be: |
|---|---|---|
| | ☒ Refinance  ☐ Construction-Permanent | ☒ Primary Residence  ☐ Secondary Residence  ☐ Invest |

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements  ☐ made  ☒ to be |
|---|---|---|---|---|
| 1984 | $ 144,000 | 126,317 | HOME INTEROV. | TRANSILG & REMODE  Cost: $ 150,000 |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| RICHARD LKT | | ☒ Fee Simple |

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)   ☐ Leasehold (show expiratic
EQUITY FROM SUBJECT PROPERTY

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| RICHARD LKT | |

| Social Security Number | Home Phone (incl. area code) | Age | Yrs. School | Social Security Number | Home Phone (incl. area code) | Age | Yrs. Sc |
|---|---|---|---|---|---|---|---|
| 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 | 203-838-7004 | 54 | 18 | | | | |

| ☒ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no. 01  ages | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|

| Present Address (street, city, state, zip code)  ☒ Own  ☐ Rent  No. Yrs: 12 | Present Address (street, city, state, zip code)  ☐ Own  ☐ Rent |
|---|---|
| 23 RIDGEWOOD DR. NORWALK CT. 06853 | |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs: | Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs: |
|---|---|

| Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs: | Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs: |
|---|---|

## IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|

| Name & Address of Employer | ☒ Self Employed  Years on this job: 18 | Name & Address of Employer | ☐ Self Employed  Years on this job: |
|---|---|---|---|
| CELMA DATA | Years employed in this line of work/profession  35 | | Years employ in this line of work/profess |
| For Page 6 BTH ST. N.Y. N.Y. | | | |

| Position/Title/Type of Business. | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area co |
|---|---|---|---|

DOC7 131210 reference  7 of 37.

NORTHEAST MORGAGE CORPORATION

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income * | $ 14000 | $ | $ 14000 | Rent | $ | |
| Overtime | | | | First Mortgage (P & I) | 1080 | $ 1906 |
| Bonuses | | | | Other Financing (P & I) | 1310 | |
| Commissions | | | | Hazard Insurance | 50 | 50. |
| Dividends/Interest | | | | Real Estate Taxes | 419 | 419 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income." below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 14000 | $ | $ 14000 | Total | $ 2859 | $ 2415 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income  Notice:  Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) doesn't choose to have it considered for repaying this loan. | Monthly Amou |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required.  If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☐ N

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets.   List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc.  Use continuation sheet, if necessary.  Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | | | |
| Cash deposit toward purchase held by: | $ | LIABILITIES | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
| | | Name and address of Company | $ Payt./Mos. | $ |
| List checking and savings accounts below | | Ford | 388 | 15 |
| Name and address of Bank, S & L, or Credit Union | | | | |
| CHASE | | Acct. no. BK118OBPOB | | |
| | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. 391-5001191-85 | $ 25109 | CitiBank | 389 | 77 |
| Name and address of Bank, S & L, or Credit Union | | | | |
| | | Acct. no. 568339955820 | | |
| | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | CitiBank | 120 | 443 |
| Name and address of Bank, S & L, or Credit Union | | | | |
| | | Acct. no. 56833995520 | | |
| | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Amex | 102 | 340 |
| Name and address of Bank, S & L, or Credit Union | | | | |
| | | Acct. no. 0X69900 | | |
| | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | CitiBank | 20 | 338 |
| Stocks & Bonds (Company name/number & description) | | | | |
| CELINA DATA | 50,000 | Acct. no. 542418031012 | | |
| " SWEDAL | 100,000 | Name and address of Company | $ Payt./Mos. | $ |
| Face amount: $ | $ | Bank of Amer. | | |
| Subtotal Liquid Assets | $ | | | |

DOC7 131210 reference  8 of 37.        NORTHEAST MORTGAGE CORPORATION

## VI. ASSETS AND LIABILITIES  (cont.)

**Schedule of Real Estate Owned**  (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental In |
|---|---|---|---|---|---|---|---|
| 23 Ridgewood | SFR | $ 570,000 | $ 126,317 | $ | $ 2390 | $ 469 | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 570,000 | $ 126,717 | $ | $ 2380 | $ 469 | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | | | |
|---|---|---|---|---|---|
| a. Purchase price | $ | **If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.** | Borrower Yes No | | Co-B Yes |
| b. Alterations, improvements, repairs | | a. Are there any outstanding judgments against you? | ☐ ☒ | | ☐ |
| c. Land (if acquired separately) | | b. Have you been declared bankrupt within the past 7 years? | ☐ ☒ | | ☐ |
| d. Refinance (incl. debts to be paid off) | 126,317 | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ ☒ | | ☐ |
| e. Estimated prepaid items | 226.33 | d. Are you a party to a lawsuit? | ☐ ☒ | | ☐ |
| f. Estimated closing costs | 8750.50 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | ☐ ☒ | | ☐ |
| g. PMI, MIP, Funding Fee paid in cash | | | | | |
| h. Discount (if Borrower will pay) | | | | | |
| i. Total costs (add items a through h) | 117,335-82 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ ☒ | | ☐ |
| j. Subordinate financing | | g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ ☒ | | ☐ |
| k. Borrower's closing costs paid by Seller | | h. Is any part of the down payment borrowed? | ☐ ☒ | | ☐ |
| l. Other Credits (explain) | | i. Are you a co-maker or endorser on a note? | ☐ ☒ | | ☐ |
| | | j. Are you a U.S. citizen? | ☒ ☐ | | ☐ |
| | | Are you a permanent resident alien? | ☐ ☒ | | ☐ |
| | | k. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☒ ☐ | | ☐ |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 308,000 | l. Have you had an ownership interest in a property in the last three years? | ☒ ☐ | | ☐ |
| | | (1) What type of property did you own - - principal residence (PR), second home (SH), or investment property (IP)? | PR | | |
| n. PMI, MIP, Funding Fee financed | | (2) How did you hold title to the home - - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | |
| o. Loan amount (add m & n) | 308,000 | | | | |
| p. Cash from / to Borrower (subtract j, k, l & o from i) | 770,664 | | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information in this application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to a successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

**Right to Receive Copy of Appraisal.**  I/We have the right to a copy of the appraisal report used in connection with this application for credit. To obtain a copy, I/We must send written request at the mailing address Lender has provided. Lender must hear from me/us no later than 90 days after Lender notifies me/us about the action taken on this application, or I/we withdrew this application.

**Certification:** I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors or assigns, insurers, and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

Footnote...

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| | | | |

DOC7 131210 reference 9 of 37.

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Richard Lott | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

CITIBANK    912800268102    44    2174

CHASE    4258302190783675    29    1456

AMEX    2113300    68 . 1357

Brooks Bros.    1011724019    136    688

DOC7 131210 reference  10 of 37.

## NORTHEAST MORTGAGE, LLC

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when □ the income or assets of a person other than the "Borrower" (including Borrower's spouse) will be used as a basis for loan qualification or □ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | VA X | Conventional | Other: | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|
| | FHA | FmHA | | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | | |
|---|---|---|---|---|---|
| $ 308000 | 6.5 % | 360 | ☑ Fixed Rate  GPM X | Other (explain): COFI ARM  □ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & zip code) | No. of Units |
|---|---|
| 23 RIDGEWOOD DR, NORWALK, FAIRFIELD CT 06853 | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| VOL 3257 PG 234 | 1988 |

| Purpose of Loan | ☐ Purchase  ☐ Construction  ☐ Other (explain):  ☑ Refinance  ☐ Construction-Permanent | Property will be:  ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |
|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☑ to be made |
|---|---|---|---|---|
| 1984 | 140000 | 126317 | 04 Home Improvement | TRIMMING & REMODELING  150000  Cost: $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| RICHARD HOLT | Joint Tenancy | ☑ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| F4 |
| Equity from Subject Property |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| RICHARD        HOLT | |

| Social Security Number | Home Phone (incl. area code) | Age | Yrs. School | Social Security Number | Home Phone (incl. area code) | Age | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | 203-838-7004 | | 18 | | | | |

| ☑ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no. 0  ages | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|

| Present Address (street, city, state, zip code)  ☑ Own  ☐ Rent  No. Yrs. 12 | Present Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|
| 23 RIDGEWOOD DR  NORWALK, CT 06853 | |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|
| | |

| Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, zip code)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|
| | |

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Name & Address of Employer  ☑ Self Employed  Years on this job: 18 | Years employed in this line of work/profession. 35 | Name & Address of Employer  ☐ Self Employed  Years on this job: | Years employed in this line of work/profession. |
|---|---|---|---|
| CENTRA DATA CORPORATION  244 W 5TH ST  NEW YORK, NY | | | |

Footer Page 10 of 37.

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| OWNER / CONSULTANT | | | |

DOC7 131210 reference 11 of 37.

**NORTHEAST MORTGAGE, LLC**

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income * | $ 14000.00 | $ | $ 14000.00 | Rent | | |
| Overtime | | | | First Mortgage (P & I) | 1080.00 | $ 1946.77 |
| Bonuses | | | | Other Financing (P & I) | 1310.00 | |
| Commissions | | | | Hazard Insurance | 50.00 | 50.00 |
| Dividends/Interest | | | | Real Estate Taxes | 419.00 | 419.00 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 14000.00 | $ | $ 14000.00 | Total | $ 2859.00 | $ 2415.77 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) doesn't choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [X] Jointly [ ] Not Join

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Description | | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
| Cash deposit toward purchase held by: | $ | | $ Payt./Mos. | $ |
| List checking and savings accounts below | | Name and address of Company FORD | | |
| Name and address of Bank, S & L, or Credit Union CHASE | | | 388 | 15000 |
| | | Acct. no. BKN180KP08 | | |
| Acct. no. 391-5001141-85 | $ 25109 | Name and address of Company CITIBANK | $ Payt./Mos. | $ |
| Name and address of Bank, S & L, or Credit Union | | | 389 | 7784 |
| | | Acct. no. 56833995520 | | |
| Acct. no. | $ | Name and address of Company CITIBANK | $ Payt./Mos. | $ |
| Name and address of Bank, S & L, or Credit Union | | | 120 | 4437 |
| | | Acct. no. 56833995520 | | |
| Acct. no. | $ | Name and address of Company AMEX | $ Payt./Mos. | $ |
| Name and address of Bank, S & L, or Credit Union | | | 102 | 3401 |
| | | Acct. no. 03669900 | | |
| Acct. no. | $ | Name and address of Company CITIBANK | $ Payt./Mos. | $ |
| Stocks & Bonds (Company name/number CENTRA DATA CENTRA DATA SWEDEN | $ 50000 100000 | | 70 | 3381 |
| | | Acct. no. 542418031012 | | |
| Life insurance net cash value Face amount: $ | $ | Name and address of Company BANK OF AMERICA | $ Payt./Mos. | $ |
| Subtotal Liquid Assets | $ 175109 | | 48 | 2418 |
| Real estate owned (enter market value from | | | | |

DOC7 131210 reference  12 of 37.

NORTHEAST MORTGAGE, LLC

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 23 RIDGEWOOD AVE | SFR | $ 510000 | $*126317 | $ | $2390 | $469 | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 510000 | $ 126317 | $ | $2390 | $469 | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | | | |
|---|---|---|---|---|---|
| a. Purchase price | $ | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | **Borrower** | | **Co-Borrower** |
| | | | Yes | No | Yes |
| b. Alterations, improvements, repairs | | a. Are there any outstanding judgments against you? | | X | |
| c. Land (if acquired separately) | | b. Have you been declared bankrupt within the past 7 years? | | X | |
| d. Refinance (incl. debts to be paid off) | 126317.00 | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | |
| e. Estimated prepaid items | 2268.33 | d. Are you a party to a lawsuit? | | X | |
| f. Estimated closing costs | 8750.50 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | |
| g. PMI, MIP, Funding Fee paid in cash | | | | | |
| h. Discount (if Borrower will pay) | | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | |
| i. Total costs (add items a through h) | 137335.83 | | | | |
| j. Subordinate financing | | g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | |
| k. Borrower's closing costs paid by Seller | | h. Is any part of the down payment borrowed? | | X | |
| l. Other Credits (explain) | | i. Are you a co-maker or endorser on a note? | | X | |
| | | j. Are you a U.S. citizen? | X | | |
| | | k. Are you a permanent resident alien? | | X | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 308000.00 | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | |
| n. PMI, MIP, Funding Fee financed | | m. Have you had an ownership interest in a property in the last three years? | X | | |
| o. Loan amount (add m & n) | 308000.00 | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | |
| p. Cash from / to Borrower (subtract j, k, l & o from i) | -170664.17 | (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to a successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

**Right to Receive Copy of Appraisal.** I/We have the right to a copy of the appraisal report used in connection with this application for credit. To obtain a copy, I/We must send Lender a written request at the mailing address Lender has provided. Lender must hear from me/us no later than 90 days after Lender notifies me/us about the action taken on this application, or I/we withdraw this application.

**Certification:** I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors or assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

DOC7 131210 reference  13 of 37.               

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark  B  for Borrower or   C  for Co-Borrower. | Borrower: RICHARD HOLT | Agency Case Number: |
|---|---|---|
| | Co-Borrower: 9914040 | Lender Case Number: |

### LIABILITIES ADDENDUM

| Creditor's Name Address/City/State/Zipcode | Account Number | Payment To Pay | Months Left | Balance |
|---|---|---|---|---|
| CITIBANK | 412800268102 | 44 | | 2114 |
| CHASE | 4253302190783635 | 29 | | 1456 |
| AMEX | 21113300 | 68 | | 1357 |
| BROOKS BROS | 1011724019 | 136 | | 688 |
| EDDIE BAUER | 7206882495 | 25 | | 509 |
| R.E. Loans: WEBSTER BANK | 5039075519 | *1080 | | *77925 |
| HSBC | 5478530823 | *1310 | | *48392 |
| TOTAL: | | 2692 | | 132441 |

# EXHIBIT "N"

RETURN DATE: DECEMBER 30, 2008    :    SUPERIOR COURT

JPMORGAN CHASE BANK, NATIONAL    :    J.D. OF STAMFORD/NORWALK
ASSOCIATION

VS.    :    AT STAMFORD

HOLT, RICHARD L. A/K/A HOLT,    :    DECEMBER 12, 2008
RICHARD, ET AL

## COMPLAINT

## COUNT ONE – REFORMATION OF MORTGAGE:

1.    On March 22, 2000, Richard L. Holt a/k/a Richard Holt owed Washington

Mutual Bank, FA which became known as Washington Mutual Bank and is now known as

JPMorgan Chase Bank, National Association $308,000.00, as evidenced by a promissory note

for said sum dated on said date, and payable to the order of Washington Mutual Bank, FA

which became known as Washington Mutual Bank and is now known as JPMorgan Chase

Bank, National Association with interest from said date, in monthly installments of principal

and interest. A true and correct copy of said Note is attached as Exhibit C.

2.    On said date, by a deed of that date, said Richard L. Holt a/k/a Richard Holt

individually and on behalf of Dorsum Nemus Limited Liability Company a/k/a Dorsum Lemus

Limited Liability Company, to secure said note, mortgaged to Washington Mutual Bank, FA

which became known as Washington Mutual Bank and is now known as JPMorgan Chase

Bank, National Association the premises known as 23 Ridgewood Drive, Norwalk,

BENDETT & McHUGH, P. C.
160 FARMINGTON AVENUE • FARMINGTON, CT 06032 • (860) 677-2868 • FAX (860) 677-4549 • JURIS No. 102892

Connecticut, and described in Exhibit A attached hereto and made a part hereof. A true and correct copy of said Mortgage is attached as Exhibit D.

    3.      Said mortgage deed was recorded on the Norwalk Land Records on March 27, 2000 in Volume 3876 at Page 250.

    4.      By a Quit Claim Deed, dated September 16, 1996, Richard L. Holt and Lisbet M. Holt quit-claimed the fee interest in the above-referenced property to Dorsum Nemus Limited Liability Company, which Quit Claim Deed was recorded on September 17, 1996 in Volume 3257 at Page 234 of the Norwalk Land Records. A true and correct copy of said Quit-Claim Deed is attached as Exhibit B.

    5.      On or about March 22, 2000, said Dorsum Nemus Limited Liability Company resolved that said Limited Liability Company shall grant a mortgage to Washington Mutual Bank, F.A. to secure a $308,000.00 loan and that Richard Holt was authorized to execute the mortgage, promissory note and documents required in connection with the mortgage loan transaction. A true and correct copy of said Certificate of Limited Liability Company Resolution is attached as Exhibit E.

    6.    Due to a scrivener's error at the closing of said mortgage loan, the above-reference mortgage deed stated that the mortgagor was "Dorsum Lemus Limited Liability Company," instead of "Dorsum Nemus Limited Liability Company."

7.    The mortgage should be reformed to state the name of the mortgage to be "Dorsum Nemus Limited Liability Company."

**COUNT TWO:**

1-3.    Paragraphs 1 through 3, inclusive of Count One are incorporated herein and alleged as Paragraphs 1 through 3, inclusive of Count Two.

4.    The Plaintiff is the holder of said Note and Mortgage and the unpaid balance of said note is $296,828.87, plus interest from August 1, 2005, late charges and collection costs have not been paid although due and payable.

5.    Said note and mortgage are now in default by virtue of nonpayment of the installments of principal and interest due on September 1, 2005 and each and every month thereafter, and the Plaintiff has exercised its option to declare the entire balance of said note due and payable.

6.    The following encumbrances of record upon the property sought to be foreclosed are prior in right to the Plaintiff's mortgage and are not affected by this action:

(a)    Any taxes due the City of Norwalk that remain outstanding and properly perfected as of the date hereof pursuant to applicable law.

(b)    Water Lien in favor of the City of Norwalk in the original principal amount of $282.18 dated April 13, 2004 and recorded April 13, 2004 in Volume 5371 at Page

199 of the Norwalk Land Records.

        (c)    Water Lien in favor of the City of Norwalk in the original principal amount of $495.78 dated April 13, 2005 and recorded August 22, 2005 in Volume 5933 at Page 218 of the Norwalk Land Records.

        (d)    Water Lien in favor of the City of Norwalk in the original principal amount of $901.66 dated September 25, 2006 and recorded September 25, 2006 in Volume 6330 at Page 1 of the Norwalk Land Records.

        (e)    Water Lien in favor of the City of Norwalk in the original principal amount of $1,348.41 dated November 5, 2007 and recorded November 5, 2007 in Volume 6677 at Page 315 of the Norwalk Land Records.

        (f)    Water Lien in favor of the City of Norwalk in the original principal amount of $1,723.93 dated November 5, 2008 and recorded November 5, 2008 in Volume 6892 at Page 101 of the Norwalk Land Records.

    7.    On the aforementioned piece of property, the following interests are claimed which are subsequent to Plaintiff's said mortgage: NONE

    8.    Upon information and belief, the Defendant, Dorsum Nemus Limited Liability Company is the owner of record and in possession of said premises.

WHEREFORE, The Plaintiff claims:

## AS TO COUNT ONE:

1.    Reformation of the Mortgage; and
2.    Such other relief and further equitable relief as may be appropriate.

## AT TO COUNT TWO:

1.    A foreclosure of said mortgage.
2.    Immediate possession of the mortgaged premises.
3.    A deficiency judgment. **No deficiency will be sought against any person whose obligation under the subject promissory note has been heretofore or hereafter discharged in bankruptcy.**
4.    The appointment of a receiver to collect rents and profits accruing from the premises.
5.    Reasonable attorney's fees and costs.
6.    Such other relief and further equitable relief as may be required.

**NOTICE:**    A PERSON WHO IS UNEMPLOYED OR UNDER-EMPLOYED AND WHO HAS FOR A CONTINUOUS PERIOD OF AT LEAST TWO YEARS PRIOR TO THE COMMENCEMENT OF THIS FORECLOSURE ACTION OWNED AND OCCUPIED THE PROPERTY BEING FORECLOSED AS SUCH PERSON'S PRINCIPAL RESIDENCE, MAY BE ENTITLED TO CERTAIN RELIEF PROVISIONS UNDER SECTION 49-31d to 49-31i, INCLUSIVE, OF THE CONNECTICUT GENERAL STATUTES. YOU SHOULD CONSULT AN ATTORNEY TO DETERMINE YOUR RIGHTS UNDER THIS ACT.

UNLESS YOU, WITHIN THIRTY DAYS AFTER RECEIPT OF THIS NOTICE, DISPUTE THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, THE DEBT WILL BE ASSUMED TO BE VALID BY US. IF YOU NOTIFY US IN WRITING WITHIN THE THIRTY DAY PERIOD THAT THE DEBT, OR ANY PORTION THEREOF, IS DISPUTED, WE WILL OBTAIN VERIFICATION OF THE DEBT OR A COPY OF A JUDGMENT AGAINST YOU (IF APPLICABLE) AND A COPY OF SUCH VERIFICATION OR JUDGMENT WILL BE MAILED TO YOU BY US. ALSO, UPON YOUR WRITTEN REQUEST WITHIN THE THIRTY DAY

PERIOD, WE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF THE
ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR. THE
FACT THAT YOU HAVE THIRTY (30) DAYS TO INDICATE A DISPUTE WILL NOT
PREVENT US FROM FILING SUIT WITHIN THAT TIME.

THE LAW FIRM OF BENDETT & McHUGH, P.C. IS A DEBT COLLECTOR AND IS
ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL
BE USED FOR THAT PURPOSE.  IF YOU HAVE PREVIOUSLY RECEIVED A
DISCHARGE IN BANKRUPTCY, THIS CORRESPONDENCE IS NOT AND SHOULD
NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY
ENFORCEMENT OF A LIEN AGAINST PROPERTY.

This action is within jurisdiction of the Superior Court.

Dated at Farmington, Connecticut, this 12th day of December, 2008.

THE PLAINTIFF,
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION

By _____
David F. Borrino
Bendett & McHugh, P.C.
Its Attorney
160 Farmington Avenue
Farmington, CT 06032
(860) 677-2868
Juris No. 102892

# EXHIBIT "O"



# HALLORAN
# &SAGE LLP
### ATTORNEYS AT LAW

**BRIAN D. RICH** 860 297-4698  rich@halloransage.com

December 12, 2013

**VIA FAX @ (203) 348-8092**
Larry F. Ginsberg, Esq.
706 Bedford Street
Stamford, CT 06901

Re:  **JPMorgan Chase Bank, N.A. v. Richard Holt, et al**
Loan No. ████60590
Our File No. 13947.0093

Dear Larry:

In a final effort to resolve the purported outstanding discovery issues raised by your client in this matter, this correspondence follows up on the court ordered "meet and confer" following the scheduled trial appearance before Judge Mottolese on December 3, 2013 which modified Judge Mintz's order to require the parties to work in good faith to resolve the outstanding discovery disputes and resolve the document production issues as they relate to this loan. In that regard, without waiving any and all rights, express or implied, I offer the following:.

- You have requested page 7 of the "Consolidated default log;" we have no record of this page;

- You have requested Schedule 3.1 of the September 25, 2008 Purchase & Assumption Agreement; we have no documentation of such a schedule;

- We have previously confirmed, and confirm again, that this is a Chase loan; there is thus no documentation relating to any investor on the loan;

- We have no record of the requested "screen dumps;"

- We previously provided a payoff statement, per your request;

- Please see the requested escrow account statement attached;

- We previously produced the files relating to the origination of the loan which the Plaintiff has in its possession, including the pertinent disclosures;

December 12, 2013
Page 2

- Any records of the SEC, OCC and/or any other governmental agency should be requested through the appropriate agency;

- We are unaware of any pooling and servicing agreement relating to this loan;
- We have no "electronic tracking information" as you have requested it;

- We have no further documents to be produced pursuant to your request for "LSAM" documents;

- We are unaware of the "policies and manuals" relating to the subject loan;

- We have previously produced the Purchase & Assumption Agreement relating to the assumption of WaMu assets by JPMC, but are not aware of any further documentation to be produced pursuant to your request for further communications relating to this loan;

- We are unaware of any consent decrees relating to this loan and, therefore, have nothing to produce in this regard;

- In addition to being objectionable, we are unaware of any documents relating to this loan pursuant to your request for "All documents which relate to any purported forgeries and/or robo-signing alleged against Chase or WaMu, including deposition transcripts and specifically relating to Cynthia Reilly, Margaret Dalton and Florida Munoz;

- In addition to being objectionable, we are unaware of any documents relating to this loan pursuant to your request for "a listing of all Chase robosigners;"

- We cannot confirm any information listed on the SEC website, which is outside of the control of the Plaintiff;

- This is not a Fannie Mae loan;

- We cannot confirm any "monies received by WaMu" relating to the loan or monies received by WaMu for the assumption of assets;

- Copies of insurance policies are attached.

Responsive documentation is attached, as detailed above. Please note that your client, Dorsum Nemus, contain to remain in default of its discovery obligations in failing to produce a knowledge corporate witness, despite numerous requests. If Dorsum Nemus does not produce an appropriate witness for deposition forthwith, we will ask the Court for an immediate entry of default and/or take any and all necessary action to

December 12, 2013
Page 3

proceed with the prompt disposal of this litigation as soon as possible.  In that regard, I look forward to your timely response.

Moreover, I have yet to receive any response to my correspondence of last week with regard to alternate counsel appearing on behalf of Dorsum Nemus appearing in this case.  Please advise promptly so that we can hopefully avert raising the issue before Judge Mintz at Thursday's status conference.

Very truly yours,

Brian D. Rich

BDR:maw
Enclosures

cc:  Richard Holt **via hand delivery.**

## NOTICE UNDER THE FAIR DEBT COLLECTION PRACTICES ACT 15 U.S.C. 1692, ET SEQ.

THIS FIRM IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.

3119905v.1

# EXHIBIT "P"

```
 .Γ         :0590              FOR TRACKING   ZLT A01/006  06/05/03  14:08:31
 R  HOLT        L:  F:A B:  R:     04/01/02 TYPE CONV. RES.     ARM        M:F F:3
 23 RIDGEWOOD DR NORWALK CT 06853-0000                       GUAR
                                                                          ---MORE>
ACT SCHED   ACTUAL  STEP     STEP DESCRIPTION    PRED FLT    COST    G A C L F P T
    101602  101702  002 RECEIVED IN FCL DEPT          0                  *  1
    101802  101702  004 ASSIGN TO PROCESSOR      002  1                  :
    101802  101702  006 REFERRED TO ATTY/TRUSTEE 002  1                  *  2
    101902  101802  045 FILE OPEN-ATTY/TRUSTEE   006  2
    122002  112602  034 ORIGINAL DOCS TO ATTORNEY 002 64                 :  3
    110702  102902  300 1ST LEGAL ACTION         045  20                 *
    110802  110402  026 SERVICE COMPLETE         300  10                 *
    030603  030603  239 CONTESTED                002 140
    042503          452 SEE FOR2 NOTES           239  50              *
    050203          017 FOLLOW UP WITH ATTORNEY  002 197              *
    050903          092 FINAL JUDGEMENT ENTERED  017   7              *
    061203          082 RECD BID AMOUNT          092  34              *     4
    061803          198 FCL SALE SCHEDULED       092  40              *     4
    061803          232 LAW DAY                  092  40              *     4
    061803          096 SALE HELD                092  40              *     5
    061803          100 NOTIFY INVESTOR SALE HELD 096   0             *
    061803          175 REO ACQUIRED             096   0              *     5
```

```
DLQ1  ████60590        Q7   D E L I N Q U E N C Y  OWNR   06/05/03  19:30:03
 13-A CONV. RES. ARM         PER/CLS/OFF  F/AA/00 AGE:  3Y  3M IR:  5.92300 INV: A01
DUE( 15)    28,216.77   DUE 04/01/02(    ) (10/15)  ASSUM:          ACQ:
LATE CHRG      756.21   PAYMT     @   1,767.31 P: 23 RIDGEWOOD DR
BAD CK FEES       .00   L/C AMT          88.37     NORWALK CT 06853
OTHER FEES      53.20   PAYMT + LC    1,855.68 M:
TOT DUE     29,026.18*  PRIN BAL    315,654.00
SUSPENSE         .00    P&I           1,767.31     23 RIDGEWOOD RD
NET DUE     29,026.18   DLQ 12 TIME,PAY 47 DAY     NORWALK CT 06853
C/S 301   RICHARD HOLT                                    203-853-1715
C/D 02/03                          B  BUSINESS-MR         203-866-8420
--------------------------- * ADDITIONAL MESSAGES * ----------------WU: P ----
HI-TP 1  XFER ID NPA03DUE   07/01/03   WORK STATION SET UP FOR DUE DILIGENCE
CASHIER STOP 5                         LOAN IS ACTIVE FORECLOSURE
-----~CORP----------------* CORPORATE ADVANCE INFO *---------------------------
          CORPORATE ADVANCE BALANCES        CORPORATE ADVANCE DATES
     MORTGAGOR RECOVERABLE  $      989.40      1ST DATE: 01/31/03
     3RD PARTY RECOVERABLE  $         .00      LAST DATE: 03/28/03
     NON-RECOVERABLE        $         .00
```

```
  .0590                    CUSTOMER SERVICE  INV A01/006  06/04/03  20:21:14
RICHARD HOLT                          C   TYPE CONV. RES.     ARM        MAN F
                          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       IR  5.92300  BR 00      203-853-1715
23 RIDGEWOOD DR           NORWALK CT 06853-0000                    8 203-866-8420
         < ERC* SWT LTTR TO CUSTOMER INCLUD VON FOR PAST 2YR   >: 11/12/02
----LOAN------------------------* LOAN INFORMATION *-----------------------
---- 04/01/02 PMT ---    LAST PAID  DATE     DUE       AMOUNT  (13 MONTHS)
*1ST PAI    1767.31      NSF       07/12/02  04/02       .00  WO: P
*TOT PMT    1767.31      HAZARD
                         ESC DISB 10/15/02  00/00      444.17-

                                                     C1               .00
                                                     ANALYZED COUP NO
                                                     00/00           06

LC DUE      756.21      ------- BALANCES -------       BILL AND   BILL PROD
OTH FEES     53.20      PRINCIPAL    315,694.00                   07/12/02
TOT DUE   29026.10        ESCROW          .00        YTD PRN           .00
-- PENDING PAYMENT --     SUSPENSE        .00        YTD TAX           .00
    05/02   1899.85       RES ESC         .00        YTD INT           .00
---* PF2 FOR ADDL MESSAGES *-------------------------------------------------
HI-TP 1  XFER ID NTASBCDK  07/01/03  WORK STATION SET UP FOR DUE DILIGENCE
LOAN IS ACTIVE FORECLOSURE           LOAN IS IN FORECLOSURE, P/C STOP = 3
TELEVOICE FLAG = 1                   LOAN PAST DUE 013 MONTHS
```

22

1  DAVID D. PIPER, CASB No. 179889
   david.piper@kyl.com
2  KRISTY H. SAMBOR, CASB No. 274452
   kristy.sambor@kyl.com
3  KEESAL, YOUNG & LOGAN
   A Professional Corporation
4  400 Oceangate
   Long Beach, California 90802
5  Telephone:     (562) 436-2000
   Facsimile:     (562) 436-7416
6
   Attorneys for Defendants
7  JPMORGAN CHASE BANK, N.A., CALIFORNIA
   RECONVEYANCE COMPANY, and U.S. BANK
8  NATIONAL ASSOCIATION, as Trustee, successor
   in interest to Bank of America, National Association
9  as Trustee as successor by merger to LaSalle Bank,
   National Association as Trustee for WaMu Mortgage
10 Pass-Through Certificates Series 2007-HY1

FILED
Superior Court of California
County of Los Angeles

JUN 0 8 2017

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Nancy Alvarez

11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                   FOR THE COUNTY OF LOS ANGELES

14

15 HARRY M. FOX, as individual and as Trustee of )   Case No. BC602491
   the FOX LIVING TRUST,                        )
16                                              )   *Action Filed: November 25, 2015*
                                    Plaintiff,  )
17                                              )   **JOINT TRIAL STIPULATION RE ISSUES**
             vs.                                )   **AND FACTS**
18                                              )
   JP MORGAN CHASE BANK, N.A;                   )   *ASSIGNED FOR ALL PURPOSES TO:*
19 US BANK, N.A.;                               )   *Judge Dalila Corral Lyons, Dept. 20*
   Bank of America, NA;                         )
20 WaMu Mortgage Pass Through Certificates      )
   Series 2007-HY1 Trust                        )
21 California Reconveyance Company;             )
   Doe Defendants,                              )
22                                              )
                                    Defendants. )
23 _____)

24

25          Plaintiff HARRY M. FOX, as individual and as Trustee of the FOX LIVING TRUST

26 and Defendants JPMORGAN CHASE BANK, N.A. ("Plaintiff") and Defendants JPMORGAN

27 CHASE BANK, N.A. ("Chase"), CALIFORNIA RECONVEYANCE COMPANY ("CRC"), and U.S.

28                                     - 1 -

JOINT TRIAL STIPULATION RE ISSUES AND FACTS

1   BANK NATIONAL ASSOCIATION, as Trustee, successor in interest to Bank of America, National

2   Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee for

3   WaMu Mortgage Pass-Through Certificates Series 2007-HY1 ("U.S. Bank") (collectively,

4   "Defendants") (Plaintiff and Defendants, together, the "Parties"), hereby submit this Joint Trial

5   Stipulation re Facts and Issues.

6          The Parties stipulate to the following:

7

8                                    **FACTS**

9          1.      ~~The loan was confirmed by an Adjustable Rate Note ("Note") dated December~~

10  ~~6, 2006 and executed by Plaintiff.~~

11         2.      Harry M. Fox entered into a financial transaction for the advancement of funds

12  as a loan, for $690,000.

13         3.      Plaintiff's loan was secured by a Deed of Trust ("DOT") encumbering Plaintiff's

14  property.

15         4.      The DOT is dated December 6, 2006 and was executed by Plaintiff.

16         5.      The DOT was recorded on December 14, 2006 with the Los Angeles County

17  Recorder's Office as instrument number 06-2777744.

18         6.      CRC is identified as the trustee of Plaintiff's deed of trust.

19         7.      JPMorgan Chase Bank, N.A. signed the modification agreement executed by

20  Mr. Harry M. Fox as the "lender".

21         8.      Investor Code A01 in the Loan Transfer History File represents WaMu Asset

22  Acceptance Corporation.

23         9.      Investor Code 369 in the Loan Transfer History File represents Washington

24  Mutual Mortgage Securities Corporation.

25         10.     JPMorgan Chase Bank, N.A. did not purchase the loan from the Federal

26  Deposit Insurance Corporation.

27         11.     ~~The DOT reflects that the lender can sell Plaintiff's loan at any time without~~

28  ~~notice to Plaintiff. Section 20 of the DOT provides that "[t]he note or a partial interest in the Note~~

                                    - 2 -

1  (together with this Security Instrument) can be sold one or more times without prior notice to

2  Borrower."

3      12.    The PSA lists LaSalle Bank National Association ("LaSalle") as the trustee of

4  the trust pool.

5      13.    The closing date of the PSA was January 24, 2007.

6      14.    Pursuant to a Certificate issued by the Comptroller of the Currency, Bank of

7  America National Association ("BoA") succeeded LaSalle as trustee for the trust pool, effective

8  October 17, 2008.

9      15.    Pursuant to the Purchase Agreement dated November 11, 2010, U.S. Bank

10  succeeded BoA as trustee for the trust pool.

11      16.    U.S. Bank is the trustee of the trust pool.

12      17.    On March 14, 2011, a Notice of Default and Election to Sell Under Deed of

13  Trust ("NOD") was recorded on Plaintiff's property.

14      18.    The NOD was recorded with the Los Angeles County Recorder's Office as

15  instrument number 20110383735.

16      19.    The NOD bears a Declaration of Compliance regarding California Civil Code §

17  2923.5(b) that Chase had contacted the borrower to discuss the borrower's financial situation and to

18  explore options for the borrower to avoid foreclosure.

19      20.    At his deposition on March 10, 2017, Plaintiff testified about when he

20  discovered that Chase improperly reported his interest payments for the years 2011, 2012, and 2013.

21  Plaintiff admitted that he discovered the allegedly improper reporting for 2011 in the beginning of

22  2012, the allegedly improper reporting for 2012 in the beginning of 2013, and the allegedly improper

23  reporting for 2013 in the beginning of 2014.

24      21.    At the time the Note and DOT were executed, neither Chase nor U.S. Bank had

25  any involvement in Plaintiff's loan.

26      22.    CRC was the trustee of Plaintiff's loan.

27

28

-3-

1

## OTHER

2      1.      The Parties stipulate to Local Rule 3.49(c): "Stay of Execution. In the event of a

3  judgment in favor of the plaintiff, a stay of execution may be issued to be effective for a period of ten

4  days after determination of a motion for a new trial or until ten days after expiration of the time to file

5  notice of intention to move for a new trial."

6

7              **IT IS SO STIPULATED.**

8

9  DATED: June 7, 2017

10  _____
   RONALD H. FRESHMAN

11  LAW OFFICE OF RONALD H. FRESHMAN
   Attorneys for Plaintiff

12  HARRY M. FOX, as individual and as Trustee of the
   FOX LIVING TRUST

13

14

15  DATED: June 7, 2017  _____

16  DAVID D. PIPER
   KRISTY H. SAMBOR

17  KEESAL, YOUNG & LOGAN
   Attorneys for Defendants

18  JPMORGAN CHASE BANK, N.A., CALIFORNIA
   RECONVEYANCE COMPANY, and U.S. BANK

19  NATIONAL ASSOCIATION, as Trustee, successor in
   interest to Bank of America, National Association as

20  Trustee as successor by merger to LaSalle Bank, National
   Association as Trustee for WaMu Mortgage Pass-

21  Through Certificates Series 2007-HY1

22

23

24

25

26

27

28

-4-

06/12/2017

# PROOF OF SERVICE

1        I am employed in the County of Orange, State of California. I am over the age of
2   18 and not a party to the within action; my business address is 2372 SE Bristol Street,
3   2nd Floor, Newport Beach, California 92660. On June 7, 2017, I served the within
4   **JOINT STIPULATION RE ISSUES AND FACTS** the interested parties in said action
5   by placing the original a true copy thereof, enclosed in a served envelope and addressed
    as follows:

6

7                        Kristy Sambor. Esq.
8                Kristy.Sambor@kyl.com
           KEESAL, YOUNG & LOGAN, APC
9                    400 Oceangate
10             Long Beach, CA 90802
               Tel: (562) 436-2000
11             Fax: (562) 436-7416
    *Attorneys for* **Defendants, JP MORGAN CHASE BANK, N.A; US BANK, N.A.;**
12  **BANK OF AMERICA, NA; WAMU MORTGAGE PASS THROUGH**
13  **CERTIFICATES SERIES 2007-HY1 TRUST**

14      ____**BY UNITED STATES MAIL,** I am "readily familiar" with the practice of collection
15  and processing correspondence for mailing. Under that practice, it would be deposited
    in a box or other facility regularly maintained by the United States Postal Service with
16  First-Class postage thereon fully prepaid that same day at Newport Beach, California,
    in the ordinary course of business.
17

18     __X__   **OVERNIGHT DELIVERY** – I deposited such envelope for collection and delivery by
19  GSO Overnight with delivery fees paid or provided for in accordance with ordinary business
    practices. Packages for overnight delivery by GSO Overnight are deposited with a facility
20  regularly maintained by GSO Overnight for receipt on the same day in the ordinary course of
    business.
21

22      ____**BY PERSONAL SERVICE,** I caused to be delivered such envelope by hand to the offices
    of the addressee.
23  I declare under penalty of perjury under the laws of the State of California that the above is
    true and correct.

24

25  Dated: June 7, 2017

26                            Melissa Alvarez, Declarant

27

28



Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

View Search Results

| **HOME** | | | | |
|---|---|---|---|---|

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of
Documents

## Entity Details

### THIS IS NOT A STATEMENT OF GOOD STANDING

| File Number: | 3908699 | Incorporation Date / Formation Date: | 1/6/2005 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | **WAMU ASSET ACCEPTANCE CORP.** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

#### REGISTERED AGENT INFORMATION

| Name: | **THE CORPORATION TRUST COMPANY** | | |
|---|---|---|---|
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or
more detailed information including current franchise tax assessment, current filing history
and more for a fee of $20.00.

Would you like ⚪Status ⚪Status,Tax & History Information  [ Submit ]

[ Back to Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT "Q"

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0961n.06

No. 11-1777

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NATIONAL CITY BANK, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | *Aug 29, 2012* |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | |
| | ) | |
| SYATT REALTY GROUP, INC.; FAIRFIELD AND | ) | |
| BANKS REAL ESTATE GROUP, LLC; FAIRFIELD | ) | |
| AND BANKS FUND MANAGER, LLC; LISA WRIGHT, | ) | |
| an individual; and DELBERT SAULTER, an individual, | ) | ON APPEAL FROM THE UNITED |
| jointly and severally, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| Defendants, | ) | MICHIGAN |
| | ) | |
| and | ) | |
| | ) | OPINION |
| GLEN WRIGHT, an individual, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Before:  COLE and DONALD, Circuit Judges; and SARGUS, District Judge.[*]

**Donald, Circuit Judge.**  In 2005, Defendant-Appellant Glen Wright ("Wright") signed

documents to obtain a loan from Plaintiff-Appellee National City Bank ("NCB").  The proceeds of

_____

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District
of Ohio, sitting by designation.

Dockets.Justia.com

No. 11-1777
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

the loan were distributed to Wright, Syatt Realty Group, Inc. ("Syatt"), and Fairfield & Banks

("F&B")[1]—business entities associated with Wright and owned by his business associates Lisa

Wright ("Lisa") and Delbert Saulter ("Saulter"). When the loan was not timely paid, NCB filed the

present lawsuit against Wright, Lisa, Saulter, Syatt, and F&B. This appeal only concerns NCB's

claims against Wright. NCB alleges that Wright made fraudulent and innocent misrepresentations

about his personal finances in order to obtain the loan, that Wright was part of a civil conspiracy, and

that Wright breached a promissory note. The district court granted summary judgment in favor of

NCB on each of these claims, and Wright timely appealed. For the following reasons, we

REVERSE the district court's orders granting summary judgment in favor of NCB and REMAND

for further proceedings.

I.

Wright is a Tennessee financial planner who occasionally conducts business in Michigan.

In 2005, Wright began investing in Michigan real estate with Lisa and Saulter. Lisa and Saulter

formed Syatt to represent buyers and sellers of investment properties. Wright was not a formal

partner in Syatt, but he did participate in some business ventures with it. F&B was formed as a real

estate investment trust to pool funds from investors, buy properties, and then pay a return to investors

from the gains realized by the real estate investments. Wright was not a principal, partner, or owner

---

[1]There are three F&B entities—Fairfield & Banks Real Estate Trust, L.L.C., Fairfield &
Banks Real Estate Group, L.L.C., and Fairfield & Banks Fund Manager, L.L.C. The distinction
between them is not relevant for purposes of this appeal; thus, we refer to them collectively as F&B.

- 2 -

in F&B; only Lisa and Saulter were. Wright's role was to introduce investors to investment opportunities with F&B, and he referred at least one client to invest in F&B.

In February 2005, Wright joined Lisa and Saulter (acting as Syatt) to purchase a house in Michigan (the "Avon property") and resell it for profit. Wright, Lisa, and Saulter planned to use Wright's credit profile, which was stronger than the credit profiles of Lisa, Saulter, and Syatt, to obtain a loan to purchase the Avon property, but no written agreement memorialized this plan. As part of the Avon property transaction, Wright gave a one-time power of attorney to Lisa so she could complete the loan documents and expedite the sale. Wright and Syatt were able to purchase the Avon property and flip it for a $10,000 profit. While Wright received $4,000 from the Avon property deal soon after it was completed, he claims that Lisa originally promised him approximately $20,000 more from the investment.

In June or July of 2005, Saulter learned of an opportunity to purchase a house in Michigan (the "Webber property") from a distressed owner. The owner was in financial straits and could no longer afford the mortgage, but apparently the value of the Webber property relative to the mortgage made assumption of the existing mortgage a profitable investment. Syatt thus agreed to assume the mortgage and provided a small kickback to the distressed sellers.

Around the same time, Wright, Lisa, and Saulter agreed to seek a line of credit in order to fund other business ventures. Lisa and Saulter assert that the loan was to be secured by another mortgage on the Webber property with the proceeds going to fund F&B. Because Wright had the

- 3 -

*No. 11-1777*
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

strongest credit profile, he, Lisa, and Saulter again planned to use his financial information to obtain

the loan. Lisa and Saulter set up a loan with NCB banker Mark Clark ("Clark"), who was a friend

of Saulter's. According to Wright, the loan was to be a personal line of credit that would be treated

as a business line of credit so that it would not show up on Wright's credit report.

At some point during the summer of 2005, Wright went to Lisa's office and completed a

series of NCB forms, which he thought was an NCB loan application. Wright signed a Personal

Financial Statement, a Future Advance Mortgage, a Good Faith Estimate of Closing Costs, a

Settlement Statement, a Notice of Right to Cancel, and a Fixed Rate Consumer Note and Security

Agreement ("the Note"). According to Wright, these documents were blank when he signed them

and he only saw the relevant signature pages. The completed Personal Financial Statement included

false information about Wright's finances. At his deposition, Wright testified that he gave the blank

documents to Lisa, that she had access to his accountant to obtain the proper information, and that

she may have asked him some questions over the telephone, but Wright insists that he did not

provide the false information that was included in the Personal Financial Statement.

The forms Wright signed were delivered to Clark, who forwarded them to NCB's main

underwriting office in Cleveland, Ohio. The loan to Wright was conditionally approved subject to

two conditions—that NCB take a second mortgage on the Webber property, which had been offered

as collateral, and that the first mortgage on the Webber property not be greater than $293,000. The

conditional approval was returned to Clark, but he did not ensure that the two conditions were met.

In fact, the first mortgage on the Webber property was over $600,000, which violated the second

- 4 -

No. 11-1777
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

condition of approval. Nonetheless, on August 8, 2005, Clark disbursed the proceeds from the loan, via NCB cashier's checks, as follows: $20,000 to Wright, $130,000 to F&B, and $350,000 to Syatt. According to Clark, Wright approved this allocation of the proceeds, but Wright claims he did not.

On June 6, 2007, NCB filed a complaint against Wright, Lisa, Saulter, Syatt, and F&B, alleging claims of bank fraud/intentional and innocent misrepresentation, money had and received, payment by mistake, unjust enrichment, and civil conspiracy. NCB seeks damages of $540,000 plus attorney fees, interest, and costs. During discovery, Wright admitted that the documents submitted to NCB contained his signature, after which the district court granted NCB's motion to amend its complaint to add a claim for breach of promissory note. Wright and NCB each filed two motions for summary judgment on NCB's claims against Wright—one each for the claims raised in the original complaint and one each for the breach of promissory note claim. NCB also filed a motion to dismiss Wright's counterclaims. The district court granted NCB's motions for summary judgment and motion to dismiss and denied Wright's motion for summary judgment. On May 19, 2011, the district court granted NCB's motion to amend the judgment and awarded NCB $1,288,389.35, a total amount including principal, interest, and attorney fees, to which Wright was jointly and severally liable with Syatt and F&B. On June 15, 2011, Wright timely appealed.

II.

We review de novo the district court's grant of NCB's motions for summary judgment. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). Summary judgment is appropriate where the

- 5 -

No. 11-1777
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

materials in the record show "that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must

conclusively show that no genuine issue of material fact remains for trial. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). We must view all facts and inferences in the light most favorable to the

nonmoving party without making credibility determinations or weighing the evidence. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.

The district court first granted summary judgment in favor of NCB on its claim for breach

of promissory note. NCB alleges that it loaned Wright $500,000 in exchange for the Note, which

promised payments to NCB in monthly installments. The Note contains an acceleration clause,

under which the entire Note would be due immediately and in full should Wright fail to make a

monthly payment. NCB insists that Wright failed to make the monthly payments, meaning the Note

is now payable immediately and in full. Wright denies these allegations.

The district court concluded that NCB was the holder of a valid promissory note. A

promissory note is a negotiable instrument pursuant to the Michigan Uniform Commercial Code

("MUCC"), which defines a negotiable instrument as

> an unconditional promise or order to pay a fixed amount of money, with or without
> interest or other charges described in the promise or order, if all of the following
> apply:

- 6 -

No. 11-1777
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

> (a) It is payable to bearer or to order at the time it is issued or first comes into possession of a holder.
>
> (b) It is payable on demand or at a definite time.
>
> (c) It does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain an undertaking or power to give, maintain, or protect collateral to secure payment, an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Mich. Comp. Laws § 440.3104(1). A holder is "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." *Id.* § 440.1201(20).

The Note is a negotiable instrument pursuant to § 440.3104(1). It is payable to the order of NCB. It is payable at a definite time—360 monthly payments. And, there are no undertakings or instructions except with regard to the use of mortgaged property as collateral. The acceleration clause in the Note does not destroy its negotiability. *See Northwestern Finance Co. v. Crouch*, 242 N.W. 771, 771 (Mich. 1932). Furthermore, NCB qualifies as a holder of the Note pursuant to § 440.1201(20) because the Note was made to the order of NCB and NCB possesses it.

The district court granted summary judgment in favor of NCB because it determined that NCB was entitled to enforce the Note. A holder of an instrument is entitled to enforce it. Mich. Comp. Laws § 440.3301. The MUCC provides that "[i]f the validity of signatures is admitted . . .[,] a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to

- 7 -

No. 11-1777
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

enforce the instrument under section 3301, unless the defendant proves a defense or claim in recoupment." *Id.* § 440.3308(2). Wright admits that he signed the Note; thus, there is no dispute as to the validity of the signatures. Instead, Wright offers two defenses against NCB's attempt to enforce the Note—that there was a failure to contract because there was no manifestation of intent between the parties and that NCB failed to perform a condition of the Note.

1.

Wright first argues that no contract was formed because NCB never approved the loan. NCB's Cleveland office placed conditions on the approval of the loan, and those conditions were not satisfied prior to the proceeds being disbursed. Thus, Wright avers, NCB did not manifest an intent to be bound by the loan/Note.

NCB's failure to follow its own internal procedures for approving a loan, however, does not represent a failure to contract. NCB agreed to the terms of the loan by disbursing the funds on it. Moreover, even if the funds were disbursed by an NCB employee who lacked the authority to approve the loan or disburse the funds, NCB ratified the agreement by seeking to enforce it. *See David v. Serges*, 129 N.W.2d 882, 883 (Mich. 1964). Therefore, there can be no dispute that NCB accepted the terms of the Note.

Wright insinuates that he did not agree to the terms of the contract because he signed blank documents that he thought were merely part of the application process rather than binding loan documents. Wright's acceptance of the terms of the Note also cannot be disputed. In signing the

- 8 -

*No. 11-1777*
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

Note, Wright assented to its terms and warranted that he had read the document. In a paragraph

immediately above the line for Wright's signature, the Note reads:

> YOU HAVE READ AND AGREE TO ALL PROVISIONS OF THIS NOTE
> INCLUDING THOSE ON PAGES 1 THROUGH 3 AND IN THE DISCLOSURE
> STATEMENT WHICH ARE INCORPORATED HEREIN BY REFERENCE. (1)
> DO NOT SIGN THE NOTE BEFORE YOU READ IT OR IF IT CONTAINS
> BLANK SPACES TO BE FILLED IN.  (2) YOU ARE ENTITLED TO A
> COMPLETELY FILLED-IN COPY OF THIS NOTE BEFORE YOU SIGN IT. BY
> SIGNING THE NOTE, YOU ACKNOWLEDGE THAT YOU HAVE RECEIVED
> AND HAD AN OPPORTUNITY TO REVIEW A COMPLETED COPY OF THIS
> ENTIRE NOTE BEFORE SIGNING IT ON THE DATE SHOWN ON PAGE 1.
> SEE PAGES 1, 2 AND 3 AND THE DISCLOSURE STATEMENT FOR
> ADDITIONAL IMPORTANT TERMS AND CONDITIONS.

Wright's misunderstanding as to what he was signing and his failure to demand a completed copy

of the Note prior to signing do not obviate the validity of his signature or negate his acceptance of

the terms of the Note.  Based on the clear language of the Note, there can be no factual dispute as

to Wright's acceptance of its terms.

Wright also argues that no agreement was made because NCB altered a loan document by

changing how the proceeds were to be distributed.  A fraudulently made alteration to a negotiable

instrument may provide the party whose obligation is affected with a defense against enforcement.

Mich. Comp. Laws. § 440.3407(2). NCB admits that the Settlement Statement was altered to reflect

the allocation of the proceeds from the loan, but that alteration does not provide Wright a defense

to enforcement of the Note.  The Settlement Statement is not part of the Note; thus, the alteration

is not a defense to enforcement pursuant to § 440.3407(2).

- 9 -

*No. 11-1777*
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

Wright does not have a defense against enforcement of the Note based on a failure to contract. There is no dispute of fact as to whether NCB or Wright assented to the terms of the Note. Furthermore, NCB did not fraudulently alter the Note. Wright's arguments otherwise are without merit.

2.

Wright also argues that the Note cannot be enforced because NCB did not fulfill a condition precedent by loaning Wright $500,000. The Note states that Wright gave a promise to pay in exchange for "value received" in the form of a loan and that Wright authorized NCB "to disburse all proceeds from this Loan as indicated in the Itemization of the Amount Financed in the Disclosure Statement." According to the Disclosure Statement, the value received by Wright was $500,000, an "[a]mount given to you directly." Wright claims NCB failed to loan all of the money to him.

The failure to properly distribute the proceeds of a loan can provide a defense against the enforcement of a negotiable instrument. "If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed." Mich. Comp. Laws § 440.3303(2). In other words, a lack of consideration is a defense available to the maker of an instrument. *EA Mgmt. v. JP Morgan Chase Bank, N.A.*, 655 F.3d 573, 576 (6th Cir. 2011). Moreover, "the right to enforce the obligation of a party to pay an instrument is subject to . . . [a] defense of the obligor stated in another section of this article." Mich. Comp. Laws § 440.3305(1)(b). Sections 440.3303(2) and 440.3305(1)(b) are part of the same article. *EA*

- 10 -

No. 11-1777
Nat'l City Bank v. Syatt Realty Group, Inc., et al.

*Mgmt.*, 655 F.3d at 576. Therefore, NCB's failure to provide value to Wright pursuant to the

Disclosure Statement would provide Wright with a defense against the enforcement of the Note by

NCB.

A genuine dispute of fact exists as to whether NCB disbursed the proceeds of the loan

pursuant to the Note—that is, directly to Wright. Only $20,000 of the $500,000 went directly to

Wright in the form of a check made payable to him. Of the remaining $480,000, $350,000 went to

Syatt and $130,000 went to F&B. Wright was not a formal owner, principal, or partner in either

Syatt or F&B. While NCB suggests that Wright received subsequent payments from Syatt and F&B,

those payments do not conclusively establish that the loan was disbursed directly to Wright.

Moreover, Wright testified that he did not authorize the disbursements. Accordingly, a dispute of

fact exists. The trier-of-fact must determine whether NCB satisfied the requirements of the Note by

disbursing $480,000 of the $500,000 to recipients other than Wright personally. Summary judgment

in favor of NCB on the claim for breach of promissory note, then, was inappropriate.

B.

NCB's Amended Complaint alleges that Wright provided false information in the documents

he signed to obtain the loan, namely the Personal Financial Statement. Michigan law provides

causes of action for fraudulent and innocent misrepresentations. NCB asserted claims under both

theories, and the district court granted summary judgment in NCB's favor on both of them. Because

- 11 -

*No. 11-1777*
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

there are genuine disputes of fact as to an element of both misrepresentation claims, the district court

erred in granting summary judgment.

> To establish a claim of fraudulent misrepresentation, a plaintiff must prove that:

> (1) defendant made a material representation; (2) the representation was false; (3) defendant knew, or should have known, that the representation was false when making it; (4) defendant made the representation with the intent that plaintiff rely on it; (5) and plaintiff acted on the representation, incurring damages as a result.

*Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005). As to innocent

misrepresentation,

> A claim . . . is shown where a party detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the misrepresentation. It is unnecessary to prove that the party making the representation had knowledge that it was false. But for liability under a theory of innocent misrepresentation to arise there must be privity of contract between the party making the representation and the party claiming to have detrimentally relied on it.

*Roberts v. Saffell*, 760 N.W.2d 715, 720 (Mich. Ct. App. 2008) (quotation marks and citations

omitted). An innocent misrepresentation plaintiff "need not prove that the defendant intended to

deceive the plaintiff into relying on the false or misleading misrepresentation." *Id.* Likewise, "false

statements the claimant relied on are actionable irrespective of whether the person making them

acted in good faith in making them." *Id.* (quotation marks and citations omitted).

A fundamental element of NCB's claims for fraudulent misrepresentation and innocent

misrepresentation is that Wright made a representation to NCB. While Wright admits that the

- 12 -

No. 11-1777
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

Personal Financial Statement submitted to NCB contained misrepresentations regarding his assets

and liabilities, he insists that the document was blank when he signed it. Wright further testified

during his deposition that he did not complete the Personal Financial Statement, that he did not

provide the information included in it to anyone to complete on his behalf, and that whoever

completed the Personal Financial Statement made up the information included in it. Wright's

testimony creates a genuine dispute of fact as to whether he made a representation to NCB, which

is a material element of both fraudulent and innocent misrepresentation claims. Because a genuine

dispute of material fact exists, summary judgment was improper. The trier-of-fact must determine

whether Wright's testimony is credible, and that determination is more appropriately made after a

fair presentation of the evidence at trial rather than during the summary judgment phase of litigation.

C.

NCB's final claim against Wright is that he engaged in a civil conspiracy with Lisa and

Saulter, which is actionable under Michigan law. According to NCB, Wright, Lisa, and Saulter

engaged in a concerted action to obtain an unlawful mortgage loan from NCB. The district court

agreed and granted summary judgment in favor of NCB. Because a genuine dispute of fact exists

as to what Wright, Lisa, and Saulter agreed to do, summary judgment on this claim was not proper.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to

accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or

unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct.

- 13 -

*No. 11-1777*
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

App. 1992). "[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove

a separate, actionable, tort." *Early Detection Center, PC, v. New York Life Ins. Co.*, 403 N.W.2d

830, 836 (Mich. Ct. App. 1986).

Civil conspiracy requires proof that the defendant conspired for an unlawful purpose or

conspired to use unlawful means. There appears to be no dispute that Wright, Lisa, and Saulter

agreed to have Wright apply for a line of credit from NCB and to use the proceeds to fund their real

estate ventures. But this is not an unlawful purpose, and NCB has not offered proof that they agreed

to use unlawful means to obtain the loan. Wright testified that he signed blank documents, that he

did not provide false information, that he, Lisa, and Saulter were trying to get a line of credit to fund

future ventures, and that he was not aware of the property that would be used as collateral for the line

of credit. Thus, a genuine dispute of material fact exists as to whether the agreement amongst

Wright, Lisa, and Saulter was for an unlawful purpose or to use unlawful means.

The district court noted that "[o]nce the parties to a conspiracy have agreed to conspire, all

acts done in furtherance of the conspiracy by one of the conspirators 'is to be considered as the act

of all, and all are liable irrespective of the fact that they did not actively participate therein or the

extent to which they benefitted thereby.'" (quoting *Warsop v. Cole*, 291 N.W. 33, 36 (Mich. 1940)).

The district court's insinuation here is that because someone (either Lisa, Saulter, or Wright)

included false information in the documents submitted to NCB then that unlawful act can be

attributed to each of the conspirators. The fact that someone included false information, however,

does not establish that the conspiracy was for an unlawful purpose or that Wright, Lisa, and Saulter

*No. 11-1777*
*Nat'l City Bank v. Syatt Realty Group, Inc., et al.*

conspired to use unlawful means. The unlawful act of one co-conspirator is relevant only if the

unlawfulness was part of the conspiracy as an agreed-upon purpose or means. Because there is a

genuine dispute as to what Wright, Lisa, and Saulter agreed to do and how they agreed to do it,

summary judgment in favor of NCB was inappropriate on the civil conspiracy claim.

III.

For these reasons, we REVERSE the district court's grant of summary judgment in favor of

NCB as to NCB's claims against Wright for breach of promissory note, fraudulent and innocent

misrepresentation, and civil conspiracy, and we REMAND for further proceedings.

# EXHIBIT "R"

**136 A.3d 1277 (2016)**

**163 Conn.App. 827**

# DEUTSCHE BANK NATIONAL TRUST COMPANY, Trustee

**v.**

# Rodney THOMPSON et al.

No. 37362.

**Appellate Court of Connecticut.**

Argued January 4, 2016.
Decided March 22, 2016.

Appeal from Superior Court, judicial district of Hartford, Vacchelli, J.

827   *1278 **Rodney** Thompson, self-represented, the appellant (named defendant).

Jordan W. Schur, for the appellee (substitute plaintiff).

BEACH, SHELDON and HARPER, Js.

HARPER, J.

In this foreclosure action, the self-represented defendant **Rodney** Thompson[1] appeals from the judgment of strict foreclosure, rendered in favor of the plaintiff, Deutsche Bank National Trust Company, as trustee.[2] On appeal, the defendant claims, among other things, that the plaintiff lacked standing to bring this action because it was not in possession of the subject note at the time the action was commenced.[3] Because the resolution of this claim is dependent upon a factual finding that is not part of the appellate record, and because this claim implicates the subject matter jurisdiction of the trial court, we are unable to review the merits of this appeal. We therefore reverse the judgment of the trial court and remand the case for further proceedings.

The following facts and procedural history guide our analysis. On January 25, 2007, the defendant executed a fixed-rate balloon note in favor of New Century Mortgage Company in exchange for a loan in the principal amount of $213,600 to purchase real property in West Hartford. On March 9, 2009, the plaintiff commenced foreclosure proceedings against the defendant. *1279 In paragraph four of the plaintiff's complaint, it alleged that the defendant executed and delivered a mortgage to Mortgage Electronic Registration Systems, Inc. (MERS), that MERS assigned said mortgage to the plaintiff, and that the plaintiff is the holder of said mortgage and the note securing the mortgage.[4]

On August 18, 2009, the plaintiff filed a motion for default for failure to plead, which was granted by the clerk. The defendant never filed a motion to open judgment following entry of default, nor did he ever move to set aside the default. Also on August 18, 2009, the plaintiff filed a motion for judgment of strict foreclosure. The

motion for judgment of strict foreclosure was granted by the court, *Vacchelli, J.,* but not until September 16, 2013 — more than four years after it was filed. The reasons for delay were that the parties underwent lengthy foreclosure mediation and the defendant attempted to remove the case to federal court.

On November 6, 2013, the defendant filed a petition in bankruptcy under chapter 7 of the United States Code in the United States Bankruptcy Court for the District of Connecticut. On April 16, 2014, the bankruptcy court, Dabrowski, J., issued a discharge of debtor order pursuant to 11 U.S.C. § 727. The plaintiff subsequently filed a motion to open judgment and reset the law days on August 22, 2014. This motion was granted by the court, *Vacchelli, J.,* on September 22, 2014. The court did not file a memorandum of decision with either the initial September 16, 2013 judgment of strict foreclosure or the September 22, 2014 order opening the judgment and setting new law days, and no transcript of any proceedings before the trial court was filed with this court. This appeal followed.

On appeal, the defendant challenges the plaintiff's standing to bring the present foreclosure action. Specifically, the defendant claims that the plaintiff did not own or hold the subject note when it filed the foreclosure complaint, and that the defendant's mortgage lien — which the defendant claims is invalid — did not survive the bankruptcy proceedings. The plaintiff responds that the record is inadequate for review. The plaintiff further argues that because it alleged that it was the holder of the note, and because the defendant failed to plead and was defaulted, the defendant has admitted these crucial jurisdictional allegations and cannot challenge them on appeal.

"We begin our analysis with the subject matter jurisdiction claim and the applicable standard of review.... Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it.... [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction.... [T]his court has often stated that the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, at any time." (Citations omitted; internal quotation marks omitted.) *Peters v. Dept. of Social Services,* 273 Conn. 434, 441-42, 870 A.2d 448 (2005). "A court does not have subject matter jurisdiction to hear a matter unless the plaintiff has standing to bring the action." *Western Boot & Clothing Co. v. L'Enfance Magique, Inc.,* 81 Conn.App. 486, 488, 840 · 1280 A.2d 574, cert. denied, 269 Conn. 903, 852 A.2d 737 (2004).

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy.... [When] a party is found to lack standing, the court is consequently without subject matter jurisdiction to determine the cause.... We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary.... In addition, because standing implicates the court's subject matter jurisdiction, the issue of standing is not subject to waiver and may be raised at any time." (Citations omitted; internal quotation marks omitted.) *Equity One, Inc. v. Shivers,* 310 Conn. 119, 125-26, 74 A.3d 1225 (2013).

It is well established that "the holder of a note has standing to bring an action for strict foreclosure...." *Mengwall v. Rutkowski,* 152 Conn.App. 459, 463, 102 A.3d 710 (2014); see also *Fleet National Bank v. Nazareth,* 75 Conn.App. 791, 794-95, 818 A.2d 69 (2003) (plaintiff who held mortgage but not note lacked standing to institute foreclosure proceedings). "[A] holder of a note is presumed to be the owner of the debt,

and unless the presumption is rebutted, may foreclose the mortgage under [General Statutes] § 49-17. The possession by the bearer of a note [e]ndorsed in blank imports prima facie that he acquired the note in good faith for value and in the course of business, before maturity and without notice of any circumstances impeaching its validity. The production of the note establishes his case prima facie against the makers and he may rest there." (Internal quotation marks omitted.) *Equity One, Inc. v. Shivers*, supra, 310 Conn. at 135, 74 A.3d 1225.

If the plaintiff did not hold the note at the time it commenced this action, then it would have lacked standing and the case must be dismissed. The key question for us to resolve, therefore, is when the note came into the plaintiff's possession. We cannot answer this question for two reasons. First, after a thorough review of the record, we conclude that it contains no documents demonstrating when the plaintiff came to hold or own the note. The only note in the record before us is the fixed-rate balloon note. This note is payable to the original lender, New Century Mortgage Company, and contains no endorsement. Although the record contains documents memorializing the assignment of the mortgage from MERS to the plaintiff, there are no assignment documents with respect to the note. Thus, the record provides no clues as to when, if ever, the plaintiff acquired the note. Second, the trial court made no factual finding as to when the plaintiff acquired the note. No memorandum of decision accompanies the court's judgment of strict foreclosure or order on the plaintiff's motion to open judgment and reset the law days.[5] Additionally, no transcript of any hearing in which the court might have made such a finding has been provided for our review. At oral argument before this court, the plaintiff's counsel asserted that in order to be entitled to a judgment of strict foreclosure, the note would have had to have been presented to the trial court and, therefore, the note must have been presented in the *1281 present case. We have no evidence before us that this occurred. Because the record lacks a crucial jurisdictional finding by the trial court, and further contains no evidence of when the plaintiff acquired the note, we cannot review whether the plaintiff lacked standing to commence this action.

This court's holding in *Deutsche Bank National Trust Co. v. Bialobrzeski*, 123 Conn.App. 791, 3 A.3d 183 (2010), is instructive to our analysis. The plaintiff in that case brought an action against the self-represented defendant to foreclose a mortgage on real property in New Britain. The plaintiff filed a motion for default for failure to plead, which was granted by the clerk. Id., at 792-93, 3 A.3d 183. The defendant subsequently answered, leaving the plaintiff to its proof with respect to its allegation that it was the holder of the note and mortgage. Id., at 793 and n. 2, 3 A.3d 183. As a result of the defendant's answer, the court opened the default. Id., at 793, 3 A.3d 183.

The plaintiff in *Bialobrzeski* subsequently filed an unopposed motion for summary judgment, which was granted as to liability only. Id. Among the documents submitted by the plaintiff in support of its motion for summary judgment was a fixed-adjustable rate note, which was payable to the original lender, Long Beach Mortgage Company. Id., at 793 n. 3, 3 A.3d 183. This note *was not endorsed*. Id. Subsequently, the defendant filed a motion to dismiss, arguing that the note contained no endorsement and no date. Id., at 796, 3 A.3d 183. The trial court denied the defendant's motion to dismiss. Id., at 794, 3 A.3d 183.

On appeal, the defendant in *Bialobrzeski* claimed that the plaintiff was not in possession of the subject note at the time the action was commenced. Id., at 792, 3 A.3d 183. This court noted that "[t]he key to resolving the defendant's claim is a determination of when the note came into the plaintiff's possession." Id., at 797, 3 A.3d 183. Ultimately, this court held that "[w]e cannot review the claim because [the trial court] made no factual

finding as to when the plaintiff acquired the note. Without that factual determination, we are unable to say whether [the trial court] improperly denied the defendant's motion to dismiss." Id., at 797-98, 3 A.3d 183. Noting that "appellate courts do not make findings of fact"; id., at 800, 3 A.3d 183; this court ruled that "[w]hen the question regarding the plaintiff's standing was raised, the [trial] court should have held a hearing to determine whether the plaintiff was the owner or holder of the note at the time the action was commenced." Id., at 799-800, 3 A.3d 183.

The record in the present case is likewise devoid of an endorsed note and a factual finding by the trial court concerning if and when the plaintiff acquired the note. The plaintiff nevertheless argues that the defendant cannot challenge the plaintiff's standing because the defendant failed to set aside the default judgment. In the plaintiff's view, because it alleged that it held the note, and because a default judgment was rendered in its favor, its status as holder of the note has been conclusively established and cannot be challenged by the defendant on appeal. We disagree. "A default admits the material facts that constitute a cause of action... and entry of default, when appropriately made, *conclusively determines the liability of a defendant*." (Emphasis altered; internal quotation marks omitted.) *Whitaker v. Taylor*, 99 Conn.App. 719, 725, 916 A.2d 834 (2007). Although it is established that entry of default conclusively establishes the *liability* of a defendant, the plaintiff offers no authority to support its position that entry of default conclusively establishes the *subject matter jurisdiction* *1282 of the court. Moreover, we disagree with this position because it essentially posits that a party can waive a subject matter jurisdiction challenge by virtue of a pleading deficiency, namely, a failure to reply to jurisdictional allegations during the pleading stage. This is wholly unsupportable because "[a] subject matter jurisdictional defect may not be waived ... [or jurisdiction] conferred by the parties, explicitly or implicitly." (Internal quotation marks omitted.) *Kleen Energy Systems, LLC v. Commissioner of Energy & Environmental Protection*, 319 Conn. 367, 380-81, 125 A.3d 905 (2015).

Additionally, we reject the plaintiff's argument that an inadequate record precludes our review of its standing. "The duty to provide this court with a record adequate for review rests with the appellant.... It is incumbent upon the appellant to take the necessary steps to sustain its burden of providing an adequate record for appellate review. Practice Book § [60-5].... It is not the function of this court to find facts.... Our role is ... to review claims based on a complete factual record developed by a trial court.... Without the necessary factual and legal conclusions furnished by the trial court ... any decision made by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.) *Macricostas v. Kovacs*, 67 Conn.App. 130, 133, 787 A.2d 64 (2001). Even if we were to accept that the record is inadequate, we are not foreclosed from considering the standing issue. To begin with, although it is indeed the burden of the defendant, as the appellant, to provide an adequate record for review, it is "[t]he plaintiff [who] bears the burden of proving subject matter jurisdiction, whenever and however raised." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. New London*, 265 Conn. 423, 430 n. 12, 829 A.2d 801 (2003). In *Bialobrzeski*, a case with similar facts and circumstances, this court held that "[a]lthough it is the appellant's responsibility to provide an adequate record for review; see Practice Book §§ 60-5 and 61-10; that cannot be the end of the matter because [whether a bank acquired a note before the commencement of a foreclosure action] concerns the trial court's subject matter jurisdiction." *Deutsche Bank National Trust Co. v. Bialobrzeski*, supra, 123 Conn.App. at 798, 3 A.3d 183. On the basis of the foregoing analysis, we, like the court in *Bialobrzeski*, are unable to review the defendant's subject matter jurisdiction claim.

DEUTSCHE BANK NAT. TRUST CO. v. Thompson, 136 A. 3d 1277 – Conn: Appellate Court 2024 - Google Scholar                                      3/21/17 1:44 PM

The judgment is reversed and the case is remanded for a determination of the jurisdictional issue and for further proceedings according to law.

In this opinion the other judges concurred.

[1] Also named as a defendant in this action was Mortgage Electronic Registration Systems, Inc., but it did not participate in this appeal. We refer to Thompson as the defendant.

[2] The trial court granted the plaintiff's motion to substitute Deutsche Bank National Trust Company as Trustee for the Registered Holders of Morgan Stanley ABS Capital I, Inc., Trust 2007-NC4 Mortgage Pass-Through Certificates, Series 2007-NC4, as the party plaintiff. We refer to the substitute plaintiff as the plaintiff in this opinion.

[3] The defendant raised a number of additional claims on appeal, including claims that the mortgage was discharged in bankruptcy and that his due process rights were violated. Because we conclude that we are unable to review the defendant's subject matter jurisdiction claim, we do not address these additional claims.

[4] Although the plaintiff alleged that it was the holder of the mortgage as of the filing of the complaint in March, 2009, the assignment of mortgage between it and MERS is dated June 24, 2009. At oral argument before this court, the plaintiff's counsel conceded that the mortgage had not been assigned to the plaintiff until after the complaint was filed.

[5] The court made a number of factual findings in granting the motion to open judgment and reset the law days, such as the balance of the debt and the property's fair market value, but none concerning the plaintiff's status as holder of the note.

Save trees - read court opinions online on Google Scholar.

# EXHIBIT "S"

IN THE CIRCUIT COURT
OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR LAKE COUNTY, FLORIDA

CASE NO.: 2009-CA 005717

**ORIGINAL**

JP MORGAN CHASE BANK, NA
As successor in Interest to
WASHINGTON MUTUAL BANK,

       Plaintiff,

vs.

                           VOLUME I
                        Pages 1-101

SHERONE D. WAISOME, et al.,

       Defendants.


VIDEOTAPED DEPOSITION OF:  CYNTHIA A. RILEY
Taken on behalf of Defendant, Waisome

DATE:              Monday, August 29, 2011

TIME:              1:25 p.m. - 6:23

LOCATION:          Belton Bail Bonds
                   525 West Main Street
                   Tavares, Florida 32778

REPORTER:          Jennifer Little
                   Court Reporter

The quality of this image is
equivalent to the quality of the
document filed in this office.

CLERK OF CIRCUIT
AND COUNTY COURT
LAKE COUNTY
TAVARES, FLORIDA
2011 DEC -8 PM 12: 03

CAB REPORTING, INC.
Post Office Box 1684
Ocala, Florida 34478
(352) 401-0080

Case: 2009 CA 005717

```
 1              A P P E A R A N C E S

 2

 3         RACHAEL CREWS, Esquire
           Gray Robinson, P.A.
           301 East Pine Street, Suite 1400
 4         Orlando, Florida 32801
           (407)843-8880
 5         rcrews@gray-robinson.com

 6              On behalf of the Plaintiff

 7

 8         DANIEL E. TRAVER, Esquire
           Gray Robinson, P.A.
           301 East Pine Street, Suite 1400
 9         Orlando, Florida 32801
           (407)843-8880
10         dtraver@gray-robinson.com

11              On behalf of the Defendant, Gray Robinson

12

13         JACQULYN MACK, Esquire
           Mack Law Firm
           2022 Placida Road
14         Englewood, Florida 34224
           (941)475-7966
15         jacqulyn@macklawfirm.org

16              On behalf of Mr. Waisome

17

18         ALSO PRESENT:
           Greg W. Waugh, CCVS, videographer
19         Nye Lavalle
           Sherone Waisome
20

21              *    *    *    *    *    *

22

23

24

25
```

1              I N D E X

2   TESTIMONY OF CYNTHIA A. RILEY                  PAGE

3   Direct Examination by Ms. Mack.....................5

4   Reporter's Certificate (Volume I)................101

5

6

7               *    *    *    *    *    *

8
          E X H I B I T S
9   DEFENDANT'S EXHIBITS                            PAGE

10  No. A.............................................34
    No. B.............................................34
11

12

13

14
               *    *    *    *    *    *
15
          S T I P U L A T I O N S
16

17      It is hereby agreed and so stipulated by

18  and between the parties hereto, through their

19  respective counsel, that the reading and signing of the

20  transcript be waived by the Deponent.

21

22

23

24

25

JPMorgan Chase Bank et al vs Sherone D. Waisome                              114

```
 1    to be.  It's a think tank.

 2         Q.   Like a plan for the future?

 3         A.   Very much so.

 4         Q.   Okay.  Okay.  Do you recall back in -- would

 5    this have been in your vice president role or your

 6    assistant vice president role?

 7         A.   That would be more Stockton-related,

 8    assistant VP.

 9         Q.   All right.  Do you remember what the

10    initiative was?  Was there one or more?

11         A.   A number of them.

12         Q.   Okay.  Could you give me, like, an example.

13         A.   Yes.  We bought Bank United, Long Beach, PNC.

14    All of those were integrations to the bank.  I was on

15    those teams that integrated the companies.

16         Q.   Okay.  But Bank United, you mean the one in

17    Coral Gables?

18         A.   I don't know where they were.  It was Texas,

19    as I remember.  The mortgage side of the business, it

20    was Texas.

21         Q.   Okay.  All right.  I think we're going up to

22    product manager senior, vice president strategic

23    planning and integrations default, that's your next

24    entry here on your resumé from 11/2006 to 2/2008.

25         A.   Okay.
```

JPMorgan Chase Bank et al vs Sherone D. Waisome                    115

```
 1        Q.    Was that a promotion?

 2        A.    It was a -- I project-managed certain

 3   projects -- well, obviously, project manager.

 4        Q.    Okay.  So I mean, did you get, like, a raise

 5   and...

 6        A.    No.

 7        Q.    Okay.  Did your salary stay consistent

 8   throughout the transfer through -- I keep forgetting

 9   the old bank's name -- American Savings Bank?

10        A.    No.  We all make more money as we go along.

11        Q.    So you were getting promotions?

12        A.    There were promotions in there, certainly.

13        Q.    And raises?

14        A.    Yes.  AVP to VP is a promotion and a raise,

15   yes.

16        Q.    Okay.  What type of raise are we talking

17   about, you know, $5.00 an hour to $10.00 an hour?  I

18   mean...

19        A.    I would have no idea.

20        Q.    Okay.  Were you --

21        A.    I'm salaried.

22        Q.    Okay.  All right.  Do you remember what your

23   salary was?

24        A.    No.

25        Q.    Okay.  So you had a fixed salary.  Would you
```

1        A.    Not part of our department.

2   BY MS. MACK:

3        Q.    Okay.  Were the notes supposed to be endorsed

4   by somebody other than the maker of the note?

5        A.    The endorsement is done on every note.

6        Q.    Do you know when that's done?

7        A.    As soon as it's received in the collateral

8   note review group.  It's received in the collateral

9   note review group within a very short time of the

10  borrower signing it.  I say it that way, because the

11  borrower signs it, it was supposed to be sent within 24

12  hours.

13       Q.    Okay.

14       A.    So it would hit the collateral note review in

15  that period of time.

16       Q.    Okay.  And it would be endorsed?

17       A.    It would be reviewed and endorsed.

18       Q.    Okay.  Would you do the reviewing?

19       A.    No, I would not.  I had a team of note

20  review.

21       Q.    Would you do any endorsing?

22       A.    I would not.

23       Q.    Okay.  Would your team do the endorsing?

24       A.    Yes, they would.

25       Q.    Would they use their name?

849 CLOUDBERRY BRANCH WAY • JACKSONVILLE, FLORIDA  32259
HOME PHONE: 904 230-2624 CELL PHONE 904 710-2611
E-MAIL: RILEYCYNTHIA@BELLSOUTH.NET

# CYNTHIA A. RILEY

## SUMMARY

Experienced mortgage loan employee of 20 years with accomplishments in multiple departments and functions of Servicing.  Skilled in project management, problem evaluation and resolution, strong communication, business knowledge, coordinating with diverse groups to execute projects, process analysis and improvement. Computer skills include Microsoft Outlook, Word, Excel, PowerPoint, Visio and Project.

## EDUCATION

University of Colorado, Colorado Springs
*Bachelors of Science, Major: Business Administration, Minor: Mineral Land Management*

## EMPLOYMENT

**JP Morgan Chase**
*Operations Manager, External Reporting (Default)*
*3/2008 to Present*

- Manage a team of Business Analysts generating monthly reporting to OCC, Fair Lending and Moody's. Generate responses to various audit requests including Fitch and S&P.
- Analyze and develop data requirements and source to target data mapping.
- Collaborate with management and staff in the development and implementation of projects.
- Ensured accuracy and consistency in the data supplied through analysis of other available data or generation of validation reports.
- Identify criteria and develop ad hoc reports in response to external inquires i.e. FHLMC, FNMA, MI companies.

**Washington Mutual Bank**
*Product Manager Sr., Vice-President Strategic Planning and Integrations (Default)*
*11/2006 to 2/2008*

- Provided project management skills in support of various bank initiatives including Credit and Subpoena Migration to Jacksonville, FL and the Custodial Operations Transition to Florence, SC. Support provided included project plans, action items, minutes and coordination of team tasks all driving towards a successful and timely completion.
- Responsible for the operational readiness of the HELOC loans on Fidelity project for the National Post Closing Operations.  Readiness preparation included development of Operating Instructions, determining business requirements and creation of system enhancement documentation as needed.
- New Product Response Team (NPRT) coordinator for Home Loans.  Evaluated proposed new product documentation looking for impacts to servicing processes or systems.  Provided weekly communication to the NPRT members for Loan Service.

*Process Manager – Vice President 6/2004 to 11/2006*
*Loan Servicing Manager – Assistant Vice President 1/2001 - 6/2004*
*Secondary Delivery Operations*

Exhibit A
WNS Riley
8/29/11

- Managed Collateral Note Review, Agency Delivery, Private Loan Delivery and Unsalable Loan Teams.
- Performed service transfer activities including coordination between seller, servicer and investor. Performed general ledger reconciliation, collateral and base file review, document exception curing and contract negotiation.
- Performed process analysis, and implemented change resulting in an 81% decrease in problem loans entering the queues and reduced the unsalable rate from 182% over goal to 43% under goal.
- Evaluated data generated from internal reports to determine the root cause of production concerns and implemented change to correct as needed.
- Authored operating instructions and job aides for various teams.
- Participated as a project team member in the implementation of enterprise wide projects including Z-State initiatives and Full File Imaging.

### *Financial Analyst, Purchase Servicing Department*
### *4/1994 to 1/2001*

- Provided project management support for the integration of newly acquired companies. Departments represented in this role included Secondary Delivery Operations, Lien Release and Records Management.
- Coordinated the activities affecting Loan Service departments resulting from the purchase of servicing rights and subsequent transfer of loans. Activities including, due diligence reviews, service transfer contract requirements, data mapping, loan boarding, general ledger reconciliation and transfer of collateral and base files.

### *Supervisor, Customer Service/Tax/Insurance Departments*
### *2/1990 to 4/1994*

- Responsible for the review, disbursement, research and invoicing of taxes and force order insurance (flood and hazard).
- Implemented Lereta Corp flood determination process
- Managed staff within a high paced call center to include escalated customer call handling, monitoring of customer service performance levels and training.

### SPECIAL TRAINING/DEVELOPMENT

Corporate Project Methodology Certified
Institute of Financial Education: Real Estate Law, Supervisory Management, Mortgage Lending and Financial Accounting

### REFERENCES

Upon Request

Page 1

1        IN THE CIRCUIT COURT, 11TH JUDICIAL CIRCUIT
           IN AND FOR MIAMI-DADE COUNTY, FLORIDA

2

3             CASE NO.:  09-29997 CA (11)

4

JP MORGAN CHASE BANK, N.A.,

5

       Plaintiff,

6

vs.

7

EDUARDO OROZCO, et al.,

8

       Defendants.

9  _____

10

                DEPOSITION OF
11                CINDY RILEY

12

13

      DATE TAKEN:     January 15, 2013

14

      TIME:          10:00 a.m. – 12:23 p.m.

15

      PLACE:         345 East Forsyth Street
16                     Jacksonville, Florida  32202

17

18

19      Examination of the witness taken before:

20

         Samantha Cordova, FPR, Notary Public
21        Hedquist & Associates Reporters, Inc.
             345 East Forsyth Street
22         Jacksonville, Florida  32202

23

24

25

        Hedquist & Associates Reporters, Inc.

Page 36

1       Q      When you say you were promoted, can you tell me

2    what part of the promotion was?  I mean, was it title?

3    Was it money?

4            MR. WEISS:  Object to the form of the question.

5            Objection on privacy grounds.

6            MR. SCHWARTZ:  Privacy.  Proprietary

7            information.  Confidential.  Go ahead.

8       A      I was promoted to a vice president and became

9    the department manager for secondary delivery operations

10   in Jacksonville, Florida.

11   BY MR. WRUBEL:

12      Q      And when did this promotion become effective?

13      A      Effective date I don't know.

14      Q      Okay.  Do you know if it was while you're still

15   in Stockton, California, or Jacksonville?

16      A      I was making a transition between January and

17   June of 2004.  I was offered that job, travelled back

18   and forth, and moved here in June 2004.

19      Q      And would June of 2004 or couple months before

20   then be the first time that you were ever a vice

21   president with the bank?

22      A      Correct.

23      Q      Are you still a vice president with the bank?

24      A      I am not.

25      Q      When did you cease being a vice president with

1    the bank?

2        A    2008.

3        Q    Do you know what month?

4        A    January I would guess.

5             MR. SCHWARTZ:  Don't guess.

6        A    January 2008.

7        Q    As a vice president did you have greater

8    authority than you had before they made you vice

9    president?

10            MR. WEISS:  Object to the form of the question.

11       Vague and ambiguous.

12            MR. SCHWARTZ:  Join.

13   BY MR. WRUBEL:

14       Q    You can answer.

15       A    I was managing a department as a vice president

16   versus leading a team.  Responsibilities were different.

17       Q    Okay.  Briefly can you tell me what the

18   difference is between managing a team and leading a

19   team?

20       A    Managing a department and leading a team?

21       Q    Yes, please.

22       A    The team is one piece of the department.  The

23   department encompassed other responsibilities --

24       Q    Okay.

25       A    -- than my responsibility in note review as it

1    was as a team leader.

2       Q    Okay.  I recognize that it may vary.  But when

3    you're managing a department, approximately how many

4    employees would be under your supervision?

5            MR. WEISS:  Object to the form of the question.

6       Vague and ambiguous.

7            MR. SCHWARTZ:  Overly broad as to what time

8       we're talking about.

9       A    Thirty -- thirty to forty people.

10   BY MR. WRUBEL:

11      Q    Okay.  Did you manage any other departments

12   besides secondary delivery?

13      A    No.

14      Q    Okay.  And how long did you manage secondary

15   delivery for?

16      A    Till 11 of 2006.

17      Q    And I take it you're saying you managed

18   secondary delivery approximately from June of 2004 to

19   November of 2006?

20      A    Correct.

21      Q    And during that period of time you had

22   approximately 30 to 40 employees under your supervision?

23      A    Yes.

24      Q    And tell us please what is secondary delivery?

25      A    Secondary delivery operations, it was the name

1    was in Stockton or Vernon Hills I can't speak to that.

2         Q    Okay.  Did you ship to any other custodians in

3    any locations other than Vernon Hills and Stockton?

4              MR. SCHWARTZ:  Asked and answered.  Form.  Go

5         ahead.

6         A    I just don't know at what time frames we were

7    shipping to some place other than those two.

8         Q    Okay.  Did there come a point in time that you

9    shipped to Florence, South Carolina?

10        A    When the vault was built -- I don't know if

11   that -- I can't answer that.

12             MR. SCHWARTZ:  If you don't know, say you don't

13        know.

14        A    I left the department.

15        Q    Okay.  When did you leave the department?

16        A    In November of 2006.

17             MR. SCHWARTZ:  You need a break?

18             THE WITNESS:  I think that would be nice if we

19        did.

20             MR. SCHWARTZ:  You mind if she takes a break?

21             MR. WRUBEL:  No.

22             (Break taken.)

23   BY MR. WRUBEL:

24        Q    You've indicated that it was your team that did

25   the endorsements of the stamps in Jacksonville.  Did you

Page 58

1    yourself ever endorse any of the notes?

2        A    No.

3        Q    Never?

4        A    I never put an endorsement stamp on the notes.

5        Q    Okay.  How many notes a day were coming into

6    the Jacksonville area, if you know, approximately?

7        A    2- to 3,000.

8        Q    Assuming you only had 10, not 12, just if we

9    can get through the question, am I correct then that

10   your team would be each reviewing approximately 200 to

11   300 notes a day?

12            MR. SCHWARTZ:  Form.  Speculating.  Go ahead.

13       A    That sounds reasonable.

14       Q    And they would be checking the notes and the

15   data for the loans -- strike that.

16            Each individual that was on the team would be

17   checking the notes as well as the data with regards to

18   the loans approximately 2- to 300 a day?

19       A    They compared the data -- certain data on the

20   note to what was on the system.

21       Q    Would they be comparing any other data besides

22   the data on the note to the system when they would go

23   through the system?

24       A    Other data like what?

25       Q    Information from the mortgage perhaps.

# EXHIBIT "T"

Washington Mutual
Mailstop JAXA2031
P.O. Box 44090
Jacksonville, FL 32231-4090



7100 4047 5100 5023 8171

February 14, 2008


**Washington Mutual**
HOME LOANS

000C36

RICHARD HOLT
23 RIDGEWOOD RD
NORWALK CT 06853

WE ARE A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT, AND
ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

## NOTICE OF COLLECTION ACTIVITY

RE: ▉▉60590 3
23   Ridgewood Dr.
Norwalk CT 06853

Dear Borrower:

The records of Washington Mutual Bank indicate that as of the date of this letter, you have failed to make the
required monthly payments under the terms of your Note ("Note") and related Mortgage or Deed of Trust,
whichever is applicable ("Security Instrument") since 09/01/2005. The total amount presently due and owing
("Total Amount Due") consists of the following:

| | |
|---|---|
| Principal & Interest Payment:$ | 53914.80 |
| Escrow: | 23136.30 |
| Accumulated Unpaid Late Charges: | 2812.64 |
| Outstanding Fees Total: | 115.70 |
| Corporate Advance: | 0.00 |
| Credits: | 0.00 |
| Total Amount Due:$ | 122197.31 |

The terms of the Note and Security Instrument require you to pay each monthly payment and any related late
charge and other fees when due. This correspondence will serve to notify you that you are in default under the
terms of your Note and Security Instrument because of your failure to pay the above mentioned Monthly
Payments, related late charges and fees when due.

You may cure this default within thirty (30) days from the date of this letter by paying to Washington Mutual
Bank the total amount due plus any additional monthly payments and late charges falling due within this thirty day
period. Failure to cure such default within the 30-day period will result in Washington Mutual declaring the entire
outstanding principal balance, accrued interest and any other fees and charges due under the terms of the Note and
Security Instrument to be immediately due ("Acceleration"). If this amount is not immediately paid at such time,
Washington Mutual may exercise its remedies available under the terms of the Note and Security Instrument and
applicable law, including the commencement of foreclosure proceedings which may result in the sale of your
property.

After acceleration, you will have the right to assert any grounds you may have to prove the non-existence of a
default. You may also reinstate your loan. In addition, you will have the right in any related foreclosure
proceedings to assert any defense to acceleration, the foreclosure litigation and, if applicable, the eventual sale of
your property pursuant to a court order or trustee power of sale.

We may report information about your account to credit bureaus. Late payments, missed payments or other
defaults on your account may be reflected in your credit report.

Please contact our office immediately to discuss your account status. Our toll free number is 1-866-926-8937.

Sincerely,

Collection Department

CO823

15-22704-rdd   Claim 3-1 Part 2   Filed 09/17/15   Pg 24 of 37

VOL 8085 PG 88
RECORDED 11/18/2014  01:47:20 PM
RICHARD A. McQUAID
TOWN CLERK NORWALK CT

After Recordation Return To:
JPMorgan Chase Bank, NA
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, THE FEDERAL DEPOSIT INSURANCE CORPORATION, A CORPORATION ORGANIZED AND EXISTING UNDER AN ACT OF CONGRESS (FDIC), WHOSE ADDRESS IS 1601 BRYAN STREET, DALLAS, TX 75201, AND ACTING IN ITS RECEIVERSHIP CAPACITY AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA (ASSIGNOR) by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8300, MONROE, LA 71203 (800)756-8747, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Mortgage bearing the date 03/22/2000, made by RICHARD HOLT to WASHINGTON MUTUAL BANK, FA, and recorded in the Land Records of the Town of NORWALK, State of Connecticut, in Volume 3876, at Page 250, to which reference may be had.

This Assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver.

This Assignment is intended to further memorialize the transfer that occurred by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. 51821 (d)(2)(G)(i)(II).

IN WITNESS WHEREOF, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, AS ATTORNEY IN FACT FOR THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA has hereunto set its hand on _11_/_01_/_2014_ (MM/DD/YYYY).

By: _____
Jelica Alex
Vice President

Signed and Delivered in the presence of:

_____ Witness

_____ Witness

STATE OF LOUISIANA   PARISH OF OUACHITA
On _11_/_01_/_2014_ (MM/DD/YYYY), before me appeared Jelica Alex, to me personally known, who did say that he/she/they is/are the Vice President of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, AS ATTORNEY IN FACT FOR THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_____
Eva Reese
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

EVA REESE
OUACHITA PARISH LOUISIANA
LIFETIME COMMISSION
NOTARY ID# 17070

Document Prepared By: Jelica Alex , JPMorgan Chase Bank, N.A., 780 Kansas Lane, Suite A, Monroe, LA, 71203



**FEDERAL DEPOSIT
INSURANCE CORPORATION
INSURING AMERICA'S FUTURE**

# Privacy Threshold Analysis (PTA)
# and/or Privacy Impact Assessment (PIA)

## for

## Title Search and Reporting Services

## Nationwide Title Clearing

## (RECVR-10-G-0255)



**Date Approved by Chief Privacy Officer (CPO)/Designee:** 3/26/2015

**FDIC/ISPS Privacy Program Reviewer**
Serenity Edwards
703.516.5448

**FDIC Divisional Information Security Manager or Designee**
Edward Collins
Division of Resolutions and Receiverships (DRR)
703.516.5765

**PTA/PIA TEMPLATE VERSION 1.5 – July 2014**

## CONTACT INFORMATION AND BACKGROUND

| Check applicable box(es)<br>☒ PTA<br>☒ PIA | Date Submitted to Privacy Mailbox (privacy@fdic.gov)<br>03.04.2015 | Date Contract Awarded<br><br>12.20.2010 | Dates of Performance Period | |
|---|---|---|---|---|
| | | | **From**<br>12.20.2010 | **To**<br>12.19.2015 |

| Agency<br><br>FDIC | Outsourced Provider (Vendor) Name(s)<br><br>Nationwide Title Clearing | Contract Number(s)<br><br>RECVR-10-G-0255 |
|---|---|---|

| Outsourced Service Name (Include Acronym)<br>Nationwide Title Clearing (Nationwide) | Sponsoring FDIC Division or Office<br>Division of Resolutions and Receiverships (DRR) |
|---|---|
| **Information Security Manager**<br><br>Name:     Edward Collins<br>Title:      Information Security Manager<br>Division:  DRR<br>Telephone: 703.516.5765 | **Division Program Manager or Subject Matter Expert (SME)**<br><br>Name:     Jim Wooley<br>Title:      R&R Specialist, ORE<br>Division:  DRR<br>Telephone: 972.761.4266 |
| **Contracting Officer**<br><br>Name:     Rochelle Nagel<br>Title:      Contract Specialist<br>Division:  Division of Administration (DOA)<br>Telephone: 972.761.2116 | **Oversight Manager (or Designee)**<br><br>Name:     Doug McCafferty<br>Title:      R&R Specialist<br>Division:  DRR<br>Telephone: 972.761.8254 |

**Outsourced Information Service Provider Platform Information** *(Check all applicable boxes.)*:

☒ Vendor System *(Data resides on the Provider/Vendor system.)*

☒ Non-Web *(Data resides in Vendor system/application that does not interface with the Web.)*

☒ Web-Based *(Specify type:* ☒ Internet ☐ Intranet ☐ Extranet*)*

       **Does the website use Persistent Tracking Technology?**

       ☒ No

       ☐ Yes *(If yes, complete and attach farm FDIC 1300/25, Request for Persistent Cookie, if applicable.)*

       ☐ Not Applicable (N/A) *(This is not an Internet or Extranet website.)*

☐ Other *(Specify: _____ )*

**Additional Points of Contact (Specify any additional POCs, such as Technical Monitors, Project Manager (if applicable), Subject Matter Experts, etc.):**

| POC's Name:     Angela Fichue<br>Title:       R&R Specialist<br>Division:    DRR<br>Telephone Number: 972.761.8598 | POC's Name:     Michael Capener<br>Title:       R&R Specialist<br>Division:    DRR<br>Telephone Number: 972.S60.1020 |
|---|---|
| POC's Name:<br>Title:<br>Division:<br>Telephone Number: | POC's Name:<br>Title:<br>Division:<br>Telephone Number: |

3

## SECTION I – OUTSOURCED INFORMATION SERVICE DESCRIPTION

### 1. Describe the outsourced service and its purpose.

The Federal Deposit Insurance Corporation (FDIC) maintains stability and public confidence in the nation's financial system by insuring deposits, examining and supervising financial institutions, and managing receiverships. The primary objective of the FDIC as receiver is to maximize the value of failing and/or failed insured depository institutions and their assets.

The FDIC Division of Resolutions and Receiverships (DRR) utilizes the services of Nationwide Title Clearing (Nationwide) to provide nationwide title searches and ownership reports for potential sale, marketing and/or auctions of loan asset portfolios and Owned Real Estate (ORE) property of failing or failed institutions (FIs). These services are necessary in order to determine the existence and priority of a valid security interest in a particular asset, and to confirm the current condition of title prior to selling a particular real estate asset. Assets may include ORE properties and/or secured loan interests in single-family residential, commercial, or construction properties, along with other possible product types. These reports are generated for the Program Area ORE and Legal Department to determine ownership of assets (real properties and loans) in which the FDIC may have an ownership interest, thereby determining the course of action of disposition.

A title search[1] may be required on a "Full[2]," "Current Owner[3]," "Date Down[4]," or "Tax Update[5]" search basis. Once a title order for an asset is issued, Nationwide coordinates and facilitates the following services:

- Preparation of evidence of title through an examination or search, and generation of a historical summary in the form of a title report as permitted by local jurisdiction [e.g., a preliminary title report or title commitment (the "Report")]. As applicable, the Report lists any and all documents recorded in the public records in chronological order (newest to oldest) as are necessary, appropriate, or customary in the applicable jurisdiction within such title examination and abstract.

- Obtaining and updating chains of title[6] including a list of all instruments that create rights, interests, or burdens on the assets. (The title search covers a sufficient period of time for the title company to determine all owners of record, outstanding mortgages, liens, judgments or pending suits, outstanding tax claims, easements or rights of ways of any type, whether oil,

---

[1] A title search includes a full coverage search and limited coverage search; other types include non-insured reports and foreclosure guarantee search.

[2] A "Full" title search covers at least four (4) owners or sixty (60) years, whichever results in the greatest amount of time.

[3] A "Current Owner" search verifies the current owners vested on title in land records. It shows every open mortgage found, recorded involuntary liens or financial encumbrances that could affect the property (based on the current owner), shows if the property is being foreclosed upon in land records and the last assignment of record for any open mortgage.

[4] A "Date Down" search includes a search of the property records from current owner's date of vesting title to the present, including complete deed information: grantees, grantors, execution and recording dates, recording references and legal description as well as all open mortgages/deed of trust.

[5] A "Tax Status Update" search includes a tax search on a specific property address to determine the property tax status (if current or delinquent).

[6] A chain of title is the sequence of historical transfers of title to a property. The "chain" runs from the present owner back to the original owner of the property. In situations where documentation of ownership is important, it is often necessary to reconstruct the chain of title. To facilitate this, a record of title documents may be maintained by a registry office or civil law notary.

4

gas, or mineral interests have been severed, and identifying any exceptions that may cloud the title to the property interest being sold. Each full title search covers at least 4 owners or 60 years, whichever results in the greatest amount of time.)

Nationwide is provided with a list of properties with written authorization to perform a search that will include property addresses, legal descriptions, and/or the Assessor's Parcel Numbers (APNs) for each property that is searched.

These services provide the FDIC with a clear understanding of all real properties or loans which it may have assumed ownership interest, in order to better facilitate accurate and efficient disposition.

**2. Status of the Outsourced Information Service Provider:**
☐ Solicitation/On-Boarding (Pre-Award; or At/Around the Time of Contract Award)
☐ Initial Assessment/Due Diligence (Post-Award)
☒ Ongoing Monitoring of Contract (Post-Award)
☐ Sunset or Disposition of Contract (Post-Award; At or Near Contract Expiration)
☐ Other (*Explain*):

## SECTION II – DATA TYPE, SOURCES, AND USE

**3. Describe all information/data that will be collected, used, maintained or generated by the Outsourced Provider (Vendor) as part of the services provided under the contract. If no information/data is involved, select Not Applicable.**

The FDIC collects the full names, addresses, and APNs of property owners from FIs and transmits them to Nationwide to be used to generate ownership reports.

Nationwide uses this information to generate property ownership reports from public records and delivers them to the FDIC via their secure web portal, TrackingLINK.[7] The property ownership reports contain personally identifiable information (PII) such as the property owners' full names, addresses, and any legal documents or records that may be found when conducting a public records search.

**4. Describe the intended purpose and use of the above information/data. If no information/data is involved, select Not Applicable.**

The purpose of the title reports generated by Nationwide is to translate the public information into a format that can be more readily assessed by the FDIC to determine the Corporation's ownership interests in real properties and loans.

---

[7] TrackingLINK is the web services Secure Client Access portal on the Nationwide Title Clearing website. It is used to facilitate client interaction with Nationwide and provides clients the necessary status information, images, and tools to stay connected with Nationwide and the services being performed.

5

**5. What types of personally identifiable information (PII) are (or may be) included in the information specified above?** *(This is not intended to be an all-inclusive list. Specify other categories of PII, as needed.)*:

| PII Element | Yes | No |
|---|---|---|
| Full Name | ☒ | ☐ |
| Date of Birth | ☐ | ☒ |
| Place of Birth | ☐ | ☒ |
| Social Security Number | ☐ | ☒ |
| Employment Status, History or Information | ☐ | ☒ |
| Mother's Maiden Name | ☐ | ☒ |
| Certificates (e.g., birth, death, naturalization, marriage, etc.) | ☐ | ☒ |
| Medical Information (Medical Records Numbers, Medical Notes, or X-rays) | ☐ | ☒ |
| Home Address | ☒ | ☐ |
| Phone Number(s) (non-work) | ☐ | ☒ |
| Email Address (non-work) | ☐ | ☒ |
| Employee Identification Number (EIN) | ☐ | ☒ |
| Financial Information (e.g., checking account #/PINs/passwords, credit report, etc.) | ☐ | ☒ |
| Driver's License/State Identification Number | ☐ | ☒ |
| Vehicle Identifiers (e.g., license plates) | ☐ | ☒ |
| Legal Documents, Records, or Notes (e.g., divorce decree, criminal records, etc.) | ☒ | ☐ |
| Education Records | ☐ | ☒ |
| Criminal Information | ☐ | ☒ |
| Military Status and/or Records | ☐ | ☒ |
| Investigation Report or Database | ☐ | ☒ |
| Biometric Identifiers (e.g., fingerprint, voiceprint) | ☐ | ☒ |
| Photographic Identifiers (e.g., image, x-ray, video) | ☐ | ☒ |
| Other (Specify:  Assessor's Parcel Number (APN)) | ☒ | ☐ |

6

**6. What are the sources\* of data (both PII _and_ non-PII) for the outsourced service/project? How is the data derived?**

| Data Source[8]<br>(List all sources that the Outsourced Provider collects, obtains or receives data from, as part of the services provided under the contract.) | Type of Data Provided by Source & How It is Derived<br>(Describe the type of PII and non-PII data provided by each source. If PII is included in the data, list the specific PII elements, and explain how the PII is derived.) | Does Data Include PII? |
|---|---|---|
| FDIC/DRR Personnel | Authorized FDIC/DRR personnel collect the full names, addresses, and APNs of property owners from FIs and uploads this data into Nationwide's secure web portal, TrackingLINK. | ☒ Yes  ☐ No |
| Public Records | Nationwide uses the authority granted by the FDIC's written authorization to conduct public records searches of the properties and loans collected from a FI.  The information accessed and collected during these searches may include the property owners' full names, addresses, and any legal documents or records that may be retreived from the courts. | ☒ Yes  ☐ No |

**7. As part of the outsourced service/project, will FDIC or the Outsourced Service Provider retrieve data or records using a personal identifier (e.g., name, address, SSN, EIN, or other unique identifier)?**

☐ No

☒ Yes (**Explanation:** The outsourced vendor accesses information from public tax records using names, addresses, and property identification numbers/assessor's parcel numbers. These elements are used to properly identify the properties and loans being searched.)

☐ Not applicable

---

[8] Examples of potential data sources include, but are not limited to:  internal (FDIC) or external (non-FDIC) systems, websites, individual members of the public (e.g., customers, borrowers, etc.), FDIC employees, FDIC contractors, credit bureaus, commercial entities, public records, government agencies, etc.

7



### This completes the PTA.

➢ Do not complete the rest of the form, if the service provider is not processing or maintaining sensitive PII. This is the case, if you checked:

- NOT APPLICABLE for question 3 and NO for all items in question 5; OR
- Only Full Name in question 5.

➢ Continue completing the remainder of the form, i.e., Sections III thru VI in their entirety (questions 8 thru 16), if the service provider is processing or maintaining sensitive PII. This is the case, if you checked:

- YES for Social Security Number (SSN) in question 5; OR
- YES for SSN or for Full Name in addition to one or more boxes in question 5.

➢ If you have questions or are unsure about whether or not you should complete the remainder of this form, please contact your Division ISM or the Privacy Program Office (privacy@fdic.gov).

## SECTION III – DATA ACCESS AND SHARING

**8. In the table below, specify the systems/applications and parties (FDIC and non-FDIC) that the Outsourced Service Provider will share or provide PII data to as part of the outsourced service.** *(Check "No" or "Yes" for each category. For each category checked "Yes," specify who will have access to, be provided with, or maintain the PII, what PII elements will be accessed/shared/maintained by them, how the access or sharing will occur, and the purpose and use of this PII.)*

| PII Will Be Accessed By and/or Provided To: | Yes | No | If Yes, Explain How and Why the PII Will Be Accessed/Shared |
|---|---|---|---|
| **8a. FDIC Outsourced Service Provider (OSP) Staff; OSP Subcontractors; and/or OSP Systems** | ☒ | ☐ | The FDIC provides authorized Nationwide personnel with data derived from FIs in order to perform the title search services described in Section 1. This transfer of data occurs via the TrackingLINK secure web portal. The portal is hosted on Nationwide's servers and access control is provided by Nationwide to FDIC personnel/ Receivership Assistance Contractors (RACs), as well as to Nationwide staff conducting the title search services that access the application via HTTPS. |
| **8b. FDIC Personnel and/or FDIC Systems/ Applications** | ☒ | ☐ | The FDIC requires title reports on properties and loans from FIs to determine the ownership interest the FDIC may have. This information is uploaded into the TrackingLINK web portal by Nationwide and retrieved by authorized FDIC/DRR Asset Marketing & Management Department staff to assist in disposition of the assets in receivership. |
| **8c. Individual Members of the Public (e.g., bidders, investors, borrowers, customers, etc.)** | ☐ | ☒ | Not applicable. |
| **8d. Other Non-FDIC Entities/ Parties and/or Non-FDIC Systems/Applications** | ☐ | ☒ | Not applicable. |
| **8e. Federal, State, and/or Local Agencies** | ☐ | ☒ | Not applicable. |
| **8f. Other** | ☐ | ☒ | Not applicable. |

9

**9. If data will be provided to, shared with, or maintained by non-FDIC entities (such as government agencies, contractors, or Outsourced Information Service Providers), have any of the following agreements been issued?**

| Data Protection and/or Sharing Agreements | Yes | No |
|---|---|---|
| FDIC Confidentiality Agreement (Corporation) | ☒ | ☐ |
| FDIC Confidentiality Agreement (Individual) | ☒ | ☐ |
| Non-Disclosure Agreement (NDA) | ☒ | ☐ |
| Memoranda of Understanding (MOU) | ☐ | ☒ |
| Information Sharing Agreements (ISA) | ☐ | ☒ |
| Authentication Risk Assessment | ☐ | ☒ |
| Other Applicable Agreement(s) (Specify: _____ ) | ☐ | ☒ |

If you answered NO to any item above, please provide additional information if available:

Nationwide is an outsourced service provider and therefore is not subject to an MOU or ISA.

10

## SECTION IV – NOTICE AND CONSENT

**10. Do individuals have the opportunity to decline to provide information or to consent to particular uses of their information (other than required or authorized uses)?**

    ☒ No. Individuals do not have the opportunity to "opt out" of providing their data and/or consenting to particular uses of their information. **(Explanation:** The PII from property and loan owners of FIs is derived from bank records in FDIC receivership; individuals do not have an opportunity to opt out or provide consent for the use of the data for these purposes. The public records searches are performed with written authorization from the FDIC, which possesses the authority to conduct inquiries on assets in receivership.)

    ☐ Yes. Individuals have the opportunity to decline to provide their personal data or to consent to particular uses of their information.

    ☐ Not applicable. Information is not collected directly from individuals.

**11. If PII is being collected via a public-facing website and/or application as part of this outsourced service, has the Outsourced Information Service Provider posted any of the following types of privacy policies or Privacy Act notices?**

    ☐ No
    ☐ Yes *(If yes, check applicable box(es) below.)*
        ☐ Link to FDIC Privacy Policy
        ☐ FDIC Privacy Act Statement
        ☐ Contractor Privacy Policy or Statement
        ☐ No Privacy Policy has been posted
    ☒ Not applicable

## SECTION V – DATA SECURITY AND ACCURACY

**12. Please assert what administrative procedures and technical safeguards are in place to protect sensitive PII data in the Outsourced Information Service Provider's care.** *[Provide the name of the Outsourced Service Provider and check all applicable box(es).]*

    ☒ Nationwide Title Clearing will go through the security review required by the FDIC's Outsourced Information Service Provider Assessment Methodology to determine and/or verify their having appropriate physical, technical, and administrative security measures to safeguard FDIC-provided PII and other sensitive data. If it has gone through the Methodology, has it been approved?  ☐ NO  ☐ YES  ☒ IN PROGRESS

    ☒ The FDIC conducts background investigations (BIs) on key Nationwide Title Clearing personnel and other applicable personnel prior to their beginning work on the contract.

11

☒ Nationwide Title Clearing is subject to periodic compliance reviews by FDIC. Per the contract, scheduled and unannounced inspections and assessments of the Outsource Service Provider's facilities, personnel, hardware, software and its security and privacy practices by either the FDIC information technology staff, the FDIC Inspector General, or the U.S. General Accountability Office (GAO). These inspections may be conducted either by phone, electronically or in-person, on both a pre-award basis and throughout the term of the contract or task order, to ensure and verify compliance with FDIC IT security and privacy requirements.

☐ Other (Explain any other administrative and/or technical safeguards in place to protect PII data in the Outsourced Information Service Provider's care.) *Attach the **Contract Clause Verification Checklist** to the back of this form.*

**13. What are the procedure(s) for ensuring that the information maintained is accurate, complete and up-to-date?** *[Check all applicable box(es) and insert the appropriate response and System/Project name.]*

☒ Data is collected directly from individuals and/or from the failed financial institutions. As such, the FDIC and its vendors rely on the individuals and/or financial institutions to provide accurate data.

☐ The vendor/contractor works with FDIC to verify the integrity of the data [before, in conjunction with, and/or after] inputting it into the system or using it to support the project.

☒ As necessary, an authorized user of the Title Search and Reporting Service checks the data for completeness by reviewing the information, verifying whether or not certain documents or data is missing, and as feasible, updating this data when required.

☒ Other *(Explanation: The public records searches are conducted on assets that are actively in receivership with the FDIC.)*

**14. In terms of assuring proper use of the data, please assert whether the following statements are true for the Outsourced Information Service Provider. (***Check all applicable box(es) and insert the name of the Outsourced Information Service Provider and title of the firm's senior management official.)*

☒ Within FDIC, the Nationwide Title Clearing Program Manager/Data Owner, Technical Monitors, Oversight Manager, and DRR Information Security Manager (ISM) are collectively responsible for assuring proper use of the data. In addition, it is every FDIC user's responsibility to abide by FDIC data protection rules which are outlined in the FDIC's Information Security and Privacy Awareness training course which all employees take annually and certify that they will abide by the corporation's Rules of Behavior for data protection.

☒ Additionally, the Outsourced Information Service Provider is responsible for assuring proper use of the data. Policies and procedures have been established to delineate this

12

responsibility, and the vendor has designated the Nationwide Title Clearing Project Manager to have overall accountability for ensuring the proper handling of data by vendor personnel who have access to the data. All vendor personnel with access to the data are responsible for protecting privacy and abiding by the terms of their FDIC Confidentiality and Non-Disclosure Agreements, as well as the vendor's corporate policies for data protection. Access to certain data may be limited, depending on the nature and type of data. (Refer to Section III of this Privacy Impact Assessment for more information on data access criteria.)

☐ The Outsourced Provider must comply with the Incident Response and Incident Monitoring contractual requirement.

☐ None of the above. *(Explain why na FDIC staff or Outsourced Information Service Provider personnel hove been designoted responsibility for ossuring proper use of the data.)*

## SECTION VI – DATA RETENTION AND DISPOSAL

**15. Where will the Outsourced Service Provider store or maintain the PII data identified in question 5? Describe both electronic and physical storage repositories, as applicable.**

The servers used to host the TrackingLINK secure web portal are located in Nationwide's main office building. The data is maintained in Nationwide's TrackingLINK secure web portal. The portal itself is secured with username/password authentication and protected via SSL/SSH. This is the only repository for PII collected and generated by Nationwide for the execution of this contract.

**16. Specify the period of time that data is retained by the Outsourced Service Provider and the specific procedures for disposing of or returning the data at the end of the retention period or contract, whichever is first.**

Data is retained for a period of seven (7) years from the date of delivery in the absence of a specific retention schedule in the contract and is automatically and securely destroyed/deleted after the period has elapsed.

## SECTION VII – PRIVACY EVALUATION AND COMMENTS *(Completed by FDIC Privacy Program Office Staff Only)*

| Date Assigned to Reviewer: 03/12/15 | Name of Privacy Program Reviewer: S.Edwards | Date Review Completed: 03/13/15 |
|---|---|---|

**Privacy Sensitivity Designation**

☒ This is an **existing** outsourced service that involves sensitive PII; therefore, a PIA has been completed.
☐ This is an **existing** outsourced service that has **undergone a change** that affects privacy; therefore, a PIA has been completed.
☐ This is a **new** or existing outsourced service that does not involve any sensitive PII; therefore, no PIA required.
☐ Other (*Explain*)

**Types of PII Maintained within Outsourced Service**

☐ None
☒ Public
☐ Internal to FDIC
☐ Business Relationship with FDIC

**Privacy Act System of Records Notice (SORN) Requirements**

**Has a Privacy Act System of Records Notice (SORN) been published in the Federal Register for this outsourced service?**
☒ Yes. The applicable SORN for this outsourced service is: 30–64–0013 Insured Financial Institution Liquidation Records
☐ No. Explain why a SORN is not required:
☐ To Be Determined

**Reviewer Comments:**

14



FEDERAL DEPDSIT
INSURANCE CORPORATION
INSURING AMERICA'S FUTURE

# PRIVACY IMPACT ASSESSMENT

## Nationwide Title Clearing
## (Nationwide)

### March 2015

FDIC External Service

## Table of Contents

System Overview
Personally Identifiable Information (PII) in NATIONWIDE
Purpose & Use of Information in NATIONWIDE
Sources of Information in NATIONWIDE
Notice & Consent
Access to Data in NATIONWIDE
Data Sharing
Data Accuracy in NATIONWIDE
Data Security for NATIONWIDE
System of Records Notice (SORN)
Contact Us



## System Overview

The Federal Deposit Insurance Corporation (FDIC) maintains stability and public confidence in the nation's financial system by insuring deposits, examining and supervising financial institutions, and managing receiverships. The primary objective of the FDIC as receiver is to maximize the value of failing and/or failed insured depository institutions and their assets.

The FDIC Division of Resolutions and Receiverships (DRR) utilizes the services of Nationwide Title Clearing (Nationwide) to provide nationwide title searches and ownership reports for potential sale, marketing and/or auctions of loan asset portfolios and Owned Real Estate (ORE) property of failing or failed institutions (FIs). These services are necessary in order to determine the existence and priority of a valid security interest in a particular asset, and to confirm the current condition of title prior to selling a particular real estate asset. Assets may include ORE properties and/or secured loan interests in single-family residential, commercial, or construction properties, along with other possible product types. These reports are generated for the Program Area ORE and Legal Department to determine ownership of assets (real properties and loans) in which the FDIC may have an ownership interest, thereby determining the course of action of disposition. A title search[1] may be required on a "Full[2]," "Current Owner[3]," "Date Down[4]," or "Tax Updates[5]" search basis. Once a title order for an asset is issued, Nationwide coordinates and facilitates the following services:

  • Preparation of evidence of title through an examination or search, and generation of a historical summary in the form of a title report as permitted by local jurisdiction [e.g., a preliminary title report or title commitment (the "Report")]. As applicable, the Report lists any and all documents recorded in the public records in chronological order (newest to oldest) as are necessary, appropriate, or customary in the applicable jurisdiction within such title examination and abstract.

  • Obtaining and updating chains of title[6] including a list of all instruments that create rights, interests, or burdens on the assets. (The title search covers a sufficient period of time for the title company to determine all owners of record, outstanding mortgages, liens, judgments or pending suits, outstanding tax claims, easements or rights of ways of any type, whether oil, gas, or mineral interests have been severed, and identifying any exceptions that may cloud the title to the property interest being sold. Each full title

---

[1] A title search includes a full coverage search and limited coverage search; other types include non-insured reports and foreclosure guarantee search

[2] A "Full" title search covers at least four (4) owners or sixty (60) years, whichever results in the greatest amount of time.

[3] A "Current Owner" search verifies the current owners vested on title inland records. It shows every open mortgage found, recorded involuntary liens or financial encumbrances that could affect the property (based on the current owner), shows if the property is being foreclosed upon in land records and the last assignment of record for any open mortgage.

[4] A "Date Down" search includes a search of the property records from current owner's date of vesting rifle to the present, including complete deed information, grantees, grantors, execution and recording dates, recording references and legal description as well as all open mortgages/deed of trust.

[5] A "Tax Status Update" search includes a tax search on a specific property address, to determine the property tax status (if current or delinquent)

[6] A chain of title is the sequence of historical transfers of title to a property. The "chain" runs from the present owner back to the original owner of the property. In situations where documentation of ownership is important it is often necessary to reconstruct the chain of title. To facilitate this, a record of title documents may be maintained by a registry office or civil law notary.

**FDIC**  FEDERAL DEPOSIT
INSURANCE CORPORATION
INSURING AMERICA'S FUTURE

Nationwide Title Clearing
(Nationwide)

search covers at least 4 owners or 60 years, whichever results in the greatest amount of time.)

Nationwide is provided with a list of properties with written authorization to perform a search that will include property addresses, legal descriptions, and/or the Assessor's Parcel Numbers (APNs) for each property that is searched.

These services provide the FDIC with a clear understanding of all real properties or loans which it may have assumed ownership interest, in order to better facilitate accurate and efficient disposition.

# Personally Identifiable Information (PII) in NATIONWIDE

NATIDNWIDE collects personally identifiable Information (PII) and non PII information such as: full name, home address, Legal Documents, Records, or Notes (e.g., divorce decree, criminal records, etc.) and Assessor's Parcel Number (APN).

# Purpose & Use of Information in NATIONWIDE

The purpose of the title reports generated by Nationwide is to translate the public information into a format that can be more readily assessed by the FDIC to determine the Corporation's ownership interests in real properties and loans.

# Sources of Information in NATIONWIDE

Authorized FDIC/DRR personnel collect the full Haines, addresses, and APNs of property owners from FIs and upload this data into Nationwide's secure web portal, Tracking LINK.

Nationwide uses the authority granted by the FDIC's written authorization to conduct public records searches of the properties and loans collected from a FI. The information accessed and collected during these searches may include the property owners' full names, addresses, and any legal documents or records that may be retrieved from the courts.

# Notice & Consent

Individuals do not have the opportunity to "opt out" of providing their data and/or consenting to particular uses of their information. The PII from property and loan owners of FIs is derived from bank records in FDIC receivership; individuals do not have an opportunity to opt out or provide consent for the use of the data for these purposes. The public records searches are performed with written authorization from the FDIC, which possesses the authority to conduct inquiries on assets in receivership.).

 **FDIC** FEDERAL DEPOSIT
INSURANCE CORPORATION
INSURING AMERICA'S FUTURE

Nationwide Title Clearing
(Nationwide)

## Access to Data in NATIONWIDE

The FDIC provides authorized Nationwide personnel with data derived from FIs in order to perform the title search services. This transfer of data occurs via the TrackingLINK secure web portal. The portal is hosted on Nationwide's servers and access control is provided by Nationwide to FDIC personnel/Receivership Assistance Contractors (RACs), as well as to nationwide staff conducting the title search services that access the application via HTTPS.

The FDIC requires title reports on properties and loans from FIs to determine the ownership interest the FDIC may have. This information is uploaded into the TrackingLINK web portal by Nationwide and retrieved by authorized FDIC/DRR Asset Marketing &Management Department staff to assist in disposition of the assets in receivership.

## Data Sharing

**Other Systems that Share or Have Access to Data in the System:**

| System Name | System Description | Type of Information Processed |
|---|---|---|
| N/A | N/A | N/A |

## Data Accuracy in NATIONWIDE

Data is collected directly from individuals and/or from the failed financial institutions. As such, the FDIC and its vendors rely on the individuals and/or financial institutions to provide accurate data.

As necessary, an authorized user of the Title Search and Reporting Service checks the data for completeness by reviewing the information, verifying whether or not certain documents or data is missing, and as feasible, updating this data when required.

## Data Security for NATIONWIDE

Nationwide Title Clearing is subject to periodic compliance reviews by FDIC. Per the contract, scheduled and unannounced inspections and assessments of the Outsource Service Provider's facilities, personnel, hardware, software and its security and privacy practices by either the FDIC information technology staff, the FDIC Inspector General, or the U.S. General Accountability Office (GAO). These inspections maybe conducted either by phone, electronically or in-person, on both a pre-award basis and throughout the term of the contract or task order, to ensure and verify compliance with FDIC IT security and privacy requirements.

**FDIC** FEDERAL DEPOSIT
INSURANCE CORPORATION
INSURING AMERICA'S FUTURE

Nationwide Title Clearing
(Nationwide)

## System of Records Notice (SORN)
NATIONWIDE operates under the FDIC Privacy Act SORN, 30-64-0013, *Insured Financial Institution Liquidation Records*

## Contact Us
To learn more about the FDIC's Privacy Program, please visit:
http://www.fdic.gov/about/privacy/.

If you have a privacy-related question or request, email Privacy@fdic.gov or one of the FDIC Privacy Program Contacts.   You may also mail your privacy question or request to the FDIC Privacy Program at the following address:  3501 Fairfax Drive, Arlington, VA 22226.

